# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROSS UNIVERSITY SCHOOL OF MEDICINE and GLOBAL EDUCATION INTERNATIONAL, INC., | : Civil Action No. |
| Plaintiffs, | : |
| v. | : |
| BEHZAD AMINI, WWW.ROSSU.NET, WWW.ROSSMEDICALSCHOOL.ORG, WWW.ROSSMEDSCHOOL.COM and WWW.JOHNDOEROSSINFRINGINGSITES1-20.DOE | : |
| Defendants. | : |

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 642-1900
Facsimile: (973) 642-0099
Attorneys for Plaintiffs
Ross University School of Medicine and
Global Education International, Inc.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

      A.     The Parties .................................................................................3

      B.     The Settlement Agreement ..........................................................3

      C.     RUSM's Reputation and Goodwill in the Medical
           and Educational Communities .....................................................4

      D.     The Ross University Marks ...........................................................6

      E.     The Increasing Importance of Social Media to
           RUSM's Educational and Financial Operations ...........................7

      F.     Amini's Illegal Campaign to Undermine
           RUSM's Educational and Financial Operations ...........................8

           1.  Amini's September 21 Emails............................................8

           2.  The Bogus YouTube Account .............................................9

           3.  The September 26 Email....................................................10

           4.  The September 27 Email....................................................10

           5.  The October 7 Email.........................................................11

ARGUMENT ....................................................................................................... 13

POINT I .  THE CONTROLLING LEGAL STANDARDS......................................... 13

POINT II .  INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST........................ 14

POINT III . PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS........................... 15

      A.     Amini Plainly Has Breached Settlement Agreement................................15

      B.     Amini Clearly Has Violated the Anticybersquatting Act ..........................16

      C.     Defendants Are Diluting/Tarnishing Plaintiffs' Marks ............................21

      D.     Defendants Have Infringed Upon Plaintiffs' Trademark Rights ...............22

POINT IV . PLAINTIFF HAS SUFFERED AND WILL
              CONTINUE TO SUFFER IRREPARABLE INJURY ............................................. 23

POINT V . INJUNCTIVE RELIEF WILL CAUSE NO
UNDUE HARM TO DEFENDANTS ..................................................................... 24

POINT VI . THE IMMEDIATE TRANSFER OF THE DOMAIN
REGISTRATION SHOULD BE ORDERED
AND NO BOND SHOULD BE REQUIRED........................................................... 25

CONCLUSION.................................................................................................................... 26

FIRM:23938959v1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Blackwelder Furniture Co. v. Selig Mfg. Co., Inc.,*
  550 F.2d 189 (4th Cir. 1977) .................................................................25

*D.R. by M.R. v. East Brunswick Bd. of Educ.,*
  109 F.3d 896 (3d Cir. 1997).................................................................14

*DePinto v. Bayonne Bd. of Educ.,*
  514 F. Supp. 2d 633 (D. N.J. 2007) .....................................................13

*Elliot v. Kiesewetter,*
  98 F.3d 47 (3d Cir. 1996)......................................................................25

*Green Products Co. v. Independence Corn By-Products Co.,*
  992 F. Supp. 1070 (N.D. Iowa 1997)....................................................25

*Jews for Jesus v. Brodsky,*
  993 F. Supp. 282 (D.N.J. 1998) ..................................................... passim

*Levinson &. Axelrod, P.A. v. Heyburn,*
  2010 U.S. Dist. LEXIS 43391 (D.N.J. May 3, 2010) ...........................19

*Liquid Glass Enters., Inc. v. Dr. I. H.c.F. Porsche AG,*
  8 F. Supp. 2d 398 (D.N.J. 1998) ...........................................................23

*Lone Star Steakhouse & Saloon v. Alpha of Va.,*
  43 F.3d 922 (4th Cir. 1995) ..................................................................23

*Lucas Nursery & Landscaping Inc. v. Grosse,*
  359 F.3d 806 (6th Cir. 2004) ......................................................18, 19, 20

*Mayflower Transit, L.L.C. v. Prince,*
  314 F. Supp. 2d 362 (D.N.J. 2004) ..................................................19, 20

*Morrison & Foerester LLP v. Wick,*
  94 F. Supp. 2d 1125 (D. Colo. 2000)................................................18, 19

*Otero Savings and Loan Association v. Board of Governors of Fed. Reserve,*
  497 F. Supp. 370 (D. Colo. 1980).........................................................14

*Panavision Int'l v. Toeppan,*
  141 F. 3d 1316 (9th Cir. 1998) .............................................................22

FIRM:23938959v1

*Planned Parenthood Fed'n of Am. v. Bucci*,
    1997 U.S. Dist. LEXIS 3338 (S.D.N.Y. Mar. 24, 1997) .......................................................21

*Playboy Enterprises International, Inc. v. Global Site Designs, Inc.*,
    1999 WL 311707 (S.D. Fla. May 15, 1999) .......................................................25

*Saudi Basic Industries Corp. v. Exxon Corp.*,
    364 F. 3d 106 (3d Cir. 2004).......................................................15

*Telebrands Direct Response v. Ovation Com.*,
    802 F. Supp. 1169 (D.N.J. 1992) .......................................................24

*Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*,
    212 F.3d 157 (3d Cir. 2000).......................................................21

*Toronto-Dominion Bank v. Karpacher*,
    188 F. Supp. 2d 110 (D. Mass. 2002) .......................................................18, 19, 20

*USA Technologies, Inc. v. Tirpak*,
    2012 U.S. Dist. LEXIS 72318 (E.D. Pa. May 24, 2012) .......................................................16

*Vuitton v. White*,
    945 F.2d 569 (3rd Cir. 1991) .......................................................13

*Winer v. Senior Living Guide, Inc.*,
    2013 U.S. Dist. LEXIS 44371 (E.D. Pa. Jan. 17, 2013) .......................................................19

*World Sport Networks Limited v. Artinternet S.A.*,
    2000 WL 5199 (E.D. Pa. Jan 5, 2000) .......................................................25

## Statutes

15 U.S.C. § 1051 *et seq.*.......................................................2

15 U.S.C. § 1125(d)(1)(A) .......................................................17

15 U.S.C. § 1125(d)(1)(B)(i) .......................................................17

15 U.S.C. § 1125 *et seq.*.......................................................2

FIRM:23938959v1

## PRELIMINARY STATEMENT

Plaintiffs Ross University School of Medicine ("RUSM") and Global Education International, Inc. ("Global Education International") respectfully submit this memorandum of law in support of their application for a temporary restraining order and preliminary injunction against defendants Behzad Amini, www.RossU.net, www.RossMedicalSchool.org, www.RossMedSchool.com and www.JohnDoeRossInfringingSites1-20.doe.

This action arises out of Amini's campaign to disparage, discredit and disrupt the operations of RUSM, the medical school from which he was permitted to voluntarily withdraw last year as part of the settlement of a grievance filed against him by a fellow RUSM student. In the past, Amini has launched a series of public attacks on RUSM, recklessly asserting allegations of wrongdoing against its senior administrators and making baseless accusations regarding the school's fiscal integrity and the quality of its educational programs. RUSM has ignored Amini's hostile outbursts to date, dismissing them as the emotional reactions of a disgruntled former student.

In recent weeks, however, Amini has significantly escalated his efforts to undermine RUSM's educational and financial operations. In clear violation of federal and state laws, as well as his own contractual obligations, Amini admits to having established a network of as many as twenty bogus websites named and specifically designed to confuse prospective RUSM students, members of the medical education community and the general public and drive them to what they assume are RUSM-controlled and authorized websites. In fact, those websites are controlled by Amini and serve as the platform from which he has continued to launch wildly inaccurate allegations regarding RUSM and shameful personal attacks on its senior administrators -- going so far as to accuse these highly credentialed medical educators of engaging in criminal conduct.

1

Plaintiffs seek redress against Amini, as well as www.RossU.net, www.RossMedicalSchool. org, www.RossMedSchool.com and www.JohnDoeRoss InfringingSites1-20.doe (the "Offending, Infringing Sites"), for Amini's breach of contract; clear violation of plaintiffs' trademark rights under 15 U.S.C. § 1051 *et seq.*; violation of the Lanham Act, 15 U.S.C. § 1125 *et seq.*; and violation of New Jersey unfair competition laws.  As to defendants' violation of the federal Anticybersquatting Act and infringement of plaintiffs' trademark rights, Amini admittedly has set up and controls websites named www.RossU.net, www.RossMedicalSchool.org and  www.RossMedSchool.com.  Each of these bogus websites is a Uniform Resource Locator ("URL") -- *i.e.*, web address or Internet address -- infringing upon and, confusingly similar to, plaintiffs' registered trademarks, including but not limited to U.S. Reg. Numbers 3098546, 3043741, and 3237762 ("Ross University Marks").  These marks are incorporated into RUSM's legitimate websites such as www.RossU.edu, www.RossMed.edu, and www.RossUniversity.net ("Ross University Websites").

Amini's most recent attempt to undermine RUSM's educational and financial operations plainly crosses the line, poses a grave and immediate threat to RUSM's educational and financial operations and must be enjoined.  Moreover, in his drive to pillory RUSM and its administrators, Amini also has trampled over the non-disparagement provision of the settlement agreement through which he was permitted to voluntarily withdraw from RUSM.

In their Verified Complaint, plaintiffs assert a breach of contract claim, as well as claims under the Anticybersquatting Consumer Protection Act, Trademark Dilution Act, Lanham Act and related state laws.  They seek preliminary and permanent injunctive relief, monetary damages, attorneys' fees and costs, and such additional relief as this Court deems appropriate.

2

## STATEMENT OF FACTS

### A.    The Parties

RUSM is one of the world's largest providers of medical education.  Its campus is

located in the Caribbean country of Dominica.  RUSM's administrative offices are located in

North Brunswick, New Jersey and in Miramar, Florida.  Global Education International is the

registered owner of Ross University's registered trademarks, U.S. Reg. Numbers 3098546,

3043741 and 3237762, licensed exclusively for use in promoting RUSM and affiliated

institutions.  *See* Verified Complaint, ¶¶ 15-19.

Amini is an embittered former RUSM student.  In 2012, Amini entered into a

settlement agreement that allowed him to voluntarily withdraw from RUSM rather than face a

grievance proceeding triggered by a complaint filed against him by a fellow student.  Amini is

also the admitted owner and person in control over www.RossU.net, as well as approximately 20

other websites incorporating domain name elements confusingly similar to the Ross University

Marks, including the bogus websites www.RossMedicalSchool.org and www.Rossmedschool

.com.  *Id.*, ¶¶ 20-23.[1]

### B.    The Settlement Agreement

Amini commenced his studies at RUSM in January 2009.  On September 21,

2011, an RUSM student filed an internal grievance against Amini.  RUSM's Grievance

Committee was scheduled to hear the complaint against Amini on February 11, 2012.  On

February 10, 2012, RUSM and Amini entered into a Settlement Agreement with Mutual

Releases ("Settlement Agreement").  (A copy of the Settlement Agreement is attached as Exhibit

---

[1] The offending websites themselves are defendants *in rem*.  Defendants www.RossU.net,
www.RossMedicalSchool.org, and www.RossMedSchool.com are operating websites that Amini has identified in
correspondence and admittedly controls.  Defendants www.JohnDoeRossInfringingSites1-20.doe are fictitiously
named defendants representing the additional websites that Amini has referenced, but not specifically identified, in
recent correspondence.  *See* Verified Complaint, ¶¶ 22, 24.

B to the Verified Complaint.)  The complaining student also was a party to the Settlement

Agreement, as was a witness who was scheduled to testify against Amini at the grievance

hearing. *Id.*, ¶¶ 25-28.

As part of the settlement, the complaining student withdrew his grievance, the

hearing was cancelled and Amini was permitted to "voluntarily and irrevocably withdraw as a

student of RUSM."  The settling parties agreed that Amini's withdrawal "shall be deemed to

have been effected for personal reasons[.]"  *Id.*, ¶¶ 29-30.  In Section 4.18 of the Settlement

Agreement, Amini agreed to refrain from disparaging RUSM:

> Amini shall not directly or indirectly say, write or
> do anything that would disparage, reflect
> negatively upon or otherwise call into question
> RUSM's business operations, products, services,
> integrity, reputation or business relationships, or
> the business operations, products, services,
> integrity, reputation or business relationships of
> any of the releasees identified above in Section 1.1,
> except as may be required by law.

*Id.*, ¶ 31.  This non-disparagement provision covered a broad category of individuals and entities

affiliated with RUSM and affiliated persons and entities.  At Section 4.18, Amini and the other

parties agreed "that any violation of [the non-disparagement provision] shall constitute a material

breach of this Settlement Agreement for which the harmed party will have no adequate remedy

of law." *Id.*, ¶¶ 32- 33.

## C. RUSM's Reputation and Goodwill in the Medical and Educational Communities

Each year, thousands of qualified aspiring medical students who plan one day to

practice in the United States elect to attend a Caribbean medical school to obtain their medical

degree.  As one of the premier Caribbean medical schools, RUSM plays a critical role in meeting

4

the strong demand for physicians in the United States that is projected to continue increasing in the future. *Id.*, ¶¶ 37-38.

RUSM is a fully accredited medical school whose graduates are eligible to practice medicine in all 50 states.  RUSM students are eligible to participate in the Ford Federal Direct Loan Program, commonly known as Title IV.  This eligibility reflects the United States government's recognition that RUSM is one of a select group of international medical schools that provide a quality medical education and play a critical role in supplying medical professionals qualified to meet the growing demand for physicians in the United States. *Id.*, ¶¶ 39-43.

RUSM students complete a four-semester course of study (about two years) in Dominica.  Following an additional semester of study either in Dominica, Florida or Michigan, RUSM students who successfully complete Step 1 of the U.S. Medical Licensing Examination continue on to complete the remainder of the curriculum by participating in clinical rotations at one or more of the 49 hospitals and medical centers in the United States, Canada and the United Kingdom affiliated with RUSM for this purpose.  Student performance on the Step 1 exam is universally accepted as a key metric for gauging the quality of a medical school's educational program.  In 2013, RUSM's first-time pass rate on the Step 1 was 96 percent -- on a par with the rate posted by its peers in the United States, and superior to the results achieved by osteopathic schools in the United States and other international schools. *Id.*, ¶¶ 44-45.

The majority of RUSM's students are residents of the United States or Canada who plan to practice medicine in those countries upon completing their medical education. RUSM has graduated more than 10,000 physicians since 1978.  Its alumni currently are practicing in all 50 states.  In the last five years, RUSM graduates obtained more first year

5

residency positions at United States teaching hospitals than graduates from any other medical school in the world -- including those schools located in the United States.  These residency appointments have been in virtually every medical specialty and subspecialty.  *Id.*, ¶¶ 46-48.

### D.    The Ross University Marks

As part of their commitment to maintaining and protecting RUSM's goodwill in the medical and educational communities and elsewhere, plaintiffs have registered the Ross University Marks and others.  *Id.*, ¶ 49.  For example, U.S. Reg. Numbers 3098546 and 3043741 are word marks "Ross University" covering educational services, namely, conducting continuing education courses of instruction in the fields of medicine and veterinary medicine; printed instructional materials for use, among other things, in the fields of medicine and veterinary medicine; and conducting courses of instruction in the fields of medicine and veterinary medicine, all with dates of first use in 1978.  *Id.*, ¶¶ 50-51.

U.S. Reg. Number 3237762 is a mark incorporating a design plus words, letters, and/or numbers .  It covers computer software and prerecorded audio and video tapes and CD-ROMs for use in, among other things, conducting continuing education instruction for the health care profession in the fields of medicine and veterinary medicine (with date of first use in 1981); printed instructional materials for use in conducting courses of instruction for continuing education in the fields of medicine and veterinary medicine (with date of first use in 1982);  and educational services, namely, conducting continuing education courses of instruction in the fields of medicine and veterinary medicine and conducting courses of instruction for the training of medical and veterinary assistants. (with date of first use in 1982).  *Id.*, ¶ 52.

Plaintiffs have also registered U.S. Reg. Numbers 3994130 and 4262006, mark incorporating a design plus words, letters, and/or numbers for DEDITA SCIENTIAE MEDENDI

ROSS UNIVERSITY V.  These marks cover career placement services, consulting services and educational services.  *Id.*,¶ 53.

The public readily identifies these trademarks, whether statutory or common law in origin, with RUSM and its educational services.  Additionally, plaintiffs have registered numerous domain names incorporating the Ross University Marks, including www.RossU.edu, www.RossMed.edu and www.RossUniversity.net.  The Ross University Marks are famous marks that have an inherent or acquired distinctiveness, having been used over a long period of time in association with RUSM's services, advertising, and related matters.  Plaintiffs and their affiliated educational institutions historically have vigorously defended against the infringement of its trademarks, service marks and copyrights.  *Id.*, ¶¶ 54-57.

### E.     The Increasing Importance of Social Media to RUSM's Educational and Financial Operations

Internet marketing and RUSM's web presence accessible through the Ross University Websites comprise a vital point of initial and subsequent contact with prospective and current students, current and prospective faculty, alumni, members of the medical education community and the general public.  The importance of Internet marketing to RUSM's educational and financial operations has become increasingly pronounced.  The Internet and social media are the primary vehicle by which RUSM attracts applicants and enrolls the most qualified students each year.  Accordingly, RUSM has shifted substantial funds in its marketing budget from print to digital advertising.  *Id.*, ¶¶ 58-60.

In the last year alone, RUSM has experienced a 71 percent increase in "social referrals."  Social referrals are those instances in which prospective students are introduced to RUSM because YouTube, Facebook or Twitter has directed them eventually to a Ross University Website, and from there to RUSM's admissions staff.  The emergence of social

FIRM:23938959v1

networking sites such as Facebook, Twitter and YouTube as platforms for both social interaction and the exchange of information make these sites critical to the effective marketing of educational institutions. *Id.*, ¶¶ 61-62.

**F.      Amini's Illegal Campaign to Undermine
RUSM's Educational and Financial Operations**

**1.      Amini's September 21 Emails**

In violation of federal and state laws, and in plain contravention of his non-disparagement obligations under the Settlement Agreement, Amini in recent weeks has taken direct aim at the Internet and social networking infrastructure so vital to RUSM's educational and financial operations.  On September 21, 2013, for example, Amini transmitted a highly inflammatory email replete with false allegations regarding RUSM and its administration.  The email, carrying the subject line "Ross University websites," was addressed to nearly 70 individuals.  The majority of these recipients hold senior positions at affiliated hospitals in the United States at which RUSM students complete their clinical rotations and/or residencies.  As Amini knows from his experience at RUSM, RUSM's relationships with these affiliated hospitals are absolutely critical to the continued success of the school's clinical program as well as RUSM's financial performance.  In the email, Amini claimed that an article he attached demonstrated that "Ross University had defrauded [the] government, tax-payers, and students." Further, Amini stated, the article reported "that administrators of Ross University, including [Dean] Joseph Flaherty, are [a] bunch of crooks."  The article he attached supported neither of these allegations. *Id.*, ¶¶ 64-67.

Also on September 21, 2013, Amini sent a second email to the same group of recipients targeted by his initial email earlier in the day.  Therein, Amini referenced "corruption by Ross officials."  Further, he alleged that "Ross University continues with defrauding tax-

FIRM:23938959v1

payers, students, and the US government." Amini also stated that "Ross continues to rape-off US taxpayers hundreds of millions of dollars[.]" In addition, Amini referred to "Ross University getting away with defrauding tax-payers[.]" Amini further alleged that "Ross University is a corrupt institution who rape off taxpayers and students." RUSM's Dean Flaherty and other administrators, he stated, are a "bunch of crooks." *Id.*, ¶¶ 68-71.

### 2.   The Bogus YouTube Account

On or about September 25, 2013, Amini created a bogus YouTube account, www/youtube.com/user/RossUniversity/videos. He then wrongfully downloaded to the account in excess of 160 videos obtained improperly through the internal online platform RUSM uses to permit students to view class lectures and presentations using their web browser. The videos captured on the bogus YouTube account date back to 2012 or earlier -- *i.e.*, when Amini was still enrolled at RUSM. The account also reflected a sham "About RossUniversity [sic]" page that disparages the school as "a debt trap." Most significantly, the YouTube page shows that this bogus page of disinformation and disparagement already has been accessed and viewed over 4,600 times. *Id.*, ¶¶ 72-75.

For marketing and other purposes, many universities and colleges, including RUSM, maintain official YouTube "channels" which are supervised and monitored by the schools. These channels provide prospective students with informational videos relating to, among other things, admissions criteria and procedures. Amini's bogus YouTube site strives to confuse and misinform prospective students and others seeking the official page of RUSM's YouTube channel. Further, the bogus "About RossUniversity" YouTube page has hyperlinks to the Offending, Infringing Sites, thereby subjecting those persons interested in actual RUSM websites to further confusion as to the source, sponsorship, or affiliation of the websites. *Id.*, ¶¶ 76-77.

9

### 3.    The September 26 Email

On the morning of September 26, 2013, Amini sent another email to some 70 individuals, many of whom -- once again -- are representatives of hospitals in the United States affiliated with RUSM.  Therein, Amini wrote:

> Please Visit my new Website (it is still under development as I am adding contents more and more):  http://www.RossU.net[.]  I am also publishing another 20 websites against Ross University, including http://www.RossMedicalSchool.org, http://www.RossMedSchool.com.

*Id.*, ¶ 78.  Amini's wrongful infringement on Ross University's Marks goes well beyond the creation of a single so-called "gripe site."  Amini boasts of having registered <u>at</u> <u>least</u> <u>twenty</u> domain names intended to cause mass confusion as to the source, sponsorship or affiliation of the websites in question.  These Offending, Infringing sites are in direct competition with the official Ross University Websites.  *Id.*, ¶ 79.

### 4.    The September 27 Email

On September 27, 2013, Amini forwarded from info@rossu.net the following email to more than 300 recipients:

> As we promised you, we will update you with any updates to our website.  We just added the content relating to administration of Ross University and you can view it at http://rossu.net/Ross-University-administration[.]
>
> It provide[s] you [with] an insight on how this corrupt institution is administered and the corrupt objective
>
> I think someone should file a lawsuit against department of education giving millions of dollars of taxpayers money to these involve

> My next project is to call every single medical
> board and any hospital associated with this
> organization to informed [sic] about Ross.  And
> yes, [Dean] Joseph Flaherty is a crook,
>
> Enjoy!

*Id.*, ¶ 81.

### 5.      The October 7 Email

On October 7, 2013, Amini forwarded from info@rossu.net the following email

to some 240 recipients:

> Subject: More bad news for Ross University/Devry
> in coming weeks.  Http://RossU.net is 100%
> complete. If you have any comment, please email
> me back. More bad news for Ross
> University/Devry Inc. in coming weeks.
>
> :)

*Id.*, ¶ 82. The RossU.net link is a close, near identical URL to RUSM's own RossU.edu, and

could easily be mistaken as one in the same by Internet users searching for information regarding

RUSM from a legitimate source.  *Id.*, ¶ 83.  But at the bogus RossU.net site, an Internet user

finds a site stating that RUSM operates on a "corrupt business & educational model" and is

"masquerading" as an educational institution with "no accountability & no oversight."  Further,

the site www.RossU.net advocates for DeVry investors to "dump" their DeVry stock --

presumably in the hope of inflicting grave financial harm on RUSM and other DeVry entities.

*Id.*, ¶¶ 84-85.

The site contains such commentary as:

- "DeVry, AUC and Ross are shady, corrupt institutions,
  shareholders should dump this stock, congress should
  reevaluate providing loan funds to these corporations that
  take advantage of students and do not provide adequate
  services or even what they advertise."

- "I call DeVry, Phoenix and others as dream merchants and should be shut down."

*Id.*, ¶¶ 86-87.  This initial "home" page then links to numerous other pages containing

disparaging, untrue and misleading statements concerning RUSM, its administration and its

faculty.  *Id.*, ¶ 88.

      In amassing and using such registrations confusingly similar to the Ross

University Marks, Amini is acting with a bad faith intent to gain advantage from the plaintiffs'

marks.  Indeed, Amini is not only appropriating the Ross University Marks in the Offending,

Infringing Sites but also is using them to leach off the extensive efforts that RUSM has

undertaken since 1978 to give currency to its name and to disseminate its services, which is

evidence of bad faith use and registration.  Amini's professed intent is to intercept and divert

"perspective [sic] students with an opportunity to have access to actual data in order to make

better decisions before falling into a trap!," *Id.*, ¶¶ 92-97.

      Amini's use of the Ross University Marks in his URLs is also likely to prevent

some Internet users from reaching RUSM's own Internet website.  Persons interested in

information regarding RUSM, including prospective students, who mistakenly access Amini's

bogus web sites may fail to continue to search for RUSM's own home page, due to confusion,

frustration, or the belief that RUSM's legitimate home page does not exist.  Bogus websites

masked as, or suggesting a connection by name as, real RUSM sites have the potential to

devastate and damage RUSM's goodwill because first impressions are critical when a

prospective student is conducting his/her due diligence.  *Id.*, ¶¶ 99-101.  Indeed, Amini himself

states that within the next few weeks "many of my websites against Ross University will hit the

web, **in all the top search engines, parked next to Ross University!**," – i.e., so as to increase

the likelihood that they will be mistakenly accessed by those looking for the actual Ross

University sites. *Id.*, ¶ 102. (emphasis added).

## ARGUMENT

### POINT I.

### THE CONTROLLING LEGAL STANDARDS

In determining whether to enter temporary restraints or a preliminary injunction,

courts consider four factors:

> (1) whether the movant has a reasonable probability of success on
> the merits; (2) whether the movant will be irreparably harmed by
> denying the injunction; (3) whether there will be greater harm to
> the nonmoving party if the injunction is granted; and (4) whether
> granting the injunction is in the public interest.

*DePinto v. Bayonne Bd. of Educ.*, 514 F. Supp. 2d 633, 636 (D. N.J. 2007) (citing *Sypniewski v.*

*Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 252 (3d Cir. 2002). With respect to claims

alleging violations of the Lanham Act, which encompasses the Anticybersquatting Act, courts

routinely respond "to these bad faith tactics by granting ex parte interim relief" in the form of

temporary restraining orders. *Vuitton v. White*, 945 F. 2d 569, 571 (3rd Cir. 1991).

As demonstrated below, plaintiffs' application passes muster under the controlling

four-pronged standard and injunctive relief should be entered.  Amini has no intention of

voluntarily ceasing his improper activities.  Plaintiffs have formally demanded in writing that

Amini cease and desist in these activities.  Amini acknowledged receipt of the demand but

advised that he had no intention of complying. *See* Verified Complaint, ¶ 103.  Accordingly,

plaintiffs respectfully request that the Court temporarily restrain defendants during the pendency

of this application and then preliminarily enjoin them for the duration of this litigation.

FIRM:23938959v1

## POINT II.

## INJUNCTIVE RELIEF
## <u>WILL SERVE THE PUBLIC INTEREST</u>

Enjoining Amini's malicious campaign to undermine RUSM's financial and educational operations through his network of bogus and infringing websites would plainly further the public interest. The public has a right not to be deceived or confused by the improper use of another's mark, and injunctive relief is an appropriate means of preventing such deception and confusion. *See Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 312-313 (D.N.J. 1998) (granting relief court notes "the issuance of an injunction will protect the public from the deceptive and confusing use of the Mark and Name of [plaintiff]), *aff'd*, 159 F.3d 1351 (3d Cir. 1998); *Otero Savings and Loan Association v. Board of Governors of Fed. Reserve*, 497 F. Supp. 370, 374 (D. Colo. 1980) (public interest served by granting of a preliminary injunction where there was a likelihood of consumer confusion). The Anticybersquatting Consumer Protection Act ("ACPA") reflects a strong Congressional intent that the public not be misled by precisely the kind of website shell game Amini is playing here. It was enacted to "protect consumers and American businesses . . . by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks – a practice commonly referred to as 'cybersquatting.'" S. Rep. No. 106-140, at 4 (1999).

The public interest also would be served by an injunction enforcing the non-disparagement provision of the Settlement Agreement. Settlement agreements "are encouraged as a matter of public policy because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by courts." *D.R. by M.R. v. East Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997). Courts should grant injunctive relief to enforce a settlement

FIRM:23938959v1

agreement when a party to the agreement has failed to live up to its end of the bargain. *See Saudi Basic Industries Corp. v. Exxon Corp.*, 364 F. 3d 106, 112 (3d Cir. 2004).

## POINT III.

### PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

**A.** **Amini Plainly Has Breached Settlement Agreement**

Amini's numerous and very public diatribes against RUSM provide a compelling basis for the breach of contract claim asserted in Count I. As part of a negotiated settlement, in which he was represented by counsel, Amini freely agreed to certain clearly defined and entirely reasonable restrictions on what he could say and do following the parties' execution of the Settlement Agreement. In exchange for both being spared the need to defend himself against a fellow student's grievance, and being permitted to voluntarily withdraw from RUSM, Amini agreed to refrain from disparaging RUSM. Amini has now done precisely what he promised he would not do. He does not have that luxury.

It cannot be disputed that in recent weeks, Amini has:

- accused RUSM, its Dean and other administrators of being a "bunch of crooks";

- referred to "corruption by Ross officials";

- asserted that "Ross University continues with defrauding tax-payers, students and the US government";

- alleged that "Ross continues to rape-off US taxpayers hundreds of millions of dollars";

- described Ross University as "a corrupt institution";

- maligned RUSM administrators as "criminals";

- maintained that RUSM operates on a "corrupt business and educational model" and is "masquerading" as an educational institution with "no accountability and no oversight";

15

- described RUSM and its affiliated institutions as "shady, corrupt institutions[.]"

*See* Verified Complaint, ¶¶ 63-88.  Amini's flagrant breach of his non-disparagement obligations provides a rock-solid basis for injunctive relief.  *See USA Technologies, Inc. v. Tirpak,* 2012 U.S. Dist. LEXIS 72318, at *14 (E.D. Pa.  May 24, 2012) (temporary restraints and preliminary injunction appropriate where defendant was violating a non-disparagement clause contained in parties' settlement agreement).

**B.**    **Amini Clearly Has Violated the Anticybersquatting Act**

Based on Amini's admitted attempt to confuse the public through his network of bogus websites, plaintiffs have a strong likelihood of success on the merits of the anticybersquatting claim asserted in Count II.  Under the ACPA:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person--
>
> (i)    has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
> (ii)    registers, traffics in, or uses a domain name that --
>
> (I)    in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>
> (II)    in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
>
> (III)    is a trademark, word, or name protected by reason of section 706 of title 18, United States Code, or section 220506 of title 36, United States Code.

FIRM:23938959v1

15 U.S.C. § 1125(d)(1)(A).  There is no question that in bad faith Amini has attempted to profit from, or tarnish or disparage, the Ross University Marks. The infringing domain names are, of course, by design virtually identical to the Ross University Marks and the Ross University Websites.  *See Shields,* 254 F.3d at 483.

The ACPA includes nine factors relevant to determining whether a defendant chose a domain name with the bad faith intent necessary to sustain a claim under the statute.[2] *See* 15 U.S.C. § 1125(d)(1)(B)(i).  These factors, viewed collectively and under the totality of the circumstances presented here, compel the conclusion that Amini has acted with the requisite degree of bad faith to give rise to an anticybersquatting claim.

Here, no part of Amini's name nor any reference to Amini is contained within the domain names at the Offending, Infringing Sites.  Just as in *Jews for Jesus*, 993 F. Supp. 282,

---

[2]These non-exclusive and non-mandatory factors include:

(I)   the trademark or other intellectual property rights of the person, if any, in the domain name;

(II)  the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)  the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)   the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)  the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)  the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

17

Amini is a website operator who has purposely selected an infringing domain name and calculatedly excluded from that domain name anything that would reveal the content or sponsor of the website as anyone but RUSM.  Further, Amini admittedly has structured his network of bogus websites so that the confusing similarities in domain names will occasion mistaken choices by those seeking information regarding RUSM from one of the official RUSM websites. Further, the sheer volume of Offending, Infringing Sites -- perhaps twenty or more -- illustrates Amini's bad faith.  This is not, like *Lucas Nursery & Landscaping Inc. v. Grosse*, 359 F.3d 806 (6th Cir. 2004), or *Jalin Realty Capital Advisors*, 917 F. Supp. 2d 927 (D. Minn. 2013), a case in which a person with a gripe registered a single domain name to air consumer complaints. Rather, it is case much more like *Toronto-Dominion Bank v. Karpacher*, 188 F. Supp. 2d 110 (D. Mass. 2002), and *Morrison & Foerester LLP v. Wick*, 94 F. Supp. 2d 1125 (D. Colo. 2000), discussed below at pages 19-20.  In these cases, as here, multiple infringing sites were registered as part of a campaign specifically designed to inflict consumer confusion.  As in *Toronto-Dominion,* there can be "no dispute that [defendant] has acted with the intent to 'tarnish or disparage' the [plaintiffs'] mark." 188 F. Supp. 2d at 114.  Nor is there any question that the Ross University Marks wrongfully incorporated into Amini's bogus websites are distinctive and famous, as more than five years have passed since their registration.  In addition, Amini has not denied that the Offending, Infringing Sites are his.  To the contrary, Amini has boasted that the offending websites are his. *See* Verified Complaint, ¶¶ 78, 81, 82, Exhibits A, D, F, G.  Equally clear is the fact that Amini has not registered these bogus sites in his name.

While Amini might be expected to maintain that he is using the bogus domain names for a bona fide noncommercial purpose, that predictable justification is entirely without merit under the circumstances presented here.  The courts have found a commercial purpose

18

where, as here, the conduct of the defendant "was designed to harm the Plaintiff Organization by disparaging it and preventing the Plaintiff Organization from exploiting the Mark and the Name of the Plaintiff Organization." *Jews for Jesus,* 993 F. Supp. at 282, 307; *see also Levinson & Axelrod, P.A. v. Heyburn,* 2010 U.S. Dist. LEXIS 43391, at **9-12 (D.N.J. May 3, 2010) (complaint raised plausible allegations that defendant used domain name to "tarnish the goodwill associated with [plaintiff's] name"); *Winer v. Senior Living Guide, Inc.,* 2013 U.S. Dist. LEXIS 44371, at *23 (E.D. Pa. Jan. 17, 2013) (disparaging statements and disparaging photos of plaintiff point to an inference of bad faith); *Morrison & Foerester LLP,* 94 F. Supp. 2d at 1131 (holding that the use of a law firm's trademark in domain name would confuse the public and was designed to disparage the firm).[3]

Any claim of good faith by Amini is belied by his admitted registration of at least twenty domain names nearly identical to the Ross University Marks. Indeed, federal courts have noted that the collection and hoarding of confusingly-similar domain names cuts against the contention that a defendant was merely using the domain names as a forum to express consumer criticism. *See, e.g., Toronto-Dominion,* 188 F. Supp. 2d at 114; *cf. Lucas Nursery,* 359 F.3d at 810-11; *Mayflower Transit, L.L.C. v. Prince,* 314 F. Supp. 2d 362, 371 (D.N.J. 2004). Indeed, the multiplicity of offending domain names here is prima facie evidence that Amini's sole purpose is to create consumer confusion and tarnish the goodwill associated with RUSM's marks. *Id.* In *Toronto-Dominion,* for example, defendant purchased sixteen domain names that were composed of various misspellings of the bank's mark. The sole purpose of the infringing websites was to provide defendant a forum for critical and disparaging commentary on the bank. Despite the absence of any evidence that defendant attempted to sell the domain names to the

---

[3] "The exception for non-commercial use of a famous mark is intended to prevent courts from enjoining constitutionally protected speech. That is, the exclusion encompasses conduct such as parodies and consumer product reviews." *Jews for Jesus v. Brodsky,* 993 F. Supp. 282, 307 (D.N.J. 1998)

bank, the court held that "[c]onfusion was [defendant's] sole purpose in selecting the domain names. *Id.* at 114. Further, the court noted that "there is no dispute that [defendant] acted with the intent to tarnish the [bank's] mark." *Id.* Not surprisingly, the Sixth Circuit in *Lucas Nursery* and the district courts in *Jalin Real* and *Mayflower Transit* cited to *Toronto-Dominion* in discussing whether the defendant in that case had acted in bad faith in establishing a single site. The *Lucas Nursery* court found that the defendant there did not act in bad faith because "[defendant] did not register multiple web sites; she only registered one." *Lucas Nursery*, 359 F.3d at 811. Clearly, Amini's admitted registration of at least <u>twenty</u> domain names is fatal to any argument that he is using these websites for a bona fide noncommercial purpose. Rather, Amini's sole purpose, like that of the defendant in *Toronto-Dominion*, is to confuse prospective students and other interested parties and tarnish the goodwill associated with the Ross University Marks.

Furthermore, in opining on the commercial nature of a defendant's website, the court in *Jews for Jesus* noted that such a site:

> provides Internet users with competing and directly opposing information, but also prevents those users from reaching plaintiff and its services and message. *In that way, defendant's use is classically competitive: he has taken plaintiff's mark as his own in order to purvey his Internet services--his web site--to an audience intending to access plaintiff's services.*

*Id. (quoting Planned Parenthood Fed'n of Am. v. Bucci*, 1997 U.S. Dist. LEXIS 3338, at *6 (S.D.N.Y. Mar. 24, 1997) (emphasis in original). Indeed, as with the defendant in *Jews for Jesus*, Amini "has been publicly vocal about his intent and purpose in registering and using his domain name." 993 F. Supp. at 304. Amini has boasted, "[M]any of my websites against Ross University will hit the web, in all the top search engines, parked next to Ross University!"

20

Verified Complaint, ¶ 102, Exhibit D. *Jews for Jesus, Levinson*, and *Winer* illustrate that such conduct should be enjoined.

### C.  Defendants Are Diluting/Tarnishing Plaintiffs' Marks

Pursuant to Section 43(c) of the Lanham Act, the owner of a famous mark is entitled to an injunction against another person's commercial use and commerce of the trademark if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark. *See* 15 U.S.C. § 1125(c). To demonstrate trademark dilution, a party must prove (1) it is the owner of a mark that is "famous," (2) the defendant is making commercial use of the mark in interstate commerce, (3) the defendant began using the mark after it became famous, and (4) the defendant's use "causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods and services." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.,* 212 F.3d 157, 163 (3d Cir. 2000). With respect to the second element, courts routinely have held that the establishment of a home page on the Internet satisfies the Lanham Act's "in commerce" requirement. *See, e.g., Planned Parenthood,* 1997 U.S. Dist. LEXIS 3338 at **11-12.

The Ross University Marks are highly distinctive and have acquired a high degree of recognition through a long history of the use of the mark in commerce. Further, plaintiffs have spent vast amounts of money to promote RUSM both in the United States and beyond. The Ross University Marks have a high degree of recognition in the medical and educational communities and, of course, they have long been registered. Any contention to the contrary is simply not credible. As the court noted in *Jews for Jesus*, "if [defendant] were all allowed to use [the infringing domain name], [plaintiff's] name and reputation would be at [defendant's] mercy . . . and could be associated with an unimaginable amount of messages on [defendant's] webpage." 993 F. Supp. at 307 (quoting *Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227, 1240

21

(N.D. Ill. 1996). Amini's conduct plainly runs afoul of the Lanham Act because his conduct dilutes plaintiffs' marks through their use in association with his bogus and deceitful websites. *Id.* Thus, any argument that defendants' use of the Infringing, Offending Sites does not dilute the Ross University Marks is wholly without merit and plaintiffs have established the likelihood of success on their claim asserted at Count III of the Verified Complaint.

### D. Defendants Have Infringed Upon Plaintiffs' Trademark Rights

To show a likelihood of success on the merits of a trademark infringement claim, a plaintiff must demonstrate that the mark is valid and legally protectable; the mark is owned by the plaintiff; and use of the mark by the defendant is likely to create confusion among the relevant consumers. *Jews for Jesus,* 993 F. Supp. at 294-295. Amini cannot credibly argue that plaintiffs have not satisfied the first two elements of the trademark claim asserted in Count IV of the Verified Complaint. With respect to the third element, Amini's rogue use of the Ross University Marks has caused, and absent injunctive relief will continue to cause, confusion among prospective students and other interested parties seeking accurate and reliable information regarding RUSM through the Ross University Websites. *See supra* at 18-21. Undoubtedly, many potential RUSM applicants will never reach the legitimate RUSM websites due to the confusion generated by Amini's bogus sites.

Indeed, as the Ninth Circuit has noted, "prospective users of plaintiff's services who mistakenly access defendants' website may fail to continue to search for plaintiff's own homepage, due to anger, frustration, or the belief that plaintiff's homepage does not exist." *Panavision Int'l v. Toeppan,* 141 F. 3d 1316, 1327 (9th Cir. 1998). Erecting such a dead-end and generating levels of frustration and confusion are Amini's primary goals in registering and controlling the sites. Thus, his use of the bogus sites infringe plaintiffs' marks.

FIRM:23938959v1

## POINT IV.

## PLAINTIFF HAS SUFFERED AND WILL <u>CONTINUE TO SUFFER IRREPARABLE INJURY</u>

The irreparable nature of the harm defendants' wrongful conduct is causing

RUSM is clear.  Not only are prospective students and others interested in RUSM being

wrongfully diverted to the defendants' bogus websites and domain names, but they are then left

stranded at the illegitimate sites and frustrated in their attempt to access the Ross University

Websites.  This is inexcusable and clearly constitutes irreparable harm to plaintiffs and the

public.  *Lone Star Steakhouse & Saloon v. Alpha of Va.*, 43 F.3d 922, 939 (4th Cir. 1995)

("irreparable injury regularly follows from trademark infringement").

As the court held in *Jews for Jesus*, using another's mark creates prohibited "self-

gain" even in the absence of direct commercial benefits:

> when one party misappropriates a trademark of
> another, the offending party is using the reputation
> of the trademark owner for self gain.  Such
> unauthorized use causes injury and harm, even if
> the offending party has not tarnished the mark or
> diverted any sales by its use.  [Cites omitted.]
> Trademark infringement, therefore, 'amounts to
> irreparable injury as a matter of law.'

*Jews for Jesus*, 993 F. Supp. at 311; *see also Liquid Glass Enters., Inc. v. Dr. I. H.c.F. Porsche

AG*, 8 F. Supp. 2d 398, 404 n.4 (D.N.J. 1998) (infringement may be found based on confusion

causing initial customer interest).  Irreparable harm also exists where, as here, a party may

demonstrate the "lost control of its reputation and goodwill by another's use of its mark." *Jews

for Jesus*, 993 F. Supp. at 311.  Further, "where a plaintiff makes a strong showing of a

likelihood of confusion, irreparable injury follows as a matter of course." *Id.*

If Amini's scheme remains in place, RUSM will lose contact with untold numbers

of prospective students and other interested parties who become so discouraged at being unable

23

to find legitimate and accurate sources of information regarding RUSM that they do not even attempt to find their way to the Ross University Websites.  For this reason, it is imperative that the Court "require[ defendant] to transfer the infringing domain names to [plaintiff]" and "refrain from 'using or abetting the use of' the infringing domain names or any other domain names substantially similar to [plaintiff's] marks." *Shields*, 254 F.3d at 479 (affirming preliminary injunction that ordered registration transfer).

**POINT V.**

**INJUNCTIVE RELIEF WILL CAUSE NO UNDUE HARM TO DEFENDANTS**

Injunctive relief will cause no undue harm to defendants.  It will not preclude Amini from engaging in any lawful conduct.  He certainly cannot be heard to complain of being required to refrain from engaging in illegal conduct.  Indeed, Amini's only use of the network of bogus websites is to launch disparaging and wholly baseless diatribes against RUSM in clear violation of his contractual obligations to RUSM, while also improperly infringing on RUSM's intellectual property rights.  As the court discussed in *Jews for Jesus*:

> The defendant cannot complain he will suffer irreparable injury if a preliminary injunction is issued because he misappropriated the Mark and the Name of the Plaintiff Organization with full knowledge of the rights of the Plaintiff.  [Cite omitted.] . . . Even if the Defendant could so complain, he is unable to demonstrate that he will suffer irreparable harm if a preliminary injunction is issued.

*Jews for Jesus*, 983 F. Supp at 312; *cf. Telebrands Direct Response v. Ovation Com.,* 802 F. Supp. 1169, 1179 (D.N.J. 1992) (enjoining continued patent infringement despite defendant's claim of harm because "one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected").  Accordingly, defendants cannot point to any undue harm to them if they are enjoined from engaging in the illegal conduct outline in the Verified Complaint.

FIRM:23938959v1

## POINT VI.

### THE IMMEDIATE TRANSFER OF THE DOMAIN
### REGISTRATION SHOULD BE ORDERED
### AND NO BOND SHOULD BE REQUIRED

As there is no basis on which to deprive plaintiffs of their rights as holders of a federally-registered trademark to the domain names in question, plaintiffs respectfully request that this Court order the immediate transfer to plaintiffs of the Offending, Infringing Sites. *See Blackwelder Furniture Co. v. Selig Mfg. Co., Inc.*, 550 F.2d 189 (4th Cir. 1977). Such court-ordered transfers of domain name registrations are uniquely appropriate in cybersquatting and other domain name infringement cases. *See World Sport Networks Limited v. Artinternet S.A.*, 2000 WL 5199, at *1 (E.D. Pa. Jan 5, 2000); *Playboy Enterprises International, Inc. v. Global Site Designs, Inc.*, 1999 WL 311707, at *2 (S.D. Fla. May 15, 1999); *Green Products Co. v. Independence Corn By-Products Co.,* 992 F. Supp. 1070, 1079 (N.D. Iowa 1997).

Moreover, as the Court ruled in *Elliot v. Kiesewetter*, 98 F.3d 47, 59-60 (3d Cir. 1996), and as cited to by *Jews for Jesus*, 993 F. Supp at 293, a security interest is not required when a balancing of the equities weighs overwhelmingly in favor of the party seeking the injunction. In such circumstances, the district court has the discretion to waive Rule 65(c)'s bond requirements after proper findings.

As demonstrated above, it is clear that the defendants have no right whatsoever to the domain names that are confusingly similar to the Ross University Marks. Accordingly, it is axiomatic that defendants cannot present any defense to these claims. The balance of equities therefore tilts overwhelmingly to plaintiffs, and, accordingly, a bond should not be required.

FIRM:23938959v1

## CONCLUSION

For all the foregoing reasons, plaintiffs respectfully request that this Court enter an order restraining defendants or anyone acting by or through them from engaging in any further disparagement of RUSM; using the infringing domain names or any colorable imitation thereof; and from attempting to sell, selling, hypothecating or otherwise transferring any rights in or to the infringing domain names or any other similar domain names.

Respectfully submitted,

EPSTEIN BECKER & GREEN, P.C.

One Gateway Center
Newark, New Jersey 07102
Attorneys for Plaintiffs

By: _____
James P. Flynn
William S. Gyves
Members of the Firm

DATED:  October 15, 2013

26