# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**ROSS UNIVERSITY SCHOOL OF MEDICINE AND GLOBAL EDUCATION,**

        **Plaintiff,**

**vs.**

**BEHZAD AMINI,**

        **Defendant**

**Case No.: 3:13 -CV-06121**

---

### DEFENDANT'S MOTION TO TRANSFER VENUE UNDER 28 U.S.C. § 1404

---

Pursuant to Federal Rules of Civil Procedure 28 U.S.C. § 1404, respectfully files this Motion to Transfer Venue Under 28 U.S.C. § 1404. The grounds for this motion are set forth more fully in the attached memorandum incorporated by reference herein.

Date:  October 28, 2013

_____

Behzad Amini – Pro Se
13835 N. Tatum Blvd #9-280
Phoenix, AZ 85032
602-980-0900
bccpda@yahoo.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ........................................................................................................5

- GRIEVANCE HEARING PROCESS ....................................................8

- SETTLEMENT AGREEMENT ............................................................9

- BREACH OF CONTRACT: VIOLATION OF SETTLEMENT
  AGREEMENT .......................................................................................9

STATEMENT OF FACTS ......................................................................................12

ARGUMENT............................................................................................................13

CONCLUSION ........................................................................................................21

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGES**

*Original Creatine Patent Co., Ltd. v. MET-RX USA, Inc.*,
387 F. Supp. 2d 564, 566 (E.D. Va. 2005) ............................ 13

*Job Haines Home for the Aged v. Young,*
936 F. Supp. 223, 228 (D.N.J. 1996) ........................................ 14

*Jumara v. State Farm Ins. Co.,* 55
F.3d 873, 879-80 (3d Cir. 1995) ...................................... 14, 16

*Shutte v. Armco Steel Corp.*,
431 F.2d 22, 25 (3d Cir. 1970) ................................................. 14

*Ramada Worldwide, Inc. v. Bellmark Sarasota Airport, LLC*,
2006 WL1675067, at *2 (D.N.J. June 15, 2006), ................... 14

*In re Consolidated Parlodel Litigation*,
22 F. Supp. 2d 320, 323-24 (D.N.J. 1998) .............................. 14

*Cf. Ricoh Co., Ltd. v. Honeywell Inc*.,
817 F. Supp. 473, 481-82 (D.N.J. 1993) .................................. 15

*Sadler v. Hallsmith SYSCO FoodServices,*
2009 WL 1096309, at *4-5 (D.N.J. 2009) ............................... 15

*Bremen v. Zapata Off-Shore Co*.,
407 U.S. 1, 10-15, 92 S. Ct. 1907, 1913-16, 32 L. Ed. 2d 513, 520-23 (1972) .......................... 18

*N.H. v. H.H., 418 N.J.*
Super. 262, 282 (App. Div. 2011) ........................................ 18

*Miller v. Miller*,
160 N.J. 408, 419 (1999) ......................................................... 18

*Muhammad v. Cnty. Bank of Rehoboth Beach,*
189 N.J. 1, 15 (2006) ............................................................... 18

*Rudbart v. North Jersey District Water Supply Commission*,
127 N.J. 344, 356, cert. denied, 506 U.S. 871, Ct. 203, 121 L. Ed. 2d 145 (1992) ................... 18

*Sitogum Holdings*, Inc.,
352 N.J. Super. 555, 564 (Ch. Div. 2002) ............................... 18

**STATUE**                                                                 **PAGES**

28 U.S.C. § 1404(a) .................................................... 1, 13

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER VENUE UNDER 28 U.S.C. § 1404(a)

1. Defendant Behzad Amini, Pro Se, submits this memorandum of law in support of his Motion to Transfer Venue pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the District of Arizona.  As grounds therefore, Defendant states as follows:

### PRELIMINARY STATEMENT

2. Ross University School of Medicine (hereafter Ross University) is a _for-profit_ institution that provides medical education, with a campus on the Caribbean island of Dominica. Ross University's main administrative office is located in Miramar, Florida, where offices of student services, registrar, and clinical clerkships are located. Ross University's administrative office in New Jersey only provides Student financing (**Exhibit-1**).  Ross University is owned by DeVry.Inc, which is a publicly traded company.

3. Defendant Behzad Amini resides in Phoenix,  Arizona.  He has no connection to New Jersey, such as owning property, maintaining an office or an agent, or directing any business specifically to New Jersey. Mr. Amini never lived in New Jersey before. Decl. ¶ 1

4. On October 16, 2013, Ross University filed this lawsuit against Mr. Amini, alleging claims of breach of contract, violation of the anticybersquatting act, trademark dilution in violation of the federal trademark dilution act of 1995 and related state law, and Infringement of registered trademark in violation of section 32(1) of the Lanham act and related State law.

5. On October 16, 2013 Mr. Armini was served by email in Arizona with a Summons and Complaint for this case.

6.  There is a well-documented history of malicious retaliation by Ross University against Mr. Amini for whistleblowing activities, notwithstanding his excellent performance as a student.

7.  Ross University attempted three times to force Mr. Amini into signing the settlement agreement in exchange for basic services that any medical student at the university was entitled to receive from its administration. The first attempt is reflected most notably in the "Extension Agreement" for his USM LE 1 proffered in exchange for his perpetual silence about the school and its business practices (**Exhibit-2**). The second attempt was on June 2011 when Ross University refused to schedule Mr. Amini for a clinical rotation unless he signed the settlement agreement. In both instances Mr. Amini refused to sign. On the third attempt, Ross University threatened to take him before the grievance committee unless he signed. Mr. Amini then agreed to sign the agreement and to leave Ross (**Exhibit-3**), New Jersey being the forum of choice for Ross University.

8.  But Ross University did not perform its obligations to Mr. Amini under the Settlement Agreement and breached its obligations to Mr. Amini. Specifically, Ross University has breached Section 4.18 of the Settlement Agreement by disclosing to Mr. Amini's new medical School, AUA, the circumstance of Mr. Amini's transfer, which led to Mr. Amini's discharge from AUA on March, 2013.

9.  Mr. Amini has suffered significant damages. First, his medical education has been short-circuited by Ross University. Second, he is in debt for the amount of $239,000(**Exhibit-4**), for attending Ross University, though he has nothing to show for this financial liability. Third, he has had to endure emotional and psychological suffering as a result of the plaintiff actions. Mr. Amini had no money left to go to New Jersey to file a lawsuit against Ross University.

10.  In a case very similar to Mr. Amini's, another student, Michael Green, was also forced to accept a settlement agreement in exchange for very basic services that any Ross University student is entitled to receive. Attached here as **Exhibit-5** is his settlement agreement with New Jersey being the forum of choice for Ross University. Mr. Greene refused to sign the agreement and he has launched a lawsuit against Ross University. He also has launched a website against the school at **StopDevry.net**, where he shares about his experience.

11.  While the plaintiff's and their attorney like to brag about their 97% pass rate for USMLE, only 52% of Ross Medical students graduate on time compared to the 97% graduation rate for the average medical school **(Exhibit-6)**. There are many students like Mr. Amini, such as Michael Greene, who are sitting on massive debt, which prompted a US Senator and the media to start looking into the plaintiff's unethical business practices.

12.  On September 10, 2013 Illinois Senator Dick Durbin posted the following complaint on his website that had been filed with the Secretary of the Department of Education against the plaintiffs' **(Exhibit-7)**. Here is the excerpt of the Senator complaint:

> "This troubling piece explains how two DeVry-owned foreign medical schools, American University of the Caribbean School of Medicine and **Ross University School of Medicine, prey on students who have been rejected by traditional U.S. medical schools. These students are lured into massive amounts of debt – much higher than traditional schools – and receive very little to show for it by way of a useful degree.**"

13.  On September 10, 2013, Bloomberg published the article "DeVry Lures Medical School Rejects as Taxpayers Fund Debt," describing how the plaintiffs is shortchanging taxpayer and students of millions of dollars **(Exhibit-8)**.

14.   After reading the above articles, Mr. Amini decided to share his own personal experience with Ross University to the public. He purchased six domains with the word "Ross" in them on September 21, 2013, activated three of the domains, and published his content up until October 16, 2013 for a total of 24 days.

15.   The entire website is in the record (**Exhibit-9**). Mr. Amini placed a disclaimer at the top of the first page of the website, disclosing to visitors that the website is not associated with Ross University (**Exhibit-10**). Mr. Amini's website contains no advertising, charges no fees, does not seek to sell anything or direct users to websites that do. Consistent with Mr. Amini's First Amendment Right of Freedom of Speech, the website seeks only to inform and allow visitors to express their opinions on a variety of topics. The website does not exist for any commercial purpose and it has no defamatory statement against anyone.

16.   In addition to his personal opinion and experience, Mr. Amini's website provides information that is already of public record or available elsewhere on the internet. The websites had links to Senator Durbin's web page, the Bloomberg News, the Tampa Bay Times (**Exhibit-11**), a few regulatory agencies, and a link to internal documents that are on public record.

17.   After recent negative press against the plaintiff by Bloomberg News, Senator Durbin, and the attorney generals of the states of Illinois and Massachusetts (**Exhibit-12**), the plaintiff is angry and is lashing out against Mr. Amini.

18.   Contrary to the claims of the plaintiff that they are an agent of good will, that they are comparable to the average US medical school, and that they are a repeatable medical institution, the evidence suggests otherwise. The public, the taxpayer, and the students are better served by being informed of the truth so that their money is not misspent.

**BACKGROUND**

19.   Mr. Amini commenced his studies at the Ross University Dominica campus in January 2009. Mr. Amini was an outstanding student. He maintained a GPA of 3.2 (**Exhibit-13**) while attending Ross University and received recommendation from his attending (**Exhibit-14**). He earned a 91% USMLE Step I (**Exhibit-15**).

20.   On July, 2010, Mr. Amini emailed a complaint to the president of Ross University, Mr. Tom Shepherd, regarding the high enrollment rate, the high failure rate, the delays in clinical rotations, the violations of the student handbook, the breach of contract, and the sudden change in the grade distribution (**Exhibit-16**). The president of Ross University responded by admitting a mistake had been made in the grade distribution and that he was willing to meet to discuss the complaint. But he never followed through (**Exhibit-17**).

21.   Mr. Amini decided to contact regulatory agencies. In every instance, Mr. Amini informed Ross University officials of his intent and he soon experienced retaliatory responses from the school, and multiple attempts to get him to sign the non-disparagement agreement.

22.   In Sept, 2010, Mr. Amini filed a complaint against Ross University with the Medical Board of California regarding the high enrollment rate as well as questioning the academic integrity of Ross University. The Medical Board of California found Mr. Amini's complaint legitimate and started an investigation against Ross University in 2011(**Exhibit-18**).

23.   In Sept, 2010, Mr. Amini filed a complaint against Ross University with the National Board of Medical Examiners for cheating incidents during the comp exam (**Exhibit-19**).

24.   In Nov, 2010, Mr. Amini's mother died in Iran and he requested an extension before taking his board exam. In any other circumstance, an extension would have been granted to other students at their request. However, Ross University required Mr. Amini to provide a proof of

death. Since he had no family left in Iran except for his estranged father, he had to travel to Iran to obtain this certificate. Upon his arrival, he was arrested and taken to prison, where he was kept for three weeks and subject to interrogation and torture. After being released from prison, Mr. Amini came back to the US and submitted the certificate of death to Ross University, upon which Ross University granted him a thirty-day extension.

25.  Since Mr. Amini had spent over a month in Iran in order to acquire this certificate for Ross, he asked Ross University for an additional extension. Ross University, however, would not grant an extra extension unless Mr. Amini signed a non-disparagement agreement (**Exhibit-2**).

26.  Mr. Amini refused to sign, and instead took his USMLE Step-1 exam as scheduled, passing with a score of 91%(**Exhibit-15**).

27.  This was the first attempt by Ross University to force Mr. Amini into signing a non-disparagement agreement in exchange for granting him the very basic educational services that any other medical student at the university was entitled to.

28.  On July, 2011, Mr. Amini filed a complaint against Ross University with the Department of Education for delaying clinical rotations (**Exhibit-20**). When Mr. Amini tried to arrange for another rotation after he had submitted his complaint, Ross University refused to schedule his rotation, and instructed him to have his attorney contact the school.

29.  Mr. Amini asked his ex-wife, who was an attorney, to speak with William Gyves, Ross University's attorney. Mr. Gyves told her that the Ross University didn't want Mr. Amini to graduate. In order for Mr. Amini to move forward, he would have to sign a non-disparagement agreement.

30.  This was the second attempt by Ross University to force Mr. Amini into signing a non-disparagement agreement in exchange for granting him the very basic educational services that any other medical student at the university was entitled to.

31.  Mr. Amini's ex-wife informed William Gyves that he would only agree to a verbal assurance if Mr. Amini would not say anything negative against Ross University as long as Mr. Amini received his clinicals rotations, without any interruption to his medical education. They agreed.

32.  The rotation Ross University setup for Mr. Amini, however, was at Jamaica Hospital in New York, which was a very bad assignment. Mr. Amini requested a better hospital, but his request was denied. Mr. Amini's first rotation was OBGYN. His clinical supervisor accused Mr. Amini of having bad body odor **(Exhibit-21).** He did everything she requested, even working extra hours, but Mr. Amini's supervisor was not satisfied.

33.  In Mr. Amini's absence, his OBGYN supervisor discussed Mr. Amini's body odor with two other students to humiliate Mr. Amini further. Other students began to ridicule Mr. Amini about his body odor as well, particularly Roger Curry, an SGA student, whose statement Ross University used later on as a pretext to drag Mr. Amini before the grievance committee.

34.  In response, Mr. Amini's ex-wife wrote a cease and desist letter to the OBGYN department head, asking him to investigate the matter **(Exhibit-22).** The department never responded, and Mr. Amini was told by another supervisor that Ross University had contacted the department prior to his rotation to warn them about him in order to make Mr. Amini's life difficult at Jamaica Hospital. When Mr. Amini asked Ross to investigate, they never did.

35.  The harassment by Roger Curry and another student, Anupam Gupta, continued into Mr. Amini's next rotation, pediatrics at Jamaica Hospital. The two students were disparaging Mr. Amini about his body odor and about his low grade from OBGYN. They both constantly talked about him behind his back and would publically humiliate him.

36.  In all that time, Mr. Amini never responded to their negativism. When the six-week rotation ended, the supervisor, Dr. Friedman, met with each student individually. At the meeting with Mr. Amini, he told him that Ross University had made negative comments about him, but that he would not judge Mr. Amini by what Ross University has said, but by his performance at the hospital. Mr. Amini received an "A."

37.  The day Mr. Amini's pediatric rotation ended at Jamaica Hospital, he received an email from Ross University, stating they wanted to take him before the grievance committee. Apparently Anupam Gupta, who had been harassing Mr. Amini, made a claim against him. The claims were unfounded.

**GRIEVANCE HEARING PROCESS**

38.  Ross University wouldn't grant Mr. Amini due process for the grievance hearing. First, Ross University hired an IT investigator to find any defamatory information against Mr. Amini to use at the grievance committee. This investigator never spoke to Mr. Amini at all during these investigations, asking for his side of the story. Second, Ross University did not follow its own internal procedures – as outlined in the student handbook – for a fair grievance process. Mr. Amini had to hire an attorney, George Cotz, to help him. Attached here as **Exhibit-23**, are two letters that attorney Cotz wrote to Ross University's attorney, stating that Ross University was not following its own internal guidelines.

39.  Even after attorney Cotz's involvement, Ross University wouldn't grant Mr. Amini request for due process as defined in their internal guidelines. Then Mr. Amini asked another attorney, Colleen Kerwick, to get involved. Again Ross University wouldn't grant Mr. Amini's due process. Therefore, Mr. Amini was not able to adequately defend himself.

40.  During his internal medicine rotation at Griffin Hospital, Mr. Amini experienced a nervous breakdown due to emotional distress as result of Ross University's intent to kick him out of the program. A few days prior to the signing of the non-disparagement agreement, Mr. Amini left his hospital abruptly and left for Phoenix with the intent to take his own life. His attorney became alarmed and contacted Mr. Amini's ex-wife. After a couple of days, Mr. Amini's ex-wife was able to locate him and encouraged him to sign the agreement and transfer to another university.

## SETTLEMENT AGREEMENT

41.  After realizing that he would not be able to receive a fair hearing, Mr. Amini agreed to sign a settlement agreement and leave Ross University. Like the grievance procedure, the settlement agreement was basically a "take it or live it" proposal in which Mr. Amini was given no option to change any of the terms, including the forum clause of the agreement. Mr. Amni finally succumbed to Ross's stressful tactics, signed a non-disparaging agreement in February 2012, and transferred to AUA in April 2012.

## BREACH OF CONTACT: VIOLATION OF SETTLEMENT AGREEMENT

42.  After Mr. Amini transferred to his new medical school, AUA, he started experiencing mistreatment without knowing the cause. The mistreatment was mainly related to constant delays in scheduling his clinical rotations and that's what Mr. Amini needed to be able to finish his medical education and start his residency.  He informed both his attorney and Ross'

attorney that he believed Ross had contacted AUA after his transfer to AUA, but the attorney for Ross denied the allegation.

43.  Then the clinical scheduling delays got worse to the point that Mr. Amini had to ask a physician friend to deal with AUA to arrange his clinical rotations on his behalf as Mr. Amini experienced a nervous breakdown due to emotional distress.

44.  Even after the friend's involvement, the problems continued. He finally personally responded to the school, and AUA used that response as a pretext to drag Mr. Amini before the grievance committee and dismiss him from AUA.

45.  On May 18th, 2013, Mr. Amini was informed by his attorney, George Cotz, that the attorney for AUA, Mr. Len Sclafani, stated that they had information, indicating that Mr. Amini transferred to AUA from Ross University without disclosing to AUA the circumstances of his transfer from Ross University.

46.  Given the history of animosity against Mr. Amini, including the retaliation resulting from his complaints to the various regulatory agencies, the repeated denials of basic educational services normally granted to other students, the repeated attempts by Ross University to force Mr. Amini to sign the NDAs in exchange for those services, and the information provided by AUA's attorney to Mr. Amini's attorney on May 18th , 2013, the circumstantial evidence points only to one suspect, Ross University.

47.  Therefore, Ross University did not perform its obligations to Mr. Amini under the Settlement Agreement and breached its obligations to Mr. Amini. Specifically, Ross University has breached Section 4.18 of the Settlement Agreement by disclosing to Mr. Amini's new

medical School, AUA, the circumstance of Mr. Amini's transfer, which led to dismissal of Mr. Amini's discharge from AUA on March, 2013.

48.  The settlement agreement was a fraud. Fraud was plaintiffs silence, knowing that they had already, or were about to disclose to Mr. Amini's new medical School, AUA, the circumstance of Mr. Amini's transfer, which lead to Mr. Amini's discharge from AUA on March, 2013.  Mr. Amini relied on the false impression and was damaged as a result of the reliance upon the false impression.

49.  By refusing to provide the very basic services that any medical student at the university is entitled to receive, Ross University used its bargaining power to force a weaker party, Mr. Amini, to agree to its term, leaving Mr. Amini with no power to negotiate. To Mr. Amini, the non-disparagement agreement was nothing more than a contract of adhesion, a boilerplate contract that Ross University attempted three times to shove down his throat after repeatedly denying him normal student services. Ross University finally succeeded on its third attempt. The terms and conditions of the contract were set by Ross University, and Mr. Amini had little or no ability to negotiate more favorable terms, thus placing him in a "take it or leave it" position.

50.  Furthermore, the settlement agreement was not negotiated in good faith and was forced upon Mr.Amini. Ross University attempted three times to force him into signing the settlement agreement in exchange for basic services that any medical student at the university was entitled to receive from its administration. The first attempt was on April 2011 in exchange for a 30-day extension for taking his USMLE exam (**Exhibit-11**). The second time was on June 2011 when Ross University refused to schedule Mr. Amini for a rotation unless he signed the

settlement agreement. In both instances Mr. Amini refused to sign. On the third attempt, Ross University threatened to take him before the grievance committee unless he signed. Mr. Amini then agreed to sign the agreement and to leave Ross.

## STATEMENTS OF FACTS

51.  Defendant Behzad Amini resides in Phoenix, Arizona. He has no connection to the state of New Jersey. He doesn't own property, bank accounts, maintain an office or an agent, or direct any business specifically to New Jersey. Mr. Amini has never resided in New Jersey. Decl. ¶ 1.

52.  The defendant owes US taxpayers $239,375 as result of his medical education at Ross University. Decl. ¶ 2.

53.  The defendant is <u>unemployed</u> and is unable to pay his student loan.

54.  The defendant has less than $700 left in his bank account. Decl. ¶ 3.

55.  The defendant cannot afford an attorney. Decl. ¶ 4.

56. The defendant has no health insurance plan. Decl. ¶ 5.

57. The defendant has not been able to visit his 7 years old daughter in Canada due to financial difficulties. Decl. ¶ 6.

## ARGUMENT

**DEFENDANT REQUESTS THAT THIS COURT TRANSFER VENUE OF THIS ACTION TO THE U.S. DISTRICT COURT FOR THE DISTRICT OF ARIZONA.**

58.  Mr. Amini requests that this Court transfer venue of this action to the U.S. District Court for the District of Arizona.

59.  "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  The Court should exercise its power to transfer a case in order "to prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense."  *Original Creatine Patent Co., Ltd. v. MET-RX USA, Inc.*, 387 F. Supp. 2d 564, 566 (E.D. Va. 2005).

60.  A civil action may be brought wherever "a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(a).  However, the venue is improper: 1) the plaintiff's main business is located on the Caribbean island of Dominica, and its main administrative office is located in Miramar, Florida. The New Jersey office only handles student finances (**Exhibit-1**).  2) A settlement contact was negotiated in New Jersey. However, as the agreement outlines, Mr. Amini was to sign the agreement in Phoenix, AZ and email a copy to the plaintiff's attorney in New Jersey. 3) All of the activities in question--the production of the websites' content and their launch--all originated from Phoenix, AZ, where Mr. Amini lives.

61.  When considering the factors that weigh for and against transfer, this Court must look to undisputed facts and matters of record rather than mere assertions found in the attorney's briefs. *Job Haines Home for the Aged v. Young*, 936 F. Supp. 223, 228 (D.N.J. 1996).

62.  The Third Circuit has considered a variety of factors which may be relevant in a motion to transfer venue.  These factors are frequently grouped into two categories: public and private interests.  Private interests include plaintiff's forum preference, defendant's forum preference, whether the claim arose outside of the current forum, the convenience of the parties as indicated by their physical and financial condition, the convenience of the witnesses, and the location of relevant books and records.  *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879-80 (3d Cir. 1995).  Public interests include the enforceability of the judgment, practical considerations, the relative court congestion of the two fora, local interests in deciding local controversies at home, the public policies of the fora, and the trial judge's familiarity with the applicable state law in a diversity case. Id. at 879-80. All of these factors may be balanced to determine if the requested venue would better serve the interests of justice than the current forum.

63.  The first private interests to consider are the preferences of the plaintiff and defendant. The Third Circuit previously held that when considering a request for transfer of venue, significant weight must be given to plaintiff's initial choice of forum, as it "is a paramount consideration in any determination of a transfer request." *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir. 1970); *Ramada Worldwide, Inc. v. Bellmark Sarasota Airport, LLC,* 2006 WL1675067, at *2 (D.N.J. June 15, 2006).

64.  A plaintiff's interest in getting to choose the forum may be reduced when the central facts at issue take place outside of the forum.  *In re Consolidated Parlodel Litigation*, 22 F. Supp. 2d 320, 323-24 (D.N.J. 1998).  Here, all of the alleged incidents in question have taken place in Phoenix, AZ, rather than in New Jersey. In addition, it is undisputed that defendant Behzad Amini resides in Phoenix,  Arizona.

65.  The defendant has no connection to New Jersey, such as owning property, bank accounts, maintaining an office or an agent, or directing any business specifically to New Jersey. Mr. Amini never lived in New Jersey before. Decl. ¶ 1

66.  There is no reason to disregard plaintiff's preference in favor of Defendant's preferred forum.  *Cf. Ricoh Co., Ltd. v. Honeywell Inc.*, 817 F. Supp. 473, 481-82 (D.N.J. 1993) (disregarding plaintiff's choice of forum when only connection between forum and subject of litigation was sale of products by defendant in the state); *Sadler v. Hallsmith SYSCO FoodServices*, 2009 WL 1096309, at *4-5 (D.N.J. 2009) (finding that plaintiff's choice of forum weighed against transfer when plaintiffs resided in forum and had witnesses located in forum despite majority of facts being outside the state). However in the present case, the plaintiffs' main business is located outside of the state of New Jersey. The school campus is located on the Caribbean island of Dominica, the main administrative office is located in Miramar, Florida. The dean of Ross University Medical School lives in Florida. The president of Ross University lives outside of New Jersey. Almost all of the witnesses for this case live outside of the great state of New Jersey. Again, the New Jersey office only handles student finance (**Exhibit-1**).

67.  The second private interest to consider is the convenience of the parties.  Defendant Behzad Amini resides in Phoenix, AZ, 2394 Miles away from New Jersey. Decl. ¶ 1

68.  The defendant owes US taxpayers over $239,000 for attending the university, but is unable to make any payments. Mr. Amini is <u>unemployed</u> and he has less than $700 in his bank account. He is unable to maintain a basic living.

69. The current forum is not accessible to the defendant by car or train, and given that he lacks financial means, he can neither afford a plane ticket, hotel expenses, nor hire an attorney Decl.¶2,3,4,5,6,7. The requirement by the court to defend this case in New Jersey would deprive Mr. Amini of his day in court.

70. Conversely, an order transferring the venue to the United States District Court for the District of Arizona would not inconvenience or prejudice the plaintiff in any way because of their limitless resources and their ability to litigate this case in any forum. Since 2006 over ten lawsuits have been filed by students against Ross University, and over one hundred lawsuits have been filed against the plaintiff's parent company, Devry Inc., across the country.

71. The third private interest, and perhaps the most important, is the convenience of non-party witnesses. The defendant claims that almost all of the witnesses that he will call are located in Phoenix, Arizona, and that it is particularly inconvenient for them to travel to New Jersey, 2,394 miles away, plus pay for hotels and expenses.

72. In addition, when considering the convenience of witnesses, the proximity of this Court to the location of the witnesses must again be noted. Phoenix Arizona is approximately 2,394 Miles away from this Court in Trenton, New Jersey. Indeed, the Third Circuit has found that the inconvenience of witnesses may only be considered to the extent that the witnesses would be unavailable for trial in the forum. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879-80 (3d Cir. 1995). Given the proximity of the witnesses and the fact that Phoenix Arizona is not within short distance of this Court's subpoena power, the transfer of venue will substantially reduce the inconvenience to non-party witnesses, otherwise, defendant's witnesses will not be available for trial in this forum.

73.   Finally, the last private interest to consider is the availability of books or records. None of the alleged incidents took place in the state of New Jersey. The alleged websites were launched in Phoenix, AZ. All the defendant's records for alleged claims are also located in Phoenix, AZ. None of the plaintiffs' books and records is located in state of New Jersey since their administrative office in New Jersey only handles student finance (**Exhibit-1**). Thus, on the whole, the private interests indicate that the interests of justice would be better served by a transfer of venue to U.S. District Court for the District of Arizona.

74.   In addition to the aforementioned private interests, this Court must consider the relevant public interests. First, this defendant can't produce evidence that every judgment entered in New Jersey would be afforded full faith and credit by the state of Arizona. Second, the defendant alleging that the docket of the US District Court for the District of Arizona is significantly less congested than the District of New Jersey. The court's statistical data clearly indicates that the US District Court for the District of Arizona is less congested in terms of civil case loads in comparison to the New Jersey court. The data suggests that from 2011 to 2012, there was almost twice the case load in the US District Court for the District of New Jersey in comparison with the US District Court for the District of Arizona (**Exhibit-24**). Third, this controversy took place in Phoenix, AZ, not in New Jersey. However, the appropriate law to be applied is still in dispute.

75.   Finally, the settlement agreement is in dispute. The plaintiff alleges that Mr. Amini violated the agreement by publishing his websites, and the forum clause in the agreement chooses New Jersey as a venue in case of any disputes.

76.   A forum selection clause is enforceable unless it results from "fraud, undue influence, or overweening bargaining power," is "unreasonable" or "violates" a "strong public policy." M/S *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10-15, 92 S. Ct. 1907, 1913-16, 32 L. Ed. 2d 513, 520-23 (1972)."Absent `unconscionability, fraud, or overreaching in the negotiations of the settlement, … no legal or equitable basis exists to reform the parties' property settlement agreement." *N.H. v. H.H.*, 418 N.J. Super. 262, 282 (App. Div. 2011) (quoting *Miller v. Miller*, 160 N.J. 408, 419 (1999)).

77.   As stated by the court, unconscionability can be manifested in two ways. The first is procedural unconscionability, which involves a "variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process…." *Muhammad v. Cnty. Bank of Rehoboth Beach*, 189 N.J. 1, 15 (2006), (quoting *Sitogum Holdings*, Inc., 352 N.J. Super. 555, 564 (Ch. Div. 2002)) cert. denied, 549 U.S. 1338, 127 S. Ct. 2032, 167 L. Ed. 2d 763 (2007). The second is substantive unconscionability, which is determined by applying the four factors identified by Court in *Rudbart v. North Jersey District Water Supply Commission*, 127 N.J. 344, 356, cert. denied, 506 U.S. 871, 113 S. Ct. 203, 121 L. Ed. 2d 145 (1992). These factors are: "[1] the subject matter of the contract, [2] the parties' relative bargaining positions, [3] the degree of economic compulsion motivating the `adhering' party, and [4] the public interests affected by the contract."

78.   The alleged settlement agreement is attached to the complaint as **Exhibit-3**. First, Mr. Amini contests that settlement agreement was a fraud. Fraud was plaintiffs silence, knowing that they had already, or were about to disclose to Mr. Amini's new medical School, AUA, the circumstance of Mr. Amini's transfer, which lead to Mr. Amini's discharge from AUA on March, 2013.  Mr. Amini relied on the false impression and was damaged as a result of the reliance upon the false impression.

79.   Second, by refusing to provide the very basic services that any medical student at the university is entitled to receive, Ross University used its bargaining power to force a weaker party, Mr. Amini, to agree to its term, leaving Mr. Amini with no power to negotiate. To Mr. Amini, the non-disparagement agreement was nothing more than a contract of adhesion, a boilerplate contract that Ross University attempted three times to shove down his throat after repeatedly denying him normal student services. Ross University finally succeeded on its third attempt. The terms and conditions of the contract were set by Ross University, and Mr. Amini had little or no ability to negotiate more favorable terms, thus placing him in a "take it or leave it" position.

80.   Third, the settlement agreement was not negotiated in good faith and was forced upon Mr.Amini. Ross University attempted three times to force him into signing the settlement agreement in exchange for basic services that any medical student at the university was entitled to receive from its administration. The first attempt was on April 2011 in exchange for a 30-day extension for taking his USMLE exam (**Exhibit-2**). The second time was on June 2011 when Ross University refused to schedule Mr. Amini for a rotation unless he signed the settlement agreement. In both instances Mr. Amini refused to sign. On the third attempt, Ross University

threatened to take him before the grievance committee unless he signed. Mr. Amini then agreed to sign the agreement and to leave Ross (**Exhibit-3**).

81.   Fourth, Ross University's choice in the forum selection clause arises from nothing more than forum shopping, conveniently selecting New Jersey where the plaintiff's law firm, Epstein Becker & Green, is located. In the present case, the plaintiffs' main business is located outside of the state of New Jersey. The school campus is located on the Caribbean island of Dominica, the main administrative office is located in Miramar, Florida, The dean of Ross University Medical School lives in Florida. The president of Ross University lives outside of New Jersey. Almost all of the witnesses for this case live outside of the great state of New Jersey. Again, the New Jersey office only handles student finance (**Exhibit-1**).

82.   Fifth, Ross University and their attorney's choice of New Jersey in the forum clause makes it difficult for students who can't afford to fly across the country to launch a complaint against the plaintiff in New Jersey or have their day in the court in case of any dispute in the case. Mr. Amini did request for the change of venue, but the plaintiff attorney wouldn't agree "take it or leave it" position.

83.   In a case very similar to Mr. Amini's, another student, Michael Green, was also forced to accept a settlement agreement in exchange for very basic services that any Ross University student is entitled to receive. Attached here as **Exhibit-5** is his settlement agreement with New Jersey being the forum of choice for Ross University. Mr. Greene refused to sign the agreement and he has launched a lawsuit against Ross University. He also has launched a website against the school at **StopDevry.net**, where he shares about his experience.

**CONCLUSION**

83.   Mr. Amini is a former student of Ross University who currently resides in Phoenix, Arizona. He was an outstanding medical student. He earned a 91% USMLE Step I score and maintained a GPA of 3.2 while attending Ross University and received recommendation from his attending physician.

84.   Mr. Amini was lured into massive debt by Ross University and has nothing to show for it. He owes US taxpayers $239,000 for attending the university, but is unable to make any payments. He is unemployed and has less than $700 left in his bank account and is unable to maintain a basic living. He also can't afford an attorney.

85.   He has no connection to the state of New Jersey, such as owning property, maintaining an office or an agent, or directing any business specifically to New Jersey. Mr. Amini has never lived in New Jersey.

86.   The requirement by the court to defend this case in New Jersey would not only be inconvenient, burdensome, and a gross miscarriage of justice, but it would be a depriving Mr. Amini of his day in court.

**WHEREFORE,** the Defendent, Behzad Amini, requests this Court grant defendant's Motion for Transfer Venue pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the District of Arizona, for the foregoing reasons, based on the above cited authorities.

**Dated: 28th of October, 2013.**

_____

Behzad Amini – Pro Se

PAGE - 22

VERIFICATION

I, Behzad Amini, hereby verify and certify under 28 U.S.C. § 1746 to the following facts:

1.  I am the defendant in the above case.

2.  I have read the foregoing motion and know the contents thereof, and the same is true to my own knowledge, except to those matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true.

I certify under penalty of perjury that the foregoing is true and correct.

**Dated: 28 of October, 2013.**


_____

Behzad Amini – Pro Se

PAGE - 23