**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**ROSS UNIVERSITY SCHOOL OF MEDICINE AND GLOBAL EDUCATION**,

Case No.: 3:13 -CV-06121

   **Plaintiff,**

**vs.**

**BEHZAD AMINI,**

   **Defendant**

---

## AMENDED RESPONSE TO PLAINTIFFS VERIFIED MOTION FOR PRELIMINARY INJUNCTION AGAINST BEHZAD AMINI

---

**Dated: 28 of October, 2013**

Behzad Amini – Pro Se
13835 N. Tatum Blvd #9-280
Phoenix, AZ 85032
602-980-0900
bccpda@yahoo.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ............................................................................................4

- GRIEVANCE HEARING PROCESS .........................................................9

- SETTLEMENT AGREEMENT ................................................................10

- BREACH OF CONTRACT: VIOLATION OF SETTLEMENT
  AGREEMENT ..................................................................................10

ARGUMENTS

THE CONTROLING LEGAL STANDARDS .........................................................13

PRONG 1- SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS:

- VIOLATION OF MR. AMINI'S FIRST AMENDMENT...........................................14
- VIOLATION OF LANHAM ACT AND RELATED STATE LAW ........................21
- TRADEMARK DILUTION ...................................................................21
- VIOLATION OF ACSA ......................................................................25
- BREACH OF CONTRACT ...................................................................26

PRONG 2 THE LIKELIHOOD OF IRREPRABLE HARM .......................................29

PRONG 3- BALANCE OF EQUITY ...................................................................32

PRONG 4- PUBLIC INTEREST .......................................................................32

CONCLUSION ...........................................................................................33

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGES**

*Pileggi v. Aichele,*
843 F. Supp. 2d 584, 592 (E.D. Pa. 2012) ............................................ 13

*Winter v. NRDC, Inc.,*
555 U.S. 7, 24 (2008) ...........................................................................13, 29

*Frank's GMC Truck Ctr., Inc. v. General Motors Corp,*
847 F.2d 100, 102 (3d Cir.1988) .......................................................... 13

*Koss Pharms., Inc. v. Andrx Corp.,*
369 F.3d 700, 708 (3dCir. 2004) .......................................................... 13

*Morton v. Beyer,*
822 F.2d 364, 367 (3d Cir. 1987) ......................................................... 13

*In re Arthur Treacher's Franchisee Litigation,*
689 F.2d 1137, 1143 (3d Cir. 1982) ..................................................... 13

*Virginian Ry. Co. v. United States,*
272 U.S. 658, 672 (1926) ...................................................................... 13

*AT&T v. Winback,*
42 F.3d 1421, 1427 (3d Cir. 1994) ....................................................... 14

*Continental Group, Inc. v. Amoco Chemicals Corp.,*
614 F.2d 351, 357 (3d Cir. 1980) ......................................................... 14

*Near v. Minnesota ex rel Olson,*
283 U.S. 697, 713-14, 51 S. CT. 625 (1931) ........................................ 14

*Nebraska Press Ass'n v. Stuart,*
427 U.S. 539, 560, 96 S. CT. 2791, 2803 (1976) ................................. 14

*Organization for a BetterAustin v. Keefe,*
402 U.S. 415, 418-19, 91 S. Ct. 1575, 1577-78 (1971) ....................... 14

*New York Times Co. v. Sullivan,*
403 U.S. 713, 714, 91 S. Ct. 2140, 2141 (1971) .................................15, 23

*Metro. Opera Ass'n v. Local100, Hotel Employees and Rest. Emp. Int'l Union,*
239 F.3d 172, 177 (2d Cir. 2001) ......................................................... 15

*Kramer v. Thompson,*
947 F.2d 666, 677-78 (3d Cir. 1991) .................................................... 15

*Lothschuetz v. Carpenter,*
898 F.2D 1200, 1206 (6TH CIR. 1990) ................................................. 15

ii

**CASES**                                                                              **PAGES**

*Creative Non-Violence v. Pierce,*
814 F.2ᴅ 663, 672 (D.C. Cɪʀ.1987) ................................................................. 15

*Lassiter v. Lassiter,*
456 F. Supp. 2d 876, 884 (E.D. Ky. 2006) ...........................................16, 25

*Harper & Row v. Nation Enterprises,*
471 U.S. 539, 560 (1985).................................................................................. 16

*Cliffs Notes v. Bantam Doubleday,*
886 F.2d 490, 494 (2d Cir. 1989) .................................................................. 16

*Anheuser-Busch v. Balducci Publications,*
28 F.3d 769,776 (8 Cir. 1994).......................................................................... 16

*Better Business Bureau v. Medical Directors,*
681 F.2d 397, 404-405 (5th Cir. 1982) ......................................................... 16

*L.L. Bean v. Drake Publishers,*
811 F.2d 26, 32-33(1st Cir. 1987)............................................................16, 22

*Shelley v. Kraemer,*
334 U.S. 1, 14-15 (1948) ................................................................................. 17

*Organization for a Better Austin v. Keefe,*
402 U.S. 415, 418 (1971)................................................................................. 17

*Procter & Gamble Co. v. Bankers Trust Co.,*
78 F.3d 219, 224-225 (6ᵗʰ Cir. 1996) ....................................................17, 26

*Bose Corp. v. Consumers Union,*
466 U.S. 485 (1984) ......................................................................................... 17

*Semco v. Amcast,*
52 F.3d 108, 111-114 (6ᵗʰ Cir. 1995) .......................................................... 17

*Porous Media Corp. v. Pall Corp.,*
173 F.3d 1109, 1119-1121 (8ᵗʰ Cir. 1999)................................................... 17

*U.S. Healthcare v. Blue Cross of Greater Philadelphia,*
898 F.2d 914, 927-939 (3d Cir. 1990) ......................................................... 17

*Mattel v. MCA Records,*
28 F. Supp. 2d 1120,1144-1145 (C.D. Cal. 1998) ...................................... 17

*Bad Frog Brewery v. New York State Liquor Authority,*
134 F.3d 87, 94-97 (2d Cir. 1998)................................................................. 18

*Semco v. Amcast,*
52 F.3d 108, 112-114 (6ᵗʰ Cir. 1995) .......................................................... 18

iii

**CASES**            **PAGES**

*Cardtoons v. Major League Baseball Players Ass'n,*
95 F.3d 959, 968-970 (10th Cir. 1996) ............................................................... 18

*Rogers v. Grimaldi,*
875 F.2d 994, 997-999 (2d Cir. 1989) ................................................................... 19

*Mutual of Omaha Ins. Co. v. Novak,*
836 F.2d 397, 402-403 (8th Cir. 1987) ............................................................... 19

*Bally Total Fitness Holding Corp. v. Faber,*
29 F. Supp. 1161, 1167 (C.D. Cal. 1998) ...................................................... 19, 22, 24

*Lighthawk v.Robertson,*
812 F. Supp. 1095, 1097-1101 (W.D. Wash. 1993) ............................................ 19, 22

*Stop the Olympic Prison v. United States Olympic Comm.*
489 F. Supp. 1112, 1124-1125 (S.D.N.Y. 1980) .............................................. 19, 22

*Lucasfilm v. High Frontier,*
622 F. Supp. 931 (D.D.C. 1985). ................................................................... 19, 22

*ACLU of Georgia v. Miller,*
977 F. Supp. 1228, 1233 (N.D. Ga. 1997) ...................................................... 19, 22, 24

*Taubman Company v. Webfeats,*
319 F.3d 770 (6th Cir. 2003) ................................................................................. 23

*TMI, Inc. v. Maxwell,*
368 F.3d 433 (5th Cir. 2004) ................................................................................. 25

*McMullen v Joldersma,*
174 Mich App 207, 213; 435 NW2d 428 (1988) ...................................................... 29

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006) ............................................................................................. 29

*Ford Motor Co. v. Lane,*
67 F. Supp.2d 745 (E.D. Mich. 1999) .................................................................... 33


**STATUE**            **PAGES**

U.S.C. § 1114(1) ................................................................................................. 21
U.S.C. § 1125 (b)(C) ........................................................................................... 21
U.S.C. § 1125 (d) ............................................................................................... 25

| _Taubman Company v. Webfeats_, 319 F.3d 770 (6th Cir. 2003) | AUA Vs. Steven Woodward (Exhibit-23) | LEVINSON AXELROD Vs. Edward HEYBURN | Ross Vs. Behzad Amini |
|---|---|---|---|
| **6th Cir. 2003** | **Federal Judge Patrick Duggan** | **Federal Judge Ann Thompson** | **Federal Judge Ann Thompson** |
| **§ 1114(1) § 1125(a)(c)(d)** | **§ 1114(1) § 1125(a)(c)(d)** | **§ 1114(1) § 1125(a)(c)(d)** | **§ 1114(1) § 1125(a)(c)(d)** |
| Multiple Domains | Multiple Domains | Multiple Domains | Multiple Domains |
| Disgruntled Customer | Disgruntled Medical Student | Competitor: Both lawyers | Disgruntled Medical Student |
| professional critiques | professional critiques | Mix of professional critiques and personal insults | professional critiques |
| Non-comercial | Non-comercial | Commercial | Non-comercial |
| Overturned | Denied | Granted | Pending |

**MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS VERIFIED MOTION FOR PRELIMINARY INJUNCTION AGAINST BEHZAD AMINI**

1.  Defendant Behzad Amini, Pro Se, submits this memorandum of law in response to plaintiffs verified motion for preliminary injunction against Behzad Amini. As grounds therefore, Defendant states as follows:

## PRELIMINARY STATEMENT

2.  Ross University School of Medicine (hereafter Ross University) is a *for-profit* institution that provides medical education, with a campus on the Caribbean island of Dominica. Ross University's main administrative office is located in Miramar, Florida, where offices of student services, registrar, and clinical clerkships are located. Ross University's administrative office in New Jersey only provides Student financing. Ross University is owned by DeVry.Inc, which is a publicly traded company.

3.  On October 16, 2013, Ross University filed this lawsuit against Mr. Amini, alleging claims of breach of contract, violation of the anticybersquatting act, trademark dilution in violation of the federal trademark dilution act of 1995 and related state law, and Infringement of registered trademark in violation of section 32(1) of the Lanham act and related State law.

4.  On October 16, 2013 Mr. Armini was served by email in Arizona with a Summons and Complaint for this case.

5.  There is a well-documented history of malicious retaliation by Ross University against Mr. Amini for whistleblowing activities, notwithstanding his excellent performance as a student.

PAGE - 1

6.  Ross University attempted three times to force Mr. Amini into signing the settlement agreement in exchange for basic services that any medical student at the university was entitled to receive from its administration. The first attempt is reflected most notably in the "Extension Agreement" for his USMLE 1 proffered in exchange for his perpetual silence about the school and its business practices (**Exhibit-1**). The second attempt was on June 2011 when Ross University refused to schedule Mr. Amini for a clinical rotation unless he signed the settlement agreement. In both instances Mr. Amini refused to sign. On the third attempt, Ross University threatened to take him before the grievance committee unless he signed. Mr. Amini then agreed to sign the agreement and to leave Ross (**Exhibit-2**), New Jersey being the forum of choice for Ross University.

7.  But Ross University did not perform its obligations to Mr. Amini under the Settlement Agreement and breached its obligations to Mr. Amini. Specifically, Ross University has breached Section 4.18 of the Settlement Agreement by disclosing to Mr. Amini's new medical School, AUA, the circumstance of Mr. Amini's transfer, which led to Mr. Amini's discharge from AUA on March, 2013.

8.  Mr. Amini has suffered significant damages. First, his medical education has been short-circuited by Ross University. Second, he is in debt for the amount of $239,000(**Exhibit-3**), for attending Ross University, though he has nothing to show for this financial liability. Third, he has had to endure emotional and psychological suffering as a result of the plaintiff actions. Mr. Amini had no money left to go to New Jersey to file a lawsuit against Ross University.

9.  While the plaintiff's and their attorney like to brag about their 97% pass rate for USMLE, only 52% of Ross Medical students graduate on time compared to the 97% graduation rate for the average medical school **(Exhibit-4)**. There are many students like Mr. Amini, such as Michael Greene, who are sitting on massive debt, which prompted a US Senator and the media to start looking into the plaintiff's unethical business practices.

10.  On September 10, 2013 Illinois Senator Dick Durbin posted the following complaint on his website that had been filed with the Secretary of the Department of Education against the plaintiffs' (**Exhibit-5**). Here is the excerpt of the Senator complaint:

> "This troubling piece explains how two DeVry-owned foreign medical schools, American University of the Caribbean School of Medicine and **Ross University School of Medicine, prey on students who have been rejected by traditional U.S. medical schools. These students are lured into massive amounts of debt – much higher than traditional schools – and receive very little to show for it by way of a useful degree**."

11.  On September 10, 2013, Bloomberg published the article "DeVry Lures Medical School Rejects as Taxpayers Fund Debt," describing how the plaintiffs is shortchanging taxpayer and students of millions of dollars (**Exhibit-6**).

12.   After reading the above articles, Mr. Amini decided to share his own personal experience with Ross University to the public. He purchased six domains with the word "Ross" in them on September 21, 2013, activated three of the domains, and published his content up until October 16, 2013 for a total of 24 days.

13.  The entire website is in the record **(Exhibit-7)**. Mr. Amini placed a disclaimer at the top of the first page of the website, disclosing to visitors that the website is not

PAGE - 3

associated with Ross University (**Exhibit-8**). Mr. Amini's website contains no advertising, charges no fees, does not seek to sell anything or direct users to websites that do. Consistent with Mr. Amini's First Amendment Right of Freedom of Speech, the website seeks only to inform and allow visitors to express their opinions on a variety of topics. The website does not exist for any commercial purpose and it has no defamatory statement against anyone.

14.  In addition to his personal opinion and experience, Mr. Amini's website provides information that is already of public record or available elsewhere on the internet. The websites had links to Senator Durbin's web page, the Bloomberg News, the Tampa Bay Times (**Exhibit-9**), a few regulatory agencies, and a link to internal documents that are on public record.

15.  After recent negative press against the plaintiff by Bloomberg News, Senator Durbin, and the attorney generals of the states of Illinois and Massachusetts (**Exhibit-10**), the plaintiff is angry and is lashing out against Mr. Amini.

16.  Contrary to the claims of the plaintiff that they are an agent of good will, that they are comparable to the average US medical school, and that they are a repeatable medical institution, the evidence suggests otherwise. The public, the taxpayer, and the students are better served by being informed of the truth so that their money is not misspent.

## **BACKGROUND**

17.  Mr. Amini was born in Iran. After the takeover of the Ayatollahs in 1979 and during the hostage crisis, many of his family members disseminated to the United States, except for Mr. Amini. As he was growing up in Iran under a totalitarian regime, which banned free speech for its own people, Mr. Amini came to appreciate the importance of being able to express an opinion without being incarcerated or punished.

PAGE - 4

18.  Mr. Amini left Iran at the age of sixteen and traveled to many countries before settling in Canada. He graduated with a degree in Business Administration from a top Canadian university, and then moved to the United States in the hope of pursuing his ultimate dream of becoming a medical doctor.

19.  Mr. Amini took all the science prerequisites necessary, achieving a 4.0 GPA, and then applied for admission to Ross University in late 2008.

20.  Mr. Amini commenced his studies at the Ross University Dominica campus in January 2009. Mr. Amini was an outstanding student. He maintained a GPA of 3.2 (**Exhibit-11**) while attending Ross University and received recommendation from his attending (**Exhibit-12**). He earned a 91% USMLE Step I (**Exhibit-13**).

21.  In July, 2010, Mr. Amini emailed a complaint to the president of Ross University, Mr. Tom Shepherd, regarding the high enrollment rate, the high failure rate, the delays in clinical rotations, the violations of the student handbook, the breach of contract, and the sudden change in the grade distribution (**Exhibit-14**). The president of Ross University responded by admitting a mistake had been made in the grade distribution and that he was willing to meet to discuss the complaint. But he never followed through (**Exhibit-15**).

22.  Mr. Amini decided to contact regulatory agencies. In every instance, Mr. Amini informed Ross University officials of his intent and he soon experienced retaliatory responses from the school, and multiple attempts to get him to sign the non-disparagement agreement.

23.  In Sept, 2010, Mr. Amini filed a complaint against Ross University with the Medical Board of California regarding the high enrollment rate as well as questioning the academic integrity of Ross University. The Medical Board of California found Mr. Amini's complaint legitimate and started an investigation against Ross University in 2011(**Exhibit-16**).

24.  In Sept, 2010, Mr. Amini filed a complaint against Ross University with the National Board of Medical Examiners for cheating incidents during the comp exam (**Exhibit-17**).

25.  In Nov, 2010, Mr. Amini's mother died in Iran and he requested an extension before taking his board exam. In any other circumstance, an extension would have been granted to other students at their request. However, Ross University required Mr. Amini to provide a proof of death. Since he had no family left in Iran except for his estranged father, he had to travel to Iran to obtain this certificate. Upon his arrival, he was arrested and taken to prison, where he was kept for three weeks and subject to interrogation and torture. After being released from prison, Mr. Amini came back to the US and submitted the certificate of death to Ross University, upon which Ross University granted him a thirty-day extension.

26.  Since Mr. Amini had spent over a month in Iran in order to acquire this certificate for Ross, he asked Ross University for an additional extension. Ross University, however, would not grant an extra extension unless Mr. Amini signed a non-disparagement agreement (**Exhibit-1**).

27.  Mr. Amini refused to sign, and instead took his USMLE Step-1 exam as scheduled, passing with a score of 91%(**Exhibit-13**).

28.  This was the first attempt by Ross University to force Mr. Amini into signing a non-disparagement agreement in exchange for granting him the very basic educational services that any other medical student at the university was entitled to.

29.  On July, 2011, Mr. Amini filed a complaint against Ross University with the Department of Education for delaying clinical rotations (**Exhibit-18**). When Mr. Amini tried to arrange for another rotation after he had submitted his complaint, Ross University refused to schedule his rotation, and instructed him to have his attorney contact the school.

30.  Mr. Amini asked his ex-wife, who was an attorney, to speak with William Gyves, Ross University's attorney. Mr. Gyves told her that the Ross University didn't want Mr. Amini to graduate. In order for Mr. Amini to move forward, he would have to sign a non-disparagement agreement.

31.  This was the second attempt by Ross University to force Mr. Amini into signing a non-disparagement agreement in exchange for granting him the very basic educational services that any other medical student at the university was entitled to.

32.  Mr. Amini's ex-wife informed William Gyves that he would only agree to a verbal assurance if Mr. Amini would not say anything negative against Ross University as long as Mr. Amini received his clinicals rotations, without any interruption to his medical education. They agreed.

33.  The rotation Ross University setup for Mr. Amini, however, was at Jamaica Hospital in New York, which was a very bad assignment. Mr. Amini requested a better hospital, but his request was denied. Mr. Amini's first rotation was OBGYN. His clinical supervisor accused Mr. Amini of having bad body odor **(Exhibit-19).** He did everything she requested, even working extra hours, but Mr. Amini's supervisor was not satisfied.

34.  In Mr. Amini's absence, his OBGYN supervisor discussed Mr. Amini's body odor with two other students to humiliate Mr. Amini further. Other students began to ridicule Mr. Amini about his body odor as well, particularly Roger Curry, an SGA student, whose statement Ross University used later on as a pretext to drag Mr. Amini before the grievance committee.

35.  In response, Mr. Amini's ex-wife wrote a cease and desist letter to the OBGYN department head, asking him to investigate the matter **(Exhibit-20).** The department never

PAGE - 7

responded, and Mr. Amini was told by another supervisor that Ross University had contacted the department prior to his rotation to warn them about him in order to make Mr. Amini's life difficult at Jamaica Hospital. When Mr. Amini asked Ross to investigate, they never did.

36.  The harassment by Roger Curry and another student, Anupam Gupta, continued into Mr. Amini's next rotation, pediatrics at Jamaica Hospital. The two students were disparaging Mr. Amini about his body odor and about his low grade from OBGYN. They both constantly talked about him behind his back and would publically humiliate him.

37.  In all that time, Mr. Amini never responded to their negativism. When the six-week rotation ended, the supervisor, Dr. Friedman, met with each student individually. At the meeting with Mr. Amini, he told him that Ross University had made negative comments about him, but that he would not judge Mr. Amini by what Ross University has said, but by his performance at the hospital. Mr. Amini received an "A."

38.  The day Mr. Amini's pediatric rotation ended at Jamaica Hospital, he received an email from Ross University, stating they wanted to take him before the grievance committee. Apparently Anupam Gupta, who had been harassing Mr. Amini, made a claim against him. The claims were unfounded.

**GRIEVANCE HEARING PROCESS**

39.  Ross University wouldn't grant Mr. Amini due process for the grievance hearing. First, Ross University hired an IT investigator to find any defamatory information against Mr. Amini to use at the grievance committee. This investigator never spoke to Mr. Amini at all during these investigations, asking for his side of the story. Second, Ross University did not follow its own internal procedures – as outlined in the student handbook – for a fair grievance process. Mr. Amini had to hire an attorney, George Cotz, to help him. Attached here as **Exhibit-21**, are two letters that attorney Cotz wrote to Ross University's attorney, stating that Ross University was not following its own internal guidelines.

40.  Even after attorney Cotz's involvement, Ross University wouldn't grant Mr. Amini request for due process as defined in their internal guidelines. Then Mr. Amini asked another attorney, Colleen Kerwick, to get involved. Again Ross University wouldn't grant Mr. Amini's due process. Therefore, Mr. Amini was not able to adequately defend himself.

41.  During his internal medicine rotation at Griffin Hospital, Mr. Amini experienced a nervous breakdown due to emotional distress as result of Ross University's intent to kick him out of the program. A few days prior to the signing of the non-disparagement agreement, Mr. Amini left his hospital abruptly and left for Phoenix with the intent to take his own life. His attorney became alarmed and contacted Mr. Amini's ex-wife. After a couple of days, Mr. Amini's ex-wife was able to locate him and encouraged him to sign the agreement and transfer to another university.

**SETTLEMENT AGREEMENT**

42.  After realizing that he would not be able to receive a fair hearing, Mr. Amini agreed to sign a settlement agreement and leave Ross University. Like the grievance procedure, the settlement agreement was basically a "take it or live it" proposal in which Mr. Amini was given no option to change any of the terms, including the forum clause of the agreement. Mr. Amni finally succumbed to Ross's stressful tactics, signed a non-disparaging agreement in February 2012, and transferred to AUA in April 2012.

**BREACH OF CONTACT: VIOLATION OF SETTLEMENT AGREEMENT**

43.  After Mr. Amini transferred to his new medical school, AUA, he started experiencing mistreatment without knowing the cause. The mistreatment was mainly related to constant delays in scheduling his clinical rotations and that's what Mr. Amini needed to be able to finish his medical education and start his residency.  He informed both his attorney and Ross' attorney that he believed Ross had contacted AUA after his transfer to AUA, but the attorney for Ross denied the allegation.

44.  Then the clinical scheduling delays got worse to the point that Mr. Amini had to ask a physician friend to deal with AUA to arrange his clinical rotations on his behalf as Mr. Amini experienced a nervous breakdown due to emotional distress.

45.  Even after the friend's involvement, the problems continued. He finally personally responded to the school, and AUA used that response as a pretext to drag Mr. Amini before the grievance committee and dismiss him from AUA.

46.  On May 18th, 2013, Mr. Amini was informed by his attorney, George Cotz, that the attorney for AUA, Mr. Len Sclafani, stated that they had information, indicating that Mr. Amini

transferred to AUA from Ross University without disclosing to AUA the circumstances of his

transfer from Ross University.

47.  Given the history of animosity against Mr. Amini, including the retaliation resulting

from his complaints to the various regulatory agencies, the repeated denials of basic educational

services normally granted to other students, the repeated attempts by Ross University to force Mr.

Amini to sign the NDAs in exchange for those services, and the information provided by AUA's

attorney to Mr. Amini's attorney on May 18th , 2013, the circumstantial evidence points only to

one suspect, Ross University.

48.  Therefore, Ross University did not perform its obligations to Mr. Amini under the

Settlement Agreement and breached its obligations to Mr. Amini. Specifically, Ross University

has breached Section 4.18 of the Settlement Agreement by disclosing to Mr. Amini's new

medical School, AUA, the circumstance of Mr. Amini's transfer, which led to dismissal of Mr.

Amini's discharge from AUA on March, 2013.

49.  The settlement agreement was a fraud. Fraud was plaintiffs silence, knowing that

they had already, or were about to disclose to Mr. Amini's new medical School, AUA, the

circumstance of Mr. Amini's transfer, which lead to Mr. Amini's discharge from AUA on March,

2013.  Mr. Amini relied on the false impression and was damaged as a result of the reliance upon

the false impression.

50.  By refusing to provide the very basic services that any medical student at the

university is entitled to receive, Ross University used its bargaining power to force a weaker

party, Mr. Amini, to agree to its term, leaving Mr. Amini with no power to negotiate. To Mr.

Amini, the non-disparagement agreement was nothing more than a contract of adhesion, a

PAGE - 11

boilerplate contract that Ross University attempted three times to shove down his throat after repeatedly denying him normal student services. Ross University finally succeeded on its third attempt. The terms and conditions of the contract were set by Ross University, and Mr. Amini had little or no ability to negotiate more favorable terms, thus placing him in a "take it or leave it" position.

51.  Furthermore, the settlement agreement was not negotiated in good faith and was forced upon Mr.Amini. Ross University attempted three times to force him into signing the settlement agreement in exchange for basic services that any medical student at the university was entitled to receive from its administration. The first attempt was on April 2011 in exchange for a 30-day extension for taking his USMLE exam (**Exhibit-1**). The second time was on June 2011 when Ross University refused to schedule Mr. Amini for a rotation unless he signed the settlement agreement. In both instances Mr. Amini refused to sign. On the third attempt, Ross University threatened to take him before the grievance committee unless he signed. Mr. Amini then agreed to sign the agreement and to leave Ross.

## SUMMARY OF ARGUMENT
## THE CONTROLLING LEGAL STANDARDS

52.  The legal standards for issuing a temporary restraining order are the same as for a preliminary injunction. *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 592 (E.D. Pa. 2012). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.,* 555 U.S. 7, 24 (2008); *see also*, *Frank's GMC Truck Ctr., Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988) (observing that "the grant or injunctive relief is an extraordinary remedy which should be granted only in limited circumstances.").

53.  Pursuant to the Third Circuit's "familiar" test for preliminary relief, plaintiffs bear the burden of affirmatively demonstrating four conditions before this extraordinary relief is granted: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.[*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3dCir. 2004).]

54.  The first two conditions are mandatory. "To obtain a preliminary injunction, the moving party must demonstrate both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987); *see also*, *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir. 1982) (commenting that "[a] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction.").

55.  Nonetheless, even proof of irreparable harm does not render injunctive relief a matter of right. *Winter*, 555 U.S. at 24; *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

56.  When the remaining two factors are relevant, an applicant must demonstrate that "all four factors favor preliminary relief." *AT&T v. Winback*, 42 F.3d 1421, 1427 (3d Cir. 1994). Thus, the court must also weigh the possibility of harm to any other interested person and the harm to the public. *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 357 (3d Cir. 1980).

## PRONG 1- SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS:

## VIOLATION OF MR. AMINI'S FIRST AMENDMENT RIGHTS – BOTH

## FEDERAL AND NEW JERSEY STATE CONSTITUTION, ARTICLE I,

## SECTION 6:

57.  Enforcement of any of Ross University claims would violate the First Amendment. A fundamental principle emerging from the Supreme Court's decisions interpreting the First Amendment is that governmental units and courts may not impose a prior restraint on speech. *See Near v. Minnesota ex rel Olson*, 283 U.S. 697, 713-14, 51 S. Ct. 625 (1931) (". . . prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."); *see also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 560, 96 S. Ct. 2791, 2803 (1976); *Organization for a BetterAustin v. Keefe*, 402 U.S. 415, 418-19, 91 S. Ct. 1575, 1577-78 (1971) ("[C]ourts do not concern themselves with the truth or validity of the publication. Under *Near* . . . the injunction, so far as it imposes prior restraint on speech and publication constitutes an impermissible restraint on First Amendment rights.")  "Temporary restraining orders and permanent injunctions– *i.e.*, court orders that actually forbid speech activities– are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993).

58.  In *Near*, the Court invalidated a court order that perpetually enjoined the named party, who had published a newspaper containing articles found to violate a state nuisance statute, from producing any future "malicious, scandalous or defamatory" publication. 283 U.S. at 706, 51 S. Ct. at 627.

59.  In addition to the First Amendment's "heavy presumption" against prior restraints, *see New York Times Co. v. Sullivan*, 403 U.S. 713, 714, 91 S. Ct. 2140, 2141 (1971), "courts have long held that equity will not enjoin a libel." *Metro. Opera Ass'n v. Local 100, Hotel Employees and Rest. Emp. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001); *see also Kramer v. Thompson*, 947 F.2d 666, 677-78 (3d Cir. 1991) (following "nearly two centuries of widespread acceptance at common law" to conclude that equity will not enjoin a defamation). "'The usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.'" *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1206 (6th Cir. 1990) (Guy, J., majority opinion, controlling except as to injunctive relief for defamatory speech) (quoting *Cmty. For Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir.1987)).

60.  Some courts have permitted an exception to this long-standing, traditional rule. In fact, a majority of the court in *Lothschuetz* granted "a narrow and limited injunction" as an exception to this rule, prohibiting the defendant "from continuing and reiterating the same libelous and defamatory charges" found to be false and libelous. 898 F.2d at 1208-09 (Wellford, J., for the court, concurring in part, dissenting in part.)

61.  The court made it clear, however, that such an injunction only should be permitted for statements found by the trier of fact to be false and libelous. Where this "modern rule" has been followed, there has been a full adjudication of the merits before an injunction has issued

and the judge or jury has made a final determination that the statements to be enjoined are false and libelous. *See, e.g., Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 884 (E.D. Ky. 2006); *Kramer*, 947 F.2d at 676-77(summarizing cases applying the modern rule but concluding that the Pennsylvania Supreme Court would adhere to the traditional rule).

62.  In trademark cases, unlike copyright cases where the fair use defense is generally co-extensive with the First Amendment, *e.g.*, *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 560 (1985), First Amendment considerations routinely receive separate discussion, although they also inform consideration of statutory interpretation issues. Thus, even if a trademark has been used in a commercial context, courts are required to construe the trademark laws narrowly to avoid undue impingements on First Amendment rights, *e.g.*, *Cliffs Notes v. Bantam Doubleday*, 886 F.2d 490, 494 (2d Cir. 1989);

63.  First Amendment interests are weighed as a factor in deciding whether a trademark violation should be found, *e.g.*, *Anheuser-Busch v. Balducci Publications*, 28 F.3d 769, 776 (8 Cir. 1994); and injunctions must be narrowly crafted to comply with the general and virtually absolute rule against prior restraints of speech. *Id.* at 778; *Better Business Bureau v. Medical Directors*, 681 F.2d 397, 404-405 (5th Cir. 1982). And where, as is true here, the defendant is engaged in non-commercial speech rather than soliciting business, the mere application of trademark law may violate the First Amendment altogether, *L.L. Bean v. Drake Publishers*, 811 F.2d 26, 32-33(1st Cir. 1987).

64.  Finally, the rule against prior restraints is at its apogee with respect to noncommercial speech. *See* Lemley & Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Duke L.J. 147, 223-224 (1998).

1

2

3

**MR. AMINI'S NON-COMMERCIAL SPEECH ENJOYS FULL PROTECTION UNDER THE FIRST AMENDMENT.**

4

65.   The First Amendment bars each of plaintiff's claims. It is beyond peradventure that

5

plaintiff's action to enforce its trademark implicates the First Amendment even though

6

plaintiff is not a government actor.

7

66.   An injunction sought by private party is still government action by a court, *Shelley v.*

8

*Kraemer*, 334 U.S. 1, 14-15 (1948), which is therefore subject to scrutiny under the First

9

10

Amendment. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418 (1971); *see also*

11

*Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 224-225 (6th Cir. 1996). Similarly, an

12

award of monetary relief is government action that must comply with the First Amendment. *New*

13

*York Times v. Sullivan*, 376 U.S. 254 (1964).

14

67. Nor can it be disputed that the contents of Mr. Amini's web site are protected by

15

the First Amendment. Numerous cases hold that commentary about commercial products is

16

17

core speech protected by the First Amendment.  In *Bose Corp. v. Consumers Union*, 466 U.S.

18

485 (1984), the Supreme Court applied the *New York Times* standard to a libel action brought

19

by a manufacturer claiming that a consumer group had maligned its product.

20

68.   Many other cases have similarly treated criticisms of a company's products or

21

22

business practices as speech protected by the First Amendment.  *E.g.*, *Semco v. Amcast*, 52 F.3d

23

108, 111-114 (6th Cir. 1995); *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1119-1121 (8th

24

Cir. 1999); *U.S. Healthcare v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 927-939 (3d

25

Cir. 1990); *Mattel v. MCA Records*, 28 F. Supp. 2d 1120,1144-1145 (C.D. Cal. 1998).

26

69.  These principles do not apply any differently when trademarks are used in the course of speech on the Internet simply because the trademarks appear in HTML code. Mr. Amini's use of Plaintiff's name in the HTML code for his web site – even if treated as a trademark use, as alleged by Plaintiff – is just the sort of consumer commentary that courts fastidiously protect. The courts have repeatedly held that the use of trademarks constitutes speech within the protection of the First Amendment. *E.g.*, *Bad Frog Brewery v. New York State Liquor Authority*, 134 F.3d 87, 94-97 (2d Cir. 1998); *ACLU of Georgia v. Miller*, 977 F. Supp. 1228, 1233 (N.D. Ga. 1997).

70.  Mr. Amini's criticisms would be wholly mysterious — indeed, they would be pointless — if he had to omit from his web pages the name of the University or a company he is criticizing.  This is core speech that is fully protected by the First Amendment.

71.  When one company has, in the course of an advertising campaign, made statements about another company's products, the courts have hammered out a multi-factor test to determine when the statements are non-commercial, and thus entitled to full First Amendment protection,  or commercial, and thus entitled only to have their First Amendment interests weighed as part of a fair use or fair commentary defense. *Semco v. Amcast*, 52 F.3d 108, 112-114 (6th Cir. 1995).

72.  Similarly, when a seller of T-shirts or some other commercial product spoofs a trademark or uses a trademark to denounce a political position, the courts have had to decide whether the alleged infringer or diluter is predominantly engaged in commentary, thus obtaining greater protection under the First Amendment, or mainly making a use of a trademark to sell its own product. *E.g.*, *Cardtoons v. Major League Baseball Players Ass'n*, 95 F.3d 959, 968-970

(10th Cir. 1996); *Rogers v. Grimaldi*, 875 F.2d 994, 997-999 (2d Cir. 1989); *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 402-403 (8th Cir. 1987).

73. But when an action is brought against a non-commercial use of a trademark for either political or consumer commentary, the courts have not hesitated to afford full First Amendment protection against the trademark holder's claim, either by holding that First Amendment principles bar application of the federal statute, *Bally Total Fitness Holding Corp. v. Faber*, 29 F. Supp. 1161, 1167 (C.D. Cal. 1998); *Lighthawk v. Robertson,* 812 F. Supp. 1095, 1097-1101 (W.D. Wash. 1993); *Stop the Olympic Prison v. United States Olympic Comm.*, 489 F. Supp. 1112, 1124-1125 (S.D.N.Y. 1980); *see also Lucasfilm v. High Frontier*, 622 F. Supp. 931 (D.D.C. 1985) (ruling on non-constitutional grounds), or by holding that the state law in question is unconstitutional on its face or as applied to the particular case. *L.L. Bean v. Drake Publishers*, 811 F.2d 26, 33 (1st Cir. 1987); *ACLU of Georgia v. Miller*, 977 F. Supp. 1228, 1233 (N.D. Ga. 1997).

74. Ross University is apparently trying to shoehorn Mr. Amini's web site into the category of commercial speech. Quite to the contrary, the web site is on its face a description of alleged false advertising by Ross University, and a warning to other students about being careful before falling into a debt trap. Indeed, viewers who want to file a complaint, as opposed to simply providing information, are directed to complaint-filing web page. However, the web site itself, which does not solicit clients, is non-commercial speech under the First Amendment.

PAGE - 19

**THE FIRST AMENDMENT REQUIRES DENIAL OF THE PRELIMINARY INJUNCTION AND DISMISSAL OF THE COMPLAINT.**

75.  This is what trademark authority J. Thomas McCarthy calls a "nominative use" – that is, it simply describes the company which defendant has created his website to criticize – which is perfectly permissible under trademark law.

76.  At this stage of the proceedings, there has been no final determination that any statements on Mr. Amini's website are false and defamatory. Precedent therefore instructs that it would be inappropriate to grant Plaintiffs' request for an injunction restraining Mr. Amini's speech and website publications. Mr. Amini's conduct constitutes purely protected written speech which "fall(s) within the ambit of first amendment protections and are not subject to prior restraint whether or not those activities are tortious.

77.  Moreover, even if an injunction ultimately is entered in this case, it must "be clearly and narrowly drawn so as not to prohibit protected expression." *See Lassiter*, 456 F. Supp. 2d at 884.

78.  The injunctive relief Plaintiffs' request in its motion reaches far beyond the statements on Mr. Amini's website alleged to be false and defamatory and seeks to suppress *in toto* Mr. Amini's lawful exercise of his First Amendment rights via the internet.

79.  Given the non-commercial character of Mr. Amini's web site, there cannot be any doubt that the motion for a preliminary injunction must be denied on the ground that it is a prior restraint.  The law in the Sixth Circuit is clear and unequivocal – prior restraints are not permitted except in the most exceptional of circumstances, involving "a grave threat to a critical government interest or to a constitutional right." *Procter & Gamble Co. v. Bankers*

*Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996); *Ford Motor Co. v. Lane*, 67 F. Supp.2d 745 (E.D. Mich. 1999).

80. Accordingly, the Court should rule that the claims stated in the complaint fail on First Amendment grounds because Mr. Amini is engaged in non-commercial speech.

**INFRINGEMENT OF REGISTERED TRADEMARK IN VIOLATION OF SECTION 32(1) OF THE LANHAM ACT AND RELATED STATE LAW, TRADEMARK DILUTION IN VIOLATION OF THE FEDERAL TRADE MARK DILUTION ACT OF 1995 AND RELATED STATE LAW**

81. The trademark claims are defective because Mr. Amini's web site consists of protected speech relating to his former University. Not only does the First Amendment protect Mr. Amini's right to publish his views about Ross University on his website, but trademark law does not prevent consumers and their legal representatives from criticizing corporations and from using a company's trademarked names to identify the corporation whom they are criticizing.

82. The entire website is in the record **(Exhibit-7)**. Mr. Amini created a "gripe" website in order to share his experience with Ross University. In addition to his personal opinion and experience, Mr. Amini's website provides information that is already of public record or available elsewhere on the internet.

83. Moreover, there is no evidence of likelihood of confusion. Mr. Amini placed a disclaimer at the top of the first page of the website, disclosing to visitors that the website is not associated with Ross University **(Exhibit-6)**.

The disclaimer states:

> **Disclaimer:**  The Terms RossUniversity.info is for education purposes only, there are no goods or services provided on this site. RossUniversity.info is not the official site of any corporation or business. RossUniversity.info contains opinions of the author. RossUniversity.info is not associated/affiliated with Ross University, Ross University School of Medicine (RUSM), Ross Health Science. Inc. or Devry. Inc. These terms and conditions (the "Terms") govern your use of the RossUniversity.info website (the "Website"). If you do not agree with these Terms, do not use this Website.

84.  Mr. Amini is not a competitor of the Movants, his website has no commercial purpose, and the website disclaimer combined with the content certainly causes no confusion with the official site of the Plaintiffs. The website contains no advertising, charges no fees, does not seek to sell anything or direct users to websites that do.

85.  It is important for this Court to understand that the law is well settled that non-commercial "gripe' websites do not violate the trademark anti-dilution provisions of the Lanham Act, 15 U.S.C. or the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. §1125 (d).

86.  In numerous cases under state and federal trademark law, the courts have upheld the use of trademarked names in the course of criticizing the trademark holders:

- o  *L.L. Bean v. Drake Publishers*, 811 F.2d 26, 33 (1st Cir. 1987);
- o  *Bally Total Fitness Holding Corp. v. Faber*, 29 F. Supp. 1161, 1167 (C.D. Cal. 1998);
- o  *ACLU of Georgia v. Miller*, 977 F. Supp. 1228, 1233 (N.D. Ga. 1997);
- o  *Lighthawk v.Robertson,* 812 F. Supp. 1095, 1097-1101 (W.D. Wash. 1993);
- o  *Stop the Olympic Prison v. United States Olympic Comm.*, 489 F. Supp. 1112, 1124-1125 (S.D.N.Y. 1980);
- o  *Lucasfilm v. High Frontier*, 622 F. Supp. 931 (D.D.C. 1985).

87. In *Bally Total Fitness Holding Corporation v. Faber*, 29 F.Supp.2d 1161 (C.D.Cal.1998), Faber created a website called "Ballysucks" and used Bally's mark with the word "sucks" printed across it on the website. The website was dedicated to complaints about Bally's health club business. Bally sued for trademark infringement, unfair competition and trademark dilution. In granting summary judgment for Faber, the Court found there could be no confusion with Bally's cite because the site stated that it was "unauthorized" and contained the words "Ballys sucks", so no consumer would think the website was created by Bally.  The Court specifically found the purpose of the website was to criticize Bally and provide others with a forum for expressing their opinions of Bally and that Faber purposely chose to use Bally's mark for that purpose.

Significantly, the Court stated:

> Further, the average Internet user may want to receive all the information available on Bally. The user may want to access the official Internet site to see how Bally sells itself. Likewise the user may also want to be apprised of the opinions of others about Bally. This individual will be unable to locate sites containing outside commentary unless those sites include Bally's marks on the machine readable code upon which search engines rely. Prohibiting Faber from using Bally's name in the machine readable code would effectively isolate him from all but the most savvy Internet users. [emphasis added] 29 F.Supp.2dat 1165

The Court went on to say:

> ...Faber however is exercising his right to publish commentary about Bally. He cannot do this without making reference to Bally. In this regard, Professor McCarthy states: The main remedy of the trademark owner is not an injunction to suppress the message, but a rebuttal to the message. As Justice Brandeis long ago, stated, "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the process of education, the remedy to be applied is more  speech, not  enforced silence."SMcCarthy,

PAGE - 23

31:148at 31-216.[emphasis added] 29 F.Supp.2dat  1165-1166

88.  The *Taubman  Company  v.  Webfeats*, 319 F.3d 770 (6th Cir. 2003), is another example where First Amendment freedom triumphed over prior restraint of the right to speak. As with the cases discussed above, Mishkoff, proprietor of the website Webfeats, created a "gripe" website aimed at Appellee Taubman. Initially, he registered domain names and created websites using the name of a mall which Taubman was constructing. Thereafter, once Taubman filed suit to enjoin his use of these names, he registered five more domain names involving Taubman and its mall, all with the word "sucks" in the name. As the Court noted, all of the sites linked to the same site where Mishkoff, similar to Mr. Amini, posted a running commentary on his battle with Taubman and its attorneys, including documenting the legal proceedings through the posting of court filings.

89.  The granting of injunctive relief was reversed since Taubman could not demonstrate a substantial likelihood of success and that the orders represented a prior restraint on Mishkoff's First Amendment right to speak. As with the other cases cited, Mishkoff's site was not for commercial purposes and it contained the necessary disclaimers to avoid confusion with Taubman's website. The Court found that even if economic damage to Taubman was the intended effect of Mishkoff's expression, it was nonetheless  protected critical commentary of a business. Since damage to Taubman, if any, would be purely economic and thus compensable, the irreparable harm to Mishkoff in suppressing his constitutional right outweighed any harm that could result to Taubman by allowing the site to operate.

## VIOLATION OF THE ANTICYBERSQUATING ACT

90.  One of the seminal cases on these issues is *TMI, Inc. v. Maxwell*, 368 F.3d 433 (5th Cir. 2004) Maxwell created a "gripe" website "trendmakerhome.com" that resembled the Appellee TMI's TrendMaker Homes mark. Upon expiration of that website registration he created "trendmakerhome.info". The primary inquiry in Maxwell, as in all other cases under the Lanham Act, is whether the mark is being used for commercial purposes. There, the court found Maxwell had no commercial purpose, since he never charged for someone to use the site, accepted no payment for listings on the site, the site contained no advertising nor did he obtain the domain name for purposes of selling it to TMI.  In reaching its conclusion that Maxwell had no commercial purpose, the Court stated:

> In contrast to these instances of bad faith intent to profit, the Sixth Circuit recently affirmed a trial court's finding that a disgruntled customer who posted a website similar to Maxwell's did not have a bad faith intent to profit. Lucas Nursery & Landscaping, Inc. v. Grosse, 359 F.3d at 811. In Lucas Nursery, a former customer of Lucas Nursery registered the domain name "lucasnursery.com" and used the site to post her complaints about the nursery's work. [emphasis added] /d. at 808. The nursery sued her under ACPA. !d. After addressing the purposes behind ACPA,' the Lucas Nursery court concluded that the former customer did not have the kind of intent to profit that the act was designed to prohibit. /d. at 808-11.

> As in Lucas Nursery, here "[t]he paradigmatic harm that the ACPA was enacted to eradicate- the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark -is simply not present." !d. at 810. Also here, as in Lucas Nursery, the site's purpose as a method to inform potential customers about a negative experience with the company is key.[emphasis added]

> As the Sixth Circuit noted: Perhaps most important to our conclusion are, (defendant's) actions, which seem to have

been undertaken in the spirit of informing fellow consumers about the practices of a landscaping company that she believed had performed inferior work on her yard. One of the ACPA's main objectives is the protection of consumers from slick internet peddlers who trade on the names and reputations of established brands. The practice of informing fellow consumers of one's experience with a particular service provider is surely not inconsistent with  this ideal. Id at 811. [emphasis added] 368 F.3d at 439-440.

91.  The Actions of Mr. Amini are consistent with those of Maxwell, Faber, Mishkoff and many others in reported cases throughout the United States. He is not a competitor of the Movants, his website has no commercial purpose, and the website disclaimer combined with the content certainly causes no confusion with the official site of the Plaintiffs.

92.  Consequently, although the Movants may not like what Mr. Amini has to say, he has an absolute First Amendment right to say it.

## BREACH OF CONTRACT

93.  Finally, the settlement agreement is in dispute. The plaintiff alleges that Mr. Amini violated the agreement by publishing his websites, and the forum clause in the agreement chooses New Jersey as a venue in case of any disputes.

94.  The alleged settlement agreement is attached to the complaint as **Exhibit-1**. First, Mr. Amini contests that settlement agreement was a fraud. Fraud was plaintiffs silence, knowing that they had already, or were about to disclose to Mr. Amini's new medical School, AUA, the circumstance of Mr. Amini's transfer, which lead to Mr. Amini's discharge from AUA on March, 2013.  Mr. Amini relied on the false impression and was damaged as a result of the reliance upon the false impression.

95. The elements of silent fraud are the same as common-law fraud, apart from the nature of the representation. *McMullen v Joldersma*, 174 Mich App 207, 213; 435 NW2d 428 (1988).

96. After Mr. Amini transferred to his new medical school, AUA, he started experiencing mistreatment without knowing the cause. The mistreatment was mainly related to constant delays in scheduling his clinical rotations and that's what Mr. Amini needed to be able to finish his medical education and start his residency.  He informed both his attorney and Ross' attorney that he believed Ross had contacted AUA after his transfer to AUA, but the attorney for Ross denied the allegation.

97. Then the clinical scheduling delays got worse to the point that Mr. Amini had to ask a physician friend to deal with AUA to arrange his clinical rotations on his behalf as Mr. Amini experienced a nervous breakdown due to emotional distress.

98. Even after the friend's involvement, the problems continued. He finally personally responded to the school, and AUA used that response as a pretext to drag Mr. Amini before the grievance committee and dismiss him from AUA.

99. On May 18th, 2013, Mr. Amini was informed by his attorney, George Cotz, that the attorney for AUA, Mr. Len Sclafani, stated that they had information, indicating that Mr. Amini transferred to AUA from Ross University without disclosing to AUA the circumstances of his transfer from Ross University.

100. Given the history of animosity against Mr. Amini, including the retaliation resulting from his complaints to the various regulatory agencies, the repeated denials of basic educational services normally granted to other students, the repeated attempts by Ross University to force Mr.

Amini to sign the NDAs in exchange for those services, and the information provided by AUA's

attorney to Mr. Amini's attorney on May 18th , 2013, the circumstantial evidence points only to

one suspect, Ross University.

101.  Therefore, Ross University did not perform its obligations to Mr. Amini under the

Settlement Agreement and breached its obligations to Mr. Amini. Specifically, Ross University

has breached Section 4.18 of the Settlement Agreement by disclosing to Mr. Amini's new

medical School, AUA, the circumstance of Mr. Amini's transfer, which led to dismissal of Mr.

Amini's discharge from AUA on March, 2013.

102.  Second, by refusing to provide the very basic services that any medical student at

the university is entitled to receive, Ross University used its bargaining power to force a weaker

party, Mr. Amini, to agree to its term, leaving Mr. Amini with no power to negotiate. To Mr.

Amini, the non-disparagement agreement was nothing more than a contract of adhesion, a

boilerplate contract that Ross University attempted three times to shove down his throat after

repeatedly denying him normal student services. Ross University finally succeeded on its third

attempt. The terms and conditions of the contract were set by Ross University, and Mr. Amini

had little or no ability to negotiate more favorable terms, thus placing him in a "take it or leave

it" position.

103.  Third, the settlement agreement was not negotiated in good faith and was forced

upon Mr.Amini. Ross University attempted three times to force him into signing the settlement

agreement in exchange for basic services that any medical student at the university was entitled

to receive from its administration. The first attempt was on April 2011 in exchange for a 30-day

extension for taking his USMLE exam (**Exhibit-2**). The second time was on June 2011 when

Ross University refused to schedule Mr. Amini for a rotation unless he signed the settlement agreement. In both instances Mr. Amini refused to sign. On the third attempt, Ross University threatened to take him before the grievance committee unless he signed. Mr. Amini then agreed to sign the agreement and to leave Ross (**Exhibit-2**).

104.  In a case very similar to Mr. Amini's, another student, Michael Green, was also forced to accept a settlement agreement in exchange for very basic services that any Ross University student is entitled to receive. Attached here as **Exhibit-23** is his settlement agreement with New Jersey being the forum of choice for Ross University. Mr. Greene refused to sign the agreement and he has launched a lawsuit against Ross University. He also has launched a website against the school at **StopDevry.net**, where he shares about his experience.

## PRONG 2-THE LIKELIHOOD OF IRREPARABLE HARM:

105.  Plaintiffs have not established imminent irreparable harm in the absence of a temporary restraining order. A preliminary injunction is not warranted unless the plaintiff has already suffered irreparable injury or the complained of injury is imminent and irreparable. *See, e.g.*, *Marxe v. Jackson*, 833 F.2d 1121, 1128 (3d Cir. 1987); Continental Group, Inc., 614 F.2d at 359.

106.  Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant. In *Winter v. Natural Resources Defense Council*, 547 U.S. 338 (2006), the Court reiterated the general standard and held that a "*mere possibility*" of irreparable harm is insufficient to warrant a preliminary injunction.

PAGE - 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The Court stated:

> "Issuing a preliminary injunction based only on a possibility
> of irreparable harm is inconsistent with [the] characterization
> of injunctive relief as an extraordinary remedy that may only
> be awarded upon a clear showing that the plaintiff is
> entitled to such relief."

107. Supreme Court reversed, vacating the preliminary injunction. First, the Supreme Court restated the traditional test for a permanent injunction: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." The Supreme Court then rejected the lower court's sliding scale approach by which a plaintiff who demonstrates a strong likelihood of success on the merits may obtain a preliminary injunction based only on a "possibility" of irreparable harm.

108. The Supreme Court recognized the "frequently reiterated standard" that a plaintiff must demonstrate that irreparable injury is "likely" and held that the "possibility" standard is too lenient and inconsistent with the Court's characterization of injunctive relief as "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

109. The Supreme Court's decision in *Winter*, like its decision in *eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006)*, re-confirmed that a plaintiff must satisfy the traditional equitable test in order to obtain injunctive relief. More specifically, both cases emphasize that neither a more lenient "possibility" of irreparable harm, nor a categorical rule that an injunction will issue is sufficient to warrant the extraordinary relief provided by an injunction.

110. Trademark infringement warrants a presumption of irreparable harm because such harm inherently flows from a finding of likelihood of confusion. However, the Actions of Mr. Amini are consistent with those of Maxwell, Faber, Mishkoff and many others in reported cases throughout the United States. He is not a competitor of the Movants, his website has no commercial purpose, and the website disclaimer combined with the content certainly causes no confusion with the official site of the Plaintiffs. Consequently, although the Movants may not like what Mr. Amini has to say, he has an absolute First Amendment right to say it.

111.  In *Taubman Company v. Webfeats*, 319 F.3d 770 (6th Cir. 2003), the court stated:

> "even if economic damage to Taubman was the intended effect of Mishkoff's expression, it was nonetheless protected critical commentary of a business. Since damage to Taubman, if any, would be purely economic and thus compensable, the irreparable harm to Mishkoff in suppressing his constitutional right outweighed any harm that could result to Taubman by allowing the site to operate."

**PRONG 3- BALANCE OF EQUITIES**

112. The court must also balance the fairness of the case. This involves assessing the harm to the defendant if an injunction is granted against the harm to the plaintiff if an injunction is denied. Everything that has been shared about the plaintiff on Mr. Amini's websites has already been said publicly. After recent negative press against the plaintiff by Senator Durbin (**Exhibit-5**), Bloomberg News (**Exhibit-6**), and the attorney generals of the states of Illinois and Massachusetts(**Exhibit-10**), the plaintiffs are angry and lashing out at Mr. Amini.

PAGE - 31

113. The plaintiff is well aware that Mr. Amini left his birth country to live in a world where he could exercise free speech. To assert that Mr. Amini should be denied his first amendment rights through an injunction of the court is not only harmful, but cruel.

### PRONG 4- PUBLIC INTEREST

114. The entire website is in the record (**Exhibit-7**). Mr. Amini created a "gripe" website in order to share his experience with Ross University. In addition to his personal opinion and experience, Mr. Amini's website provides information that is already of public record or available elsewhere on the internet.

115. Moreover, there is no evidence of likelihood of confusion. Mr. Amini placed a disclaimer at the top of the first page of the website, disclosing to visitors that the website is not associated with Ross University (**Exhibit-8**).

116. Mr. Amini is not a competitor of the Movants, his website has no commercial purpose, and the website disclaimer combined with the content certainly causes no confusion with the official site of the Plaintiffs. The website contains no advertising, charges no fees, does not seek to sell anything or direct users to websites that do.

117. Given the non-commercial character of Mr. Amini's web site, there cannot be any doubt that the motion for a preliminary injunction must be denied on the ground that it is a prior restraint. The law in the Sixth Circuit is clear and unequivocal – prior restraints are not permitted except in the most exceptional of circumstances, involving "a grave threat to a critical government interest or to a constitutional right." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996); *Ford Motor Co. v. Lane*, 67 F. Supp.2d 745 (E.D. Mich. 1999).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**CONCLUSION**

118. The motion for a preliminary injunction should also be denied because plaintiff has no chance of succeeding either on its trademark related claims or on its breach of contract claims.

119. The trademark claims are defective because Mr. Amini's web site consists of protected speech relating to his former University. Not only does the First Amendment protect Mr. Amini's right to publish his views about Ross University on his website, but trademark law does not prevent consumers and their legal representatives from criticizing corporations and from using a company's trademarked names to identify the corporation whom they are criticizing.

120. The breach of contract claim are defective because the contract was fraud and fraud was plaintiffs silence, knowing that they had already, or were about to disclose to Mr. Amini's new medical school, AUA, the circumstance of Mr. Amini's transfer, which lead to Mr. Amini's discharge from AUA on March, 2013.

121. Measured by these rigorous standards, plaintiffs cannot establish either irreparable harm or reasonable likelihood of success on the merits. Moreover, the public interest weighs heavily against restraining of free speech, especially when it involves tax-payers money being misappropriated, as outlined by Senator Durbin complaint to DOE against Ross University.

122. For all the foregoing reasons, the Court should enter an order: dismissing plaintiffs' request for preliminary injunction.

**WHEREFORE,** the Defendant, Behzad Amini, requests this Court to dismiss plaintiffs' request for preliminary injunction for the foregoing reasons, based on the above cited authorities.

**Dated: 28 of October, 2013.**

_____
Behzad Amini – Pro Se

**<u>VERIFICATION</u>**

I, Behzad Amini, hereby verify and certify under 28 U.S.C. § 1746 to the following facts:

1.  I am the defendant in the above case.

2.  I have read the foregoing motion and know the contents thereof, and the same is true to my own knowledge, except to those matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true.

I certify under penalty of perjury that the foregoing is true and correct.

**Dated: 28 of October, 2013**

_____
Behzad Amini – Pro Se

PAGE - 34