# EXHIBITS

EXHIBIT # 1.................................................... FIRST NON-DISPARAGEMENT AGREEMENT

EXHIBIT # 2....................................................THIRD NON-DISPARAGEMENT AGREEMENT

EXHIBIT # 3........................................................MR. AMINI STUDENT LOAN DEBT

EXHIBIT # 4........................................................ ROSS UNIVERSITY GRADUATION RATE

EXHIBIT # 5.........................................................SENATOR DURBIN STATEMENT

EXHIBIT # 6.........................................................................BLOOMBERG ARTICLE

EXHIBIT # 7.........................................................ENTIRE WEBSITE TRANSCRIPT

EXHIBIT # 8.........................................................WEBSITE DISCLAIMER

EXHIBIT # 9.............................................................. TAMPA BAY TIMES REPORT

EXHIBIT # 10................................ STATE ATTORNEYS ISSUED SUBPOENAS TO DEVRY

EXHIBIT # 11.................................................................. ACADEMIC TRANSCRIPT

EXHIBIT # 12......................................................................... REFERENCE LETTER

EXHIBIT # 13................................................................................ USMLE SCORE

EXHIBIT # 14......................... MR. AMINI COPLAINT TO ROSS UNIVERSITY PRESIDENT

EXHIBIT # 15................................................... ROSS UNIVERSITY PRESIDENT RESPONSE

EXHIBIT # 16................................................ CALIFORNIA MEDICAL BOARD COMPLAINT

EXHIBIT # 17.................... NATIONAL BOARD OF MEDICAL EXAMINERS COMPLAINT

EXHIBIT # 18.................................................DEPARTMENT OF EDUCATION COMPLAINT

EXHIBIT # 19..................................................................... ACCUSING MR. AMINI OF BODY

EXHIBIT # 20........................................ATTORNEY C&D TO STOP HARASSING MR.AMINI

EXHIBIT #21 ......................  ATTORNEY GEORGE COTZ LETTER TO TOSS UNIVERSITY

EXHIBIT #22 ...........................  MICHAEL GREEN NON-DISPARAGEMENT AGREEMENT

EXHIBIT #23 ... FEDERAL JUDGE PATRICK DUGGEN RULING DENYING INJUNCTION

EXHIBIT #24 .......................................................................... CASE COMPARISONS

# EXHIBIT-1

## EXTENSION AGREEMENT

This Extension Agreement ("Agreement") is made effective this            day of

April, 2011 ("Effective Date"), by and between Ben Amini ("Amini"), residing at 13835 N.

Tatum Boulevard, #9-280, Phoenix, Arizona, and Ross Health Sciences, Inc. ("Ross"),

maintaining its offices at 630 U.S. 1, North Brunswick, New Jersey.

## RECITALS

**WHEREAS,** Ross is a subsidiary of DeVry Inc. which, through its subsidiaries,

operates Ross University School of Medicine ("RUSM");

**WHEREAS,** RUSM is an educational institution offering a Doctor of Medicine

degree program;

**WHEREAS,** Amini is a student enrolled at RUSM;

**WHEREAS,** RUSM uses the United States Medical Licensing Examination

Policy Step 1 examination ("USMLE Step 1") as one criteria of a student's eligibility to enter

into the clinical clerkships that are an integral component of RUSM's curriculum;

**WHEREAS,** RUSM students become eligible to sit for the USMLE Step 1 when

they have passed all courses in the first four semesters, successfully completed the Advanced

Introduction to Clinical Medicine clerkship and have passed the National Board of Medical

Examiners' Comprehensive Basic Science Exam;

**WHEREAS,** RUSM requires its students to sit for the USMLE Step 1 for the first

time within six months of becoming eligible to do so;

**WHEREAS,** RUSM students are required to take and pass the USMLE Step 1 in

no more than three attempts and must do so within one year of becoming eligible;

**WHEREAS,** a RUSM student who fails to sit for the USMLE Step 1 for the first

time within six months of becoming eligible is subject to administrative withdrawal;

FIRM:15695025v2

**WHEREAS,** a RUSM student who does not pass the USMLE Step 1 in three attempts within one year of becoming eligible to sit for that examination is dismissed from the school;

**WHEREAS,** Amini did not sit for the USMLE Step 1 for the first time within six months of becoming eligible to do so, i.e., by March 31, 2011, as required by RUSM's policies;

**WHEREAS,** Amini secured an extension through April 30, 2011 to sit for the USMLE Step 1;

**WHEREAS,** Amini now seeks a further extension of the time within which he must sit for the USMLE Step 1;

**WHEREAS,** a dispute has arisen regarding Amini's eligibility for an additional extension of the deadline by which he must sit for the USMLE Step 1;

**WHEREAS,** the parties wish to resolve any and all differences that may exist or arise between them;

**NOW, THEREFORE,** in consideration of the mutual promises exchanged herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Amini and Ross hereby memorialize their agreement as follows:

## ARTICLE I.

### Extension

1.1     **Final <u>Extension</u> --** In exchange for Amini's obligations assumed herein, Ross agrees to extend the time within which Amini must sit for the USMLE Step 1 through to May 31, 2011. Amini acknowledges that he otherwise would not be entitled to this extension.

1.2     **Consequences of Failing to Sit for the Step 1 --** It is expressly agreed and understood that the extension provided to Amini pursuant to Section 1.1 above shall be the final extension afforded to Amini and that if Amini fails for any reason whatsoever, whether

2

within his control or not, to sit for the USMLE Step 1 by May 31, 2011 he will be subject to immediate administrative withdrawal.

        **1.3**     **Consequences of Failing to Pass the Step 1** -- It is further expressly understood and agreed that the extension provided to Amini pursuant to Section **1.1** above shall have no impact on his obligation to pass the USMLE Step 1 within one year of becoming eligible to sit for that examination, or by September 30, 2011, and that if he fails for any reason whatsoever, whether within his control or not, to pass the USMLE Step 1 by September 30, 2011, he will be dismissed from the school.

<h2 style="text-align:center">ARTICLE II.</h2>

<h3 style="text-align:center">Miscellaneous</h3>

        **2.1.**     **Confidentiality--** Amini and Ross shall treat the existence and contents of this Agreement as being strictly confidential. The parties represent that to date they have not disclosed and agree that hereinafter they shall not disclose the existence or contents of this Agreement to any third party other than their respective counsel, auditors, tax advisors, insurers or family members, existing or prospective, on a strictly as-needed basis, or pursuant to a court order or other valid and legal process. Further, no party, either by act or omission, shall knowingly permit the disclosure of same to any third party. In the event that a formal request is made to either party to compel the dissemination of information regarding the existence of this Agreement, or the terms and conditions of same, said party shall promptly notify, in writing, the other party of such request so as to afford the other party the ability (but not the obligation) to object and oppose the dissemination of such information. Any knowing and intentional violation of this confidentiality provision shall constitute a material breach of this Agreement for which Ross will be entitled to immediately seek injunctive relief and all other forms of relief available to it.

3

**2.2.     Entire Agreement** -- This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof. It supersedes any and all prior agreements relating thereto. There are no other understandings or agreements between or among the parties with respect to the subject matter hereof except as set forth herein. No condition or provision of this Agreement may be modified, waived or revised in any way except in writing executed by all parties and referring specifically to this Agreement.

2.3.     **Advice of Counsel** -- Amini acknowledges and represents that Ross has encouraged him to seek the advice of counsel prior to executing this Agreement; that he has had a full and fair opportunity to seek the advice of counsel; that to the extent Amini sought advice of cotmsel, such advice was effective in all respects; and that Amini has had all the time reasonably necessary to fully review the Agreement so as to allow effective consultation with counsel or other advisors and further negotiation prior to Amini's execution of this Agreement.

**2.4.     Binding Effect** -- This Agreement and all rights and duties set forth herein shall be binding upon and inure to the benefit of the parties hereto, as well as their respective successors and assigns.

**2.5.     Governing Law** -- This Agreement and its interpretation and performance shall be governed by the laws of the State of New Jersey, without giving effect to its conflict of law rules.

**2.6     Choice of Forum** -- Any action relating to or arising out of the terms of this Agreement shall be brought either in the United States District Court for the District of New Jersey or the Superior Court of the State of New Jersey, County of Middlesex. The parties hereby expressly consent to either court's exercise of jurisdiction over them with respect to any such action.

4

2.7.     **Partial Invalidity--** In the event any provision of this Agreement is held to be contrary to or invalid under the laws of any country, state, municipality or other jurisdiction, such illegality or invalidity shall not affect in any way any of the other provisions hereof, all of which shall continue in full force and effect.

2.8.     <u>Captions</u> -- The captions set forth in this Agreement are intended solely for the parties' convenience and ease of reference and are not intended to modify, limit, describe or affect in any way the scope, content or intent of this Agreement.

2.9.     <u>**Signatures in Counterpart**</u>-- This Agreement may be executed simultaneously in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.  The parties agree that signatures by facsimile or PDF shall be deemed original signatures.

2.10.     **Authorizations** --Ross hereby represents and warrants that its representative identified below is fully authorized to execute this Agreement on its behalf.

2.11.     **Investigations--** The parties hereto acknowledge and agree that they have entered into this Agreement and have executed it without duress or coercion, and have done so with the full advice of counsel.  Each party further acknowledges and agrees that no other party has made any representations, warranties, promises or agreements not set forth herein and no party relies in any way on any representation, warranty, statement of fact or opinion, understanding, disclosure or non-disclosure not set forth herein in entering into this Agreement and executing it, and that no party has been induced in any way, except for the consideration, representations, warranties, statements and covenants recited herein, to enter into this Agreement.

2.12.   **Non-Disparagement** -- Amini shall not directly or indirectly say or do anything that would disparage, reflect negatively on, or call into question the operations, reputation or business relationships of Ross or any of its affiliated entities, including RUSM or DeVry Inc., or any current or former employee, officer, director or agent of Ross or those affiliated entities. Should Amini violate the terms of this section, he shall be in a material breach of the Agreement and Ross shall be entitled to immediately seek injunctive relief and all other forms of relief available to it.

2.13   **Construction and Enforcement** -- The terms of this Agreement are the product of negotiations between the parties and shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

2.14.   **No Waiver--** The failure of either party to this Agreement to exercise and/or delay in their exercising any power or right hereunder shall not operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise of any other power or right hereunder.  Further, the waiver by either party to this Agreement of any right or remedy hereunder on any occasion shall not be construed as a waiver of any such right or remedy on any future occasion.

2.15.   **Notices--** All notices, requests, demands or other communications required or contemplated hereunder or relating hereto shall be in writing and forwarded by overnight and/or first class mail addressed as follows:

**If to Amini:**

Mr. Ben Amini
13835 N. Tatum Boulevard, #9-280
Phoenix. Arizona 85032

6

**If to Ross:**

Dr. Thomas C. Shepherd
President
Ross University
630 U.S. Highway 1
North Brunswick, New Jersey 08902-3311

with a copy to:

Gregory S. Davis, Esq.
DeVry Inc.
3005 Highland Parkway
Downers Grove, Illinois 60515-5799

 2.16.   **No Assignment--** Amini and Ross represent and warrant that they have not assigned or transferred any interest in the matters released herein to any person or entity not a party to this Agreement.

 2.17.   **No Admissions--** The parties' execution of this Agreement or any of the individual terms thereof shall not be construed or otherwise deemed to be an admission or acknowledgement by any party of any wrongful or improper act or conduct, of any violation of any statute, regulation, code, or any other law or contract, nor of any liability to any other party. Neither this Agreement, the fact that an agreement has been reached, nor the promises and payments in consideration of this Agreement shall be taken, used, or deemed admissible evidence in any action or proceeding, except to enforce the terms of this Agreement.

7

**IN WITNESS WHEREOF,** the parties have signed this Agreement as of the Effective Date set forth above.


_____          Date: April          , 2011

Ben Amini


ROSS IIEALTil SCIENCES, INC.


By: \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_ \_          Date: April          '2011
Dr. Thomas C. Shepherd
President

8

# EXHIBIT-2

**EXECUTION COPY**

## SETTLEMENT AGREEMENT WITH MUTUAL RELEASES

This Settlement Agreement ("Settlement Agreement") is made this 9th day of February 2012 ("Effective Date"), by and between Ross University School of Medicine ("RUSM"), located at 630 U.S. Highway 1, North Brunswick, New Jersey; Behzad Amini ("Amini"), residing at 1385 North Tatum Boulevard, #9-Z80, Phoenix, Arizona; Anupam Gupta ("Gupta"), residing at 220 Crown Prince Drive, Marlton, New Jersey; and Roger Curry ("Curry"), residing at 8927 118th Street, Richmond Hill, New York.

## RECITALS

**WHEREAS**, RUSM is an educational institution maintaining a campus in Dominica, W.I. and offering a Doctor of Medicine degree program;

**WHEREAS**, at all relevant times Amini was a student enrolled at RUSM;

**WHEREAS**, on or about September 27, 2011, Gupta, a student at RUSM, filed with RUSM an internal grievance against Amini (the "Complaint");

**WHEREAS**, Amini has denied and continues to deny the material allegations asserted against him in the Complaint;

**WHEREAS,** on or about October 21, 2011 the chairman of RUSM's Grievance Committee advised Amini that the Complaint would be referred to the Grievance Committee for a full hearing;

**WHEREAS**, RUSM's Grievance Committee scheduled a hearing into the Complaint for February 11, 2012 (the "Hearing");

**WHEREAS**, Curry, a medical student at St. George's University, was scheduled to appear at the Hearing on Gupta's behalf;

**WHEREAS**, after consulting with counsel, RUSM, Amini, Gupta and Curry have independently concluded that it is in their respective best interests to settle and resolve

amicably and expeditiously any and all disputes and controversies that have been or could have been raised among them in the Hearing or relating in any way to the facts and circumstances giving rise to the Complaint or Hearing;

      **WHEREAS**, the parties have engaged in good faith negotiations in an effort to resolve their differences; and

      **NOW, THEREFORE**, in consideration of the mutual promises exchanged herein and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, and without admitting any wrongdoing, liability or fault whatsoever, RUSM, Amini, Gupta and Curry hereby memorialize their agreement as follows:

## ARTICLE I.

### General Releases

      **1.1**    **Amini's Release of RUSM** - - Except for RUSM's obligations pursuant to this Settlement Agreement, Amini together with his heirs and assigns hereby releases and discharges RUSM and/or any of its parent, subsidiary or any other affiliated entities, and any and all of its or their former and current members, principals, directors, officers, shareholders, employees, agents, attorneys, contractors, representatives, affiliates, predecessors, successors and assigns, from liability on and for any and all claims, demands, causes of action, damages, costs, expenses, accounts, contracts, agreements, promises, compensation and all other liabilities of any kind or nature whatsoever, direct or indirect, known or unknown, that Amini may have had or now has for any reason whatsoever as against RUSM or any of its affiliated entities, including, but not limited to, any action for breach of express or implied contract, retaliation, discrimination based upon race, creed, color, national origin, religion, gender, disability, age, marital status, sexual orientation, alienage or citizenship, and any other claim of any nature whatsoever.  To the extent any such claim cannot be waived as a matter of law, it is understood and agreed that

2

Amini expressly waives his right to any relief of any kind on any such claim, including attorneys' fees and costs, should Amini pursue any such claim or should any person or entity pursue any such claim on Amini's behalf.

      1.2    **Amini's Release of Gupta** -- Except for his obligations pursuant to this Settlement Agreement, Amini together with his heirs and assigns hereby releases and discharges Gupta and/or any of his heirs and assigns from liability on and for any and all claims, demands, causes of action, damages, costs, expenses, accounts, contracts, agreements, promises, compensation and all other liabilities of any kind or nature whatsoever, direct or indirect, known or unknown, that Amini may have had or now has for any reason whatsoever as against Gupta, including, but not limited to, any action for breach of express or implied contract, tort, retaliation, discrimination based upon race, creed, color, national origin, religion, gender, disability, marital status, sexual orientation, alienage or citizenship, and any other claim of any nature whatsoever. To the extent any such claim cannot be waived as a matter of law, it is understood and agreed that Amini expressly waives his right to any relief of any kind on any such claim, including attorneys' fees and costs, should Amini pursue any such claim or should any person or entity pursue any such claim on Amini's behalf.

      1.3    **Amini's Release of Curry** -- Except for his obligations pursuant to this Settlement Agreement, Amini together with his heirs and assigns hereby releases and discharges Curry and/or any of his heirs and assigns from liability on and for any and all claims, demands, causes of action, damages, costs, expenses, accounts, contracts, agreements, promises, compensation and all other liabilities of any kind or nature whatsoever, direct or indirect, known or unknown, that Amini may have had or now has for any reason whatsoever as against Curry, including, but not limited to, any action for breach of express or implied contract, tort, retaliation

discrimination based upon race, creed, color, national origin, religion, gender, disability, marital status, sexual orientation, alienage or citizenship, and any other claim of any nature whatsoever. To the extent any such claim cannot be waived as a matter of law, it is understood and agreed that Amini expressly waives his right to any relief of any kind on any such claim, including attorneys' fees and costs, should Amini pursue any such claim or should any person or entity pursue any such claim on Amini's behalf.

      1.4    **RUSM's Release of Amini**-- Except for his obligations pursuant to this Settlement Agreement, RUSM together with its parent, subsidiary or any other affiliated entities, and any and all of its or their former or current members, principals, directors, officers, shareholders, employees, agents, attorneys, contractors, representatives, affiliates, parent or holding entities, subsidiaries, predecessors, successors and assigns, hereby release and discharge Amini and/or any of his heirs and assigns from liability on and for any and all claims, demands, causes of action, damages, costs, expenses, accounts, contracts, agreements, promises, compensation and all other liabilities of any kind or nature whatsoever, direct or indirect, known or unknown, that RUSM may have had or now has for any reason whatsoever as against Amini.

      1.5    **Gupta's Release of Amini** -- Except for his obligations pursuant to this Settlement Agreement, Gupta together with his heirs and assigns, hereby releases and discharges Amini and/or any of his heirs and assigns from liability on and for any and all claims, demands, causes of action, damages, costs, expenses, accounts, contracts, agreements, promises, compensation and all other liabilities of any kind or nature whatsoever, direct or indirect, known or unknown, that Gupta may have had or now has for any reason whatsoever as against Amini.

      1.6    **Curry's Release of Amini** -- Except for his obligations pursuant to this Settlement Agreement, Curry together with his heirs and assigns, hereby releases and discharges

FIRM:17373733v3

Amini and/or any of his heirs and assigns from liability on and for any and all claims, demands,

causes of action, damages, costs, expenses, accounts, contracts, agreements, promises,

compensation and all other liabilities of any kind or nature whatsoever, direct or indirect, known

or unknown, that Curry may have had or now has for any reason whatsoever as against Amini.

## ARTICLE II.

### Voluntary Withdrawal

**2.1** **Amini's Withdrawal** - - Effective March 24, 2012, Amini shall

voluntarily and irrevocably withdraw as a student of RUSM.  Said withdrawal shall be deemed to

have been effected for personal reasons and, absent any adverse developments between the

Effective Date and the date of his withdrawal, Amini shall be deemed to have been a student in

good standing at the time of his withdrawal.  Absent any adverse developments between the

Effective Date and the date of his withdrawal, Amini's official RUSM transcript will reflect only

that he withdrew for personal reasons and shall make no reference to the facts and circumstances

relating to the Complaint, Hearing or this Settlement Agreement.

**2.2** **Withdrawal of Complaint** - - Simultaneous with his execution of this

Settlement Agreement, Gupta shall withdraw the Complaint and RUSM shall cancel the Hearing.

**2.3** **No Application to DeVry Institutions** - - Subsequent to his voluntary

withdrawal, Amini shall be free to apply for admission to any educational institution of his

choosing other than any institution affiliated in any way with DeVry Inc. ("DeVry"), including

without limitation American University of the Caribbean School of Medicine ("AUC").  Further,

Amini shall not be permitted to apply for readmission to RUSM.

**2.4** **Hearing Record** - - RUSM hereby expressly agrees that the record  the

Grievance Committee was scheduled to consider at the Hearing shall at all times be kept separate

from Amini's academic record.  RUSM further represents that, other than the individuals

identified in Section 4.18(d) below, as well as RUSM's counsel and computer forensic expert, no representative of RUSM has had access to said record to date and that, absent any adverse developments subsequent to the Effective Date, said record shall not be further disseminated.

## ARTICLE III.

### Post-Settlement Obligations

3.1    **No Interference** - - RUSM shall not directly or indirectly interfere or attempt to interfere with Amini's efforts to enroll at any other educational institution in a manner consistent with the limitations set forth in Section 2.3 above.

3.2    **Reference Letter** - - Upon Amini's written request, RUSM shall provide him with a letter in the form attached hereto as Exhibit A for use in connection with his efforts to enroll at another educational institution in a manner consistent with the limitations set forth in Section 2.3 above.

3.3    **No Assurances** - - It is expressly understood and agreed that neither RUSM nor any of its affiliated entities has provided nor will they provide Amini with any assurances that he will be successful in his effort to enroll at another educational institution.

## ARTICLE IV.

### Miscellaneous

4.1    **Legal Proceedings** -- In the event any party hereto commences a legal action to enforce any terms of this Settlement Agreement, the prevailing party shall be reimbursed for its reasonable attorneys' fees and litigation costs by the breaching party.

4.2    **Entire Agreement** -- This Settlement Agreement, including any attachments thereto, sets forth the entire agreement between the parties with respect to the subject matter hereof.  It supersedes any and all prior agreements relating thereto.  There are no

6

other understandings or agreements between the parties with respect to the subject matter hereof except as set forth herein.

        4.3     **No Oral Modification** -- No condition or provision of this Settlement Agreement may be modified, waived or revised in any way except in writing executed by the parties and referring specifically to this Agreement.

        4.4     **Binding Effect** -- This Settlement Agreement and all rights and duties set forth herein shall be binding upon and inure to the benefit of the parties hereto, as well as their respective successors and assigns.

        4.5     **Governing Law** -- This Settlement Agreement and its interpretation and performance shall be governed by the laws of the State of New Jersey without giving effect to the conflicts of law rules of that State.

        4.6     **Venue** -- Any action arising in any way out of the terms of this Settlement Agreement, or a party's performance or non-performance thereof, shall be brought in the Superior Court of New Jersey, Middlesex County or the United States District Court for the District of New Jersey, and the parties hereby expressly consent to either court's exercise of personal jurisdiction over them with respect to any such action.

        4.7     **Partial Invalidity** -- In the event any provision of this Settlement Agreement is held to be contrary to or invalid under the laws of any country, state, municipality or other jurisdiction, such illegality or invalidity shall not affect in any way any of the other provisions hereof, all of which shall continue in full force and effect.

        4.8     **Captions** -- The captions set forth in this Settlement Agreement are intended solely for the parties' convenience and ease of reference and are not intended to modify, limit, describe or affect in any way the scope, content or intent of this Settlement Agreement.

4.9   **Signatures** -- This Settlement Agreement may be executed simultaneously or in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.  The parties agree that signature by facsimile or PDF shall constitute an original signature.

4.10   **Authorizations** -- RUSM hereby represents that its representative identified below is fully authorized to execute this Settlement Agreement on its behalf.

4.11   **No Duress** -- The parties hereto acknowledge and agree that they have entered into this Settlement Agreement and have executed it without duress or coercion, and have done so with the full advice of counsel.  Each party further acknowledges and agrees that no other party has made any representations, warranties, promises or agreements not set forth herein and no party relies in any way on any representation, warranty, statement of fact or opinion, understanding, disclosure or non-disclosure not set forth herein in entering into this Settlement Agreement and executing it, and that no party has been induced in any way, except for the consideration, representations, warranties, statements and covenants recited herein to enter into this Settlement Agreement.

4.12   **Construction and Enforcement** -- The terms of this Settlement Agreement are the product of negotiations between the parties through their respective counsel, if any, and the parties agree that those terms shall be construed without regard to any presumption or other rule requiring construction against the party causing this Settlement Agreement to be drafted.

4.13   **No Waiver** -- The failure of any party to this Settlement Agreement to exercise and/or delay in exercising any power or right hereunder shall not operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or

8

further exercise of any other power or right hereunder.  Further, the waiver by any party to this Settlement Agreement of any right or remedy hereunder on any occasion shall not be construed as a waiver of any such right or remedy on any future occasion.

      **4.14**   **No Admissions** -- The parties' execution of this Settlement Agreement or any of the individual terms thereof shall not be construed or otherwise deemed to be an admission or acknowledgement by any party of any wrongful or improper act or conduct, nor of any liability to any other party.  This Settlement Agreement shall not be taken or used, or be deemed admissible evidence, in any action or proceeding except to enforce the terms of this Settlement Agreement.

      **4.15**   **Notices** -- All notices, requests, demands or other communications required or contemplated hereunder or relating hereto shall be in writing and forwarded by overnight delivery and/or first-class mail addressed as follows:

      (a)     **If to Amini:**

           Mr. Behzad Amini
           13835 North Tatum Boulevard, #9-Z80
           Phoenix, Arizona 85032

           with a copy to:

           George J. Cotz, Esq.
           Cotz & Cotz
           180 Franklin Turnpike
           Mahwah, New Jersey 07430

      (b)     **If to RUSM:**

           Dean
           Ross University School of Medicine
           2300 SW 145th Avenue, Suite 200
           Miramar, Florida 33027

9

with a copy to:

General Counsel
DeVry Inc.
3005 Highland Parkway
Downers Grove, Illinois 60515-5799

(c)     **If to Gupta:**

Mr. Anupam Gupta
220 Crown Prince Drive
Marlton, New Jersey 08053

(d)     **If to Curry:**

Mr. Roger Curry
8927 118th Street
Richmond Hill, New York

4.16    **Confidentiality** - - The parties shall treat the existence and contents of this Settlement Agreement as being strictly confidential.  The parties represent that to date they have not disclosed and agree hereafter they shall not disclose the existence or contents of this Settlement Agreement or the settlement terms to any third party other than their respective attorneys, auditors, tax advisors, insurers or immediate family members, on a strictly as needed basis, or pursuant to a court order or other valid legal process or as necessary to enforce the terms hereof.  Further, no party, either by act or omission, shall knowingly permit the disclosure of the contents of this Settlement Agreement or the settlement terms to any third party except as stated herein.  In the event that a formal request is made to any party to compel the dissemination of information regarding the existence of this Settlement Agreement, or the terms and conditions of same, said party shall promptly notify, in writing, all other parties of such request so as to afford the other parties the ability (but not the obligation) to object and oppose the dissemination of such information.  Any knowing and intentional violation of this confidentiality provision

10

shall constitute a material breach of this Settlement Agreement for which the harmed party will have no adequate remedy at law.

      4.17   **No Assignment** –The parties each represent and warrant that they have not assigned or transferred and shall not assign or transfer any interest in the matters released herein to any person or entity not a party to this Settlement Agreement.

      4.18   **Non-Disparagement** – From the Effective Date forward:

(a)    Amini shall not directly or indirectly say, write or do anything that would disparage, reflect negatively upon or otherwise call into question RUSM's business operations, products, services, integrity, reputation or business relationships, or the business operations, products, services, integrity, reputation or business relationships of any of the releasees identified above in Section 1.1, except as may be required by law;

(b)    Amini shall not directly or indirectly say, write or do anything that would disparage, reflect negatively upon or otherwise call into question the professional skills, integrity or reputation of Gupta or any of the releasees identified above in Section 1.2, except as required by law;

(c)    Amini shall not directly or indirectly say, write or do anything that would disparage, reflect negatively upon or otherwise call into question the professional skills, integrity or reputation of Curry or any of the releasees identified above in Section 1.3, except as required by law;

(d)    Dr. Joseph Flaherty, Dr. Nancy A. Perri, Dr. Enrique Fernandez, Dr. Scott Ippolito and Mr. Tim Donnelly of RUSM shall not directly or indirectly say, write or do anything that would disparage, reflect negatively upon or otherwise call into question the professional skills, integrity or reputation of Amini or any of the releasees identified above in Section 1.4, except as may be required by law;

FIRM:17373733v3

(e)     Gupta shall not directly or indirectly say, write or do anything that would disparage, reflect negatively upon or otherwise call into question the professional skills, integrity or reputation of Amini or any of the releasees identified above in Section 1.5, except as may be required by law; and

(f)     Curry shall not directly or indirectly say, write or do anything that would disparage, reflect negatively upon or otherwise call into question the professional skills, integrity or reputation of Amini or any of the releasees identified above in Section 1.6, except as may be required by law.

It is expressly understood and agreed that any violation by any party of the terms of Section 4.18 shall constitute a material breach of this Settlement Agreement for which the harmed party will have no adequate remedy at law.

IN WITNESS WHEREOF, the parties have signed this Settlement Agreement effective as of the date first written above.

**ROSS UNIVERSITY SCHOOL OF MEDICINE**

By: _____          Date:  February          , 2012
     Joseph Flaherty, M.D.
     Dean


_____          Date:  February          , 2012
     Behzad Amini


_____          Date:  February          , 2012
     Anupam Gupta


_____          Date:  February          , 2012
     Roger Curry

12

# **EXHIBIT A**

## **RUSM Reference Letter**

**DRAFT**

**[RUSM LETTERHEAD]**

To Whom It May Concern:

   Kindly accept this letter as confirmation that Behzad Amini attended Ross University School of Medicine ("RUSM") from January 12, 2008 through March 23, 2012.  He voluntarily withdrew from RUSM effective March 24, 2012, at which time he was a student in good standing.

       Very truly yours,

       Nancy A. Perri
       Chief Academic Officer

# EXHIBIT-3

| | Type of Loan | Loan Amount | Loan Date | Disbursed Amount | Canceled Amount | Outstanding Principal | Outstanding Interest |
|---|---|---|---|---|---|---|---|
| 1 | DIRECT STAFFORD UNSUBSIDIZED | $1,624 | 05/23/2012 | $1,624 | $0 | $1,624 | $140 |
| 2 | DIRECT STAFFORD UNSUBSIDIZED | $6,000 | 10/28/2011 | $6,000 | $0 | $6,000 | $752 |
| 3 | DIRECT STAFFORD SUBSIDIZED | $4,250 | 10/28/2011 | $4,250 | $0 | $4,250 | $60 |
| 4 | DIRECT PLUS GRADUATE | $19,325 | 10/28/2011 | $19,325 | $0 | $19,325 | $2,817 |
| 5 | DIRECT PLUS GRADUATE | $18,250 | 07/20/2011 | $18,250 | $0 | $18,250 | $3,055 |
| 6 | DIRECT STAFFORD UNSUBSIDIZED | $6,000 | 06/29/2011 | $6,000 | $0 | $6,000 | $888 |
| 7 | DIRECT STAFFORD SUBSIDIZED | $4,250 | 06/29/2011 | $4,250 | $0 | $4,250 | $60 |
| 8 | FFEL PLUS GRADUATE | $19,830 | 11/03/2009 | $19,830 | $0 | $21,598 | $4,181 |
| 9 | STAFFORD UNSUBSIDIZED | $6,000 | 11/03/2009 | $6,000 | $0 | $6,829 | $637 |
| 10 | STAFFORD SUBSIDIZED | $4,250 | 11/03/2009 | $4,250 | $0 | $4,470 | $63 |
| 11 | FFEL PLUS GRADUATE | $31,844 | 08/11/2009 | $31,844 | $0 | $36,166 | $7,002 |
| 12 | STAFFORD SUBSIDIZED | $8,500 | 08/11/2009 | $8,500 | $0 | $8,941 | $126 |
| 13 | STAFFORD UNSUBSIDIZED | $12,000 | 08/11/2009 | $12,000 | $0 | $14,118 | $1,316 |
| 14 | STAFFORD UNSUBSIDIZED | $12,000 | 02/03/2009 | $12,000 | $0 | $14,655 | $1,366 |
| 15 | STAFFORD SUBSIDIZED | $8,500 | 02/03/2009 | $8,500 | $0 | $8,706 | $358 |
| 16 | FFEL PLUS GRADUATE | $29,160 | 02/03/2009 | $29,160 | $0 | $34,661 | $6,711 |
| **Total DIRECT STAFFORD UNSUBSIDIZED** | | | | | | **$13,624** | **$1,780** |
| **Total DIRECT STAFFORD SUBSIDIZED** | | | | | | **$8,500** | **$120** |
| **Total DIRECT PLUS GRADUATE** | | | | | | **$37,575** | **$5,872** |
| **Total FFEL PLUS GRADUATE** | | | | | | **$92,425** | **$17,894** |
| **Total STAFFORD UNSUBSIDIZED** | | | | | | **$35,602** | **$3,319** |
| **Total STAFFORD SUBSIDIZED** | | | | | | **$22,117** | **$547** |
| **Total All Loans** | | | | | | **$209,843** | **$29,532** |

# EXHIBIT-4

# Gainful Employment Disclosures

To help consumers make more informed decisions about their education options, the U.S. Department of Education has set forth disclosure guidelines. Ross University is proud to be an industry leader in this effort.

**On-Time Completion Rate**

52% of students who completed this program between July 1, 2011 and June 30, 2012 graduated on-time (within the published length of the program).

**Licensing Exam Pass Rate**

In (calendar year) 2011, Ross University School of Medicine students achieved a 95.4% first-attempt pass rate on the United States Medical Licensing Exam (USMLE) Step 1.*

*Source: Educational Commission for Foreign Medical Graduates (ECFMG)

**Median Loan Debt**

Graduates of this program between July 1, 2011 and June 30, 2012 had a median loan debt and are obligated to repay:

$232,743 in federal student loan debt

$0 in private loan debt

$0 in institutional financing plan debt

Note: there were 847 graduates from this program during this reporting period.

**Program Cost Information**

The total cost for this program is $189,464.        For more detailed information click here (http://campusuite.innersync.com/medical-school/documents/RossProgramCost-DoctorofMedicine.pdf) .

**Program Occupation Information**

The Classification of Instructional Programs (CIP) code assigned to the School of Medicine program is 51.1201:Medicine (MD). Associated Standard Occupational codes related to this CIP code, and detailed information about the occupations graduates of this program enter, can be found at these links:

http://www.onetonline.org/link/summary/29-1062.00 (http://campusuite.innersync.comhttp://www.onetonline.org/link/summary/29-1062.00)
(http://campusuite.innersync.comhttp://www.onetcodeconnector.org/find/result?s=MD)

http://www.onetonline.org/link/summary/29-1069.00 (http://campusuite.innersync.comhttp://www.onetonline.org/link/summary/29-1069.00)

To research additional careers of interest, you may want to visit these websites:

O*NET                                    http://online.onetcenter.org (http://campusuite.innersync.comhttp://online.onetcenter.org/)
                                         (Click on "Find Occupations")

Occupational Outlook Handbook            http://www.bls.gov/oco (http://campusuite.innersync.comhttp:

//www.bls.gov/oco)

(Type in general term for career of interest)

# EXHIBIT-5



**MAIN MENU**

HOME
ABOUT DICK DURBIN
ILLINOIS INFO CENTER
CONSTITUENT SERVICES
ISSUES AND LEGISLATION
LEGISLATIVE AGENDA
PRESS OFFICE
   PRESS RELEASES
   LOCAL NEWS COVERAGE
   STATEMENTS & COMMENTARY
MULTIMEDIA ARCHIVES
ILLINOIS INVESTMENTS
IN YOUR COMMUNITY
TODAY IN THE SENATE
CONTACT DICK DURBIN


**E-NEWSLETTER**

SEPTEMBER 10, 2013

## DURBIN TO DUNCAN: TIME TO CRACK DOWN ON FOR-PROFIT MEDICAL SCHOOLS THAT USE OFFSHORE LOOPHOLE

*Bloomberg investigation reveals troubling statistics about foreign medical schools owned by DeVry that qualify for millions in federal funding without US accreditation*

[WASHINGTON, DC] – In a letter to Education Secretary Arne Duncan, U.S. Senator Dick Durbin (D–IL) raised the alarm about foreign medical schools that are not accredited by approved U.S. accrediting bodies, but are still eligible for federal Title IV funds due to a 1992 loophole that allowed a small number of these schools to qualify for federal funding under lower standards than other foreign medical schools.

An investigative report that appeared today in Bloomberg Markets Magazine highlighted two foreign medical schools owned by DeVry, Inc. – American University of the Caribbean School of Medicine (AUC) and Ross University School of Medicine – which admit hundreds of students, many of whom were rejected by U.S. medical colleges. According to the report, when compared to their U.S. counterparts, these students:

1. Amass considerably more debt: Students at AUC accumulated an average of $253,072 in federal student loan debt as of June 2012 compared to an average of $170,000 for 2012 graduates of U.S. medical schools. The U.S. figure accounts for debt incurred for undergraduate or other degrees, while AUC's

I write to ask you to respond to allegations made in an article entitled "DeVry Lures Medical School Rejects as Taxpayers Fund Debt" that ran in Bloomberg Magazine.

This troubling piece explains how two DeVry-owned foreign medical schools, American University of the Caribbean School of Medicine and Ross University School of Medicine, prey on students who have been rejected by traditional U.S. medical schools.  These students are lured into massive amounts of debt – much higher than traditional schools – and receive very little to show for it by way of a useful degree.  What's more, it is reported that these schools actually pay U.S. hospitals for slots in training hospitals - a practice the American Medical Association worries will disrupt medical education in the United States.

Perhaps most troubling of all is that these schools are not accredited by Department-approved bodies and not subject to the same standards as other foreign medical schools, but are still eligible for federal Title IV funds.  The Bloomberg article reported that in 2012, DeVry's two foreign medical schools raked in more than $300 million in federal funds.  It is my understanding that they are able to do this because of a 1992 loophole that allowed a small number of foreign medical schools to qualify for federal funding under lower standards than other foreign medical schools.  If this is true, it seems to allow these schools access to millions in federal funds with little to no oversight or accountability.

As you work to develop effective new gainful employment regulations, I encourage the Department to look into this matter and to use whatever tools are at your disposal under the law to crack down on these practices.  If you do not have the authorities necessary, let me offer to be a partner in making the legislative changes needed to give you greater ability to protect federal tax dollars from those who seek to profit while their students struggle and many times fail.

I look forward to your prompt reply.  Thank you.

SHARE THIS PAGE:

  

## Office Locations

**WASHINGTON, D.C.**
711 Hart Senate Bldg.
Washington, DC 20510
9 am to 6 pm ET
(202) 224-2152 – phone
(202) 228-0400 – fax

**CHICAGO**
230 S Dearborn St.
Suite 3892
Chicago, IL 60604
8:30 am to 5 pm
(312) 353-4952 – phone
(312) 353-0150 – fax

**SPRINGFIELD**
525 South 8th St.
Springfield, IL 62703
8:30 am to 5 pm
(217) 492-4062 – phone
(217) 492-4382 – fax

**CARBONDALE**
250 W. Cherry Street
Suite 115-D
Carbondale, IL 62901
8:30 am to 5 pm
(618) 351-1122 – phone
(618) 351-1124 – fax

**ROCK ISLAND**
1504 Third Avenue
Suite 227
Rock Island, IL 61201
8:30 am to 4:30 pm
(309) 786-5173 – phone
(309) 786-5404 – fax

# EXHIBIT-6

# Bloomberg

# DeVry Lures Medical School Rejects as Taxpayers Fund Debt

By Janet Lorin - Sep 11, 2013
Bloomberg Markets Magazine

When he was a child, David Adams pretended to operate on his stuffed animals.

As a teen, the Salt Lake City native became a paramedic. He wanted to train to become a physician after graduating from the University of Utah with a bachelor's degree in health promotion and education in 2009 but was rejected by two dozen U.S. medical schools.

Three years later, he earned a Master of Science in medical health sciences from Touro University Nevada and applied again, Bloomberg Markets will report in its October issue. Adams was accepted to American University of the Caribbean School of Medicine, which is owned by Downers Grove, Illinois-based DeVry Inc. (DV)

*More from the October issue of **Bloomberg Markets**:*

- **50 MOST INFLUENTIAL:** Power Network | Policy Makers | Money Managers | Thinkers | Bankers | Power Brokers
- **BM50 PROFILES:** Alisher Usmanov | Mary Erdoes | Akira Amari | Michael Woodford | Paul Achleitner
- **PEER LENDING:** Big Money in Little Loans
- **BANKS:** Tackling New Capital Requirements
- **DRUGS:** Chicago's Mexican Connection | Slideshow

Adams, now 31, moved with his wife, Jessica, and their two young children to a two-bedroom apartment that smelled of dog urine and had a broken stove on the Dutch part of St. Maarten on Jan. 1. After financing his first two semesters with $67,000 in U.S. government-backed loans, Adams expects to leave medical school with as much as $400,000 in debt -- and about a 20 percent chance of never practicing as a physician in the U.S.

"I understand that I am coming from behind a little bit, attending a Caribbean medical school," Adams says, standing on his apartment's terrace, watching sailboats glide by on the deep-blue waters of Simpson Bay Lagoon.

## Rejected Students

DeVry, which has two for-profit medical schools in the Caribbean, is accepting hundreds of students who

were rejected by U.S. medical colleges. These students amass more debt than their U.S. counterparts -- a median of $253,072 in June 2012 at AUC versus $170,000 for 2012 graduates of U.S. medical schools.

And that gap is even greater because the U.S. figure, compiled by the Association of American Medical Colleges, includes student debt incurred for undergraduate or other degrees, while the DeVry number is only federal medical school loans.

Many DeVry students quit, particularly in the first two semesters, taking their debt with them. While the average attrition rate at U.S. med schools was 3 percent for the class that began in the fall of 2008, according to the AAMC, DeVry says its rate ranges from 20 to 27 percent.

Of those who remained, 66 percent of AUC students and 52 percent of students at DeVry's other Caribbean medical school, Ross University School of Medicine, finished their program -- typically two years of sciences followed by two years of clinical rotations -- on time in the academic year ended on June 30, 2012.

## Taxpayer Owes

And though neither AUC nor Ross, in the island nation of Dominica, is accredited by the body that approves medical programs in the U.S., students at both schools are eligible for loans issued by the U.S. Education Department. The loans, which totaled about $310 million in the year ended June 2012, leave the U.S. taxpayer -- not DeVry -- on the hook if students should fail to get jobs and be unable to repay them.

DeVry is also paying hospitals in the U.S. to take its students for the two years of clinical training that they need to complete their degree. U.S. medical schools typically provide the training hospitals benefits such as a faculty appointment and access to a medical school library, not cash per student per week, says Glenn Tung, associate dean for clinical affairs at Brown University's Warren Alpert Medical School, who has studied for-profit medical schools.

## AMA Ire

DeVry's pay-for-play model has drawn the ire of the American Medical Association. In June, the state of Texas passed a law prohibiting foreign medical schools from sending students to the state.

Congress needs to examine the law that makes foreign for-profit medical schools eligible for federal loans, says Senator Dick Durbin, a Democrat from DeVry's home state of Illinois.

"These schools are taking advantage of an offshore loophole that allows federal funding to be released to students attending a medical school that is not accredited in the U.S.," Durbin says. "Until Congress acts, these schools will stop at nothing to keep the American taxpayer dollars flowing."

Durbin, in a Sept. 10 letter to Education Secretary Arne Duncan, called for an examination of the medical

schools in the Caribbean that have federal loan access, yet may be subject to standards below those set for medical students in the U.S.

Students at the four schools -- the two DeVry schools, along with St. George's University School of Medicine and, since July, Saba University School of Medicine -- are also eligible for tuition benefits from the U.S. Department of Veterans Affairs.

## Students Shortchanged

DeVry's policies shortchange students, says David Bergeron, who recently retired as head of postsecondary education at the U.S. Department of Education.

"If they have to make a choice between students and profit, they choose profit," Bergeron says of the for-profit Caribbean schools. "Because their students heavily depend on student loans, it creates risk for the student and the taxpayers throughout the system."

Adds Ernie Yoder, dean of Central Michigan University's newly opened medical school, "I have grave concerns about the financial welfare of some of these kids and how they're led to believe that they will be successful as physicians and be able to pay back their debt."

A DeVry spokesman, Chris Railey, says, "Students who don't succeed academically typically leave school before accumulating a large debt load."

Michael Uva, a 2010 graduate of St. George's in Grenada, twice failed to land a residency spot that would be the next step to practicing medicine in the U.S.

## 'Unfulfilled Dream'

"I spent my entire life preparing for this career, and I am now 33 years old with massive debt and an unfulfilled dream," Uva says. The Oswego, New York, native has almost $400,000 in medical school loans and currently earns $30 an hour overseeing a blood donation clinic in New Jersey, where he also draws blood.

Medical education is crucial to the future of DeVry, which is trying to diversify from its base in undergraduate studies. When DeVry, the No. 3 publicly traded for-profit education company in the U.S. based on revenue, announced in April that undergraduate enrollment had declined 21 percent in March from a year earlier, the company's shares plummeted 20 percent in a single day.

Once among the fastest-growing U.S. industries, for-profit education faces increased competition and scrutiny from Congress and state and federal prosecutors.

"The vast majority of the students are left with student-loan debt that may follow them throughout their lives," said a July 2012 report by the Senate Committee on Health, Education, Labor and Pensions, led by

Iowa Democrat Tom Harkin, that criticized for-profit colleges.

## High Payments

"They are left with high monthly payments, but without a commensurate increase in earning power."

DeVry said in April that the attorneys general of Massachusetts and Illinois are investigating its use of student loans and its compensation practices. The company said in a filing that it's cooperating with the investigations, with the aim of demonstrating that its practices comply with the law. Other for-profits have also been struggling.

Phoenix-based Apollo Group Inc., (APOL) which owns the University of Phoenix, was demoted from the Standard & Poor's 500 Index to the S&P MidCap 400 in June as its market value shrank. Shares of Apollo, the largest public for-profit education company, traded at $20.05 on Sept. 6, down from a high of $89.22 in January 2009.

And the Kaplan education division of Washington Post Co. reported a $105.4 million operating loss for 2012, partly because of restructuring costs related to declining enrollment.

## Diversification

DeVry got 34 percent of its revenue in the year ended on June 30 from medical and health-care education, including a chain of U.S. nursing schools. The unit contributed $673 million of DeVry's $1.96 billion in revenue, up more than sevenfold from $91 million in fiscal 2005.

"The diversification strategy is working," Chief Executive Officer Daniel Hamburger said at an investor conference in Chicago in June. "About a third now of our enrollment is in the growing field of health-care education."

In addition to AUC and Ross, which also trains veterinarians, DeVry owns companies that specialize in prepping students for the U.S. medical-licensing and certified public accountant exams. It's expanding DeVry Brasil, which operates six educational institutions with 30,000 students in Brazil, including a medical school.

DeVry acquired AUC in 2011 for $235 million, attracted partly by the school's eligibility for federal loans, says Harold Shapiro, DeVry's chairman and a former president of Princeton University.

## Loan Access

"Access to federal student loans is very important for a lot of DeVry programs, including that one," says Shapiro, 78, an economist by training, who plans to retire from DeVry in November after 12 years on the board and five years as chairman. "Obviously, it's part of what makes it work."

Shapiro says he was recruited to DeVry by its co-founder, Dennis Keller, a 1963 Princeton graduate and former trustee who has donated at least $35 million to Princeton. Shapiro joined DeVry the year he stepped down as Princeton's president.

DeVry is ramping up its capacity to take on more medical students. It's adding a $30 million building at AUC that students were to begin using in September. Including the 3,500 students at Ross and about 1,300 at AUC, DeVry is currently training some 4,800 would-be doctors. Ross typically enrolls 900 to 950 students per academic year, who start in either January, May or September.

## MCAT Scores

That's about seven times the average of 139 for the 2013 graduating class of U.S. med schools, according to figures from the AAMC. St. George's has about 4,900 students.

Many of those students, like Adams, failed to gain admission to U.S. schools, where the mean score on the Medical College Admission Test, or MCAT, was 31.2 out of a possible 45 last year. At DeVry's schools, the average score was 25.

"I don't feel that these schools are very selective all the time and will potentially take students whose failures could be predicted based on their academic record," says Jessica Freedman, a physician who runs MedEdits, a company that advises applicants to medical schools. Freedman, who charges $400 for an initial consulting session, says she refuses clients whose academic credentials show they're not likely to succeed. "There are a lot of important ethical issues here," she says.

DeVry's Shapiro says the school gives prospective students the information they need to decide whether to attend.

Heidi Chumley, AUC's executive dean, says the school has permission from its accreditor to increase its enrollment by 10 to 20 percent but won't do so without adequate resources and qualified applicants. The Accreditation Commission on Colleges of Medicine, an Ireland-based body, accredits four Caribbean medical schools, including AUC, according to its website.

## Student Borrowing

As enrollment grows at the DeVry medical schools, so does revenue -- 81 percent of which came from federal student loans in the year ended June 2011. First-year tuition on Dominica costs $56,475, based on the three terms Ross divides the year into. That compares with a median of $50,309 for tuition and fees at private U.S. medical schools in the 2012-to-2013 school year.

Students can also borrow for living expenses and other costs, which can run thousands more.

"Applicants who were denied admission or wait listed at U.S. schools constitute a large segment of prospective students," DeVry says in its 2012 annual report. Some 91 percent of Ross's students are from

the U.S., while at AUC, the figure is 86 percent.

## $271,000 in Loans

Clint Walls was rejected by more than a dozen U.S. medical schools over three application cycles and went to work as a real estate appraiser in Arizona. He applied to Ross, he says, because "I just couldn't really shake the itch."

Now a third-year student doing rotations in Atlanta, Walls, 29, has about $271,000 in student loans and expects to graduate with $400,000.

"Even on a physician's salary plus whatever my wife earns, there is still doubt in our minds whether we will be able to pay the loans off in their entirety," he says.

Still, Walls says he feels grateful for the opportunity to be in medical school. Giving those shut out of U.S. medical schools that chance is AUC's aim, says Ron Testa, a Ph.D. in clinical and community psychology who is dean of medical sciences.

"When the world says no, and you have a burning desire to study medicine, there's a place that provides you an opportunity to fulfill your dreams," Testa says.

## Doctor Shortage

The U.S. is facing a shortage of doctors as the population ages and President Barack Obama's health-care law makes medical insurance available to 32 million more people. That means U.S. medical schools need to increase enrollment 30 percent by 2015, the AAMC says.

Caribbean schools aren't the only ones ramping up capacity to meet the demand. The AAMC estimates in its 2012 Medical School Enrollment Survey that by the 2017-to-2018 school year, there will be 21,434 first-year students in the U.S., matching the 30 percent increase it recommended.

About two-thirds of the gain will come from the 125 U.S. medical schools that were accredited as of 2002, while most of the rest will come from new, accredited U.S.-based schools, such as the one at Central Michigan. As of mid-August, 141 U.S. schools were accredited by the Liaison Committee on Medical Education.

Caribbean-educated students such as DeVry's will now have to vie with grads of accredited U.S. schools for a limited number of residency positions.

## 'New Competition'

"It's new competition that they didn't have before, and the competition has a better brand," says Trace Urdan, an analyst at Wells Fargo & Co. who follows for-profit colleges. "They have to duke it out on the

merits." As of mid-August, Urdan rated DeVry's stock outperform, citing the company's potential for cost cutting, among other things.

Some of the new U.S. schools are taking training slots in hospitals that had previously gone to DeVry.

When Central Michigan's first 64 students, who began classes Aug. 4, reach their third year, they will be trained at a consortium of affiliated hospitals, CMU Medical Education Partners, based in Saginaw, Michigan. Up to now, as many as 100 positions at CMU have been occupied by students from Ross, which is paying the hospital consortium $1.75 million a year for the slots, Yoder says.

Central Michigan plans to add students each year until it reaches a capacity of 400.

## 'Tough Time'

"The offshore schools know they're in for a tough time from the perspective of access to clinical sites for student training," Yoder says.

Quinnipiac University, based in Hamden, Connecticut, is also starting a medical school whose first 60 students began classes in August. They'll take the majority of their clinical rotations at St. Vincent's Medical Center in Bridgeport, Connecticut, says Anthony Ardolino, the executive dean.

The hospital currently has a paid contract with Ross, says Stuart Marcus, the hospital's president.

"We are forgoing revenue because of the affiliation with Quinnipiac," Marcus says, declining to specify how much.

"Clinical slots are dynamic," AUC's Chumley says. "If something changes in a hospital that results in more or less space, we adjust the number of students. The most important thing is that the site provides an excellent clinical experience."

## DeVry's Deals

DeVry is making deals elsewhere as well. Last year, Ross signed a $35 million, 10-year contract for 96 third-year slots annually at Kern Medical Center, a public hospital in Bakersfield, California, says Paul Hensler, Kern's CEO.

The hospital also has the option of providing up to 96 fourth-year spots at $500 per student per week, Hensler says.

In New York, AUC is paying Nassau University Medical Center on Long Island about $1.4 million annually until 2022 for 64 slots, or about $425 per student per week, according to Steven Walerstein, the hospital's chief medical officer. AUC also has paid Nassau $5 million for capital improvements, he says.

DeVry isn't the only for-profit med school taking this route: St. George's University has a 10-year, $100

million contract with New York City Health & Hospitals Corp., a consortium of city-owned hospitals, to provide at least 600 places at seven hospitals for its third- and fourth-year students. St. George's pays HHC $650 per week for each third-year medical student and $400 for each fourth-year student, HHC says.

## 'Corrupts' System

"It corrupts the whole academic system," says Brown's Tung, whose medical students train at seven affiliated teaching hospitals in the Providence, Rhode Island, area, where they're supervised by Brown faculty.

Paying the hospitals makes them accountable, says Margaret Lambert, dean of enrollment planning at St. George's, whose students borrowed almost $160 million in federal loans in the year ended on June 30, 2012.

"They're expending energy and time teaching our students," she says. "If you don't pay them, you're sending students there and hoping that someone teaches them something."

Chumley says DeVry's payments to hospitals cover the revenue lost when a physician is less productive because he or she is teaching. "We should pay for this," she says.

AUC asked Texas regulators for permission to negotiate deals with hospitals in 2011. This past June, the Texas legislature prohibited foreign schools from operating in the state.

## Quality Compromised

"The first and foremost reason was it would compromise the quality of the learning experience for the medical students that the state is investing in here," says John Zerwas, an anesthesiologist who's a member of the Texas House of Representatives.

Texas plans to open two new medical schools that eventually will have 200 students each. Dell Inc. founder Michael Dell promised to donate $50 million toward the one in Austin, which will be named after him.

DeVry's Shapiro, who's still a Princeton economics professor, says he wasn't familiar with the Texas legislation, which he described in business terms.

"They'd rather protect their market than open it," he says in his Princeton office. "Rather than try to win by quality, try to win by regulation."

The American Medical Association also opposes payments by schools for the rotations and said last year that it would ask state and federal regulators to outlaw the practice.

## Training Sites

In 2012, 78 percent of U.S. medical schools surveyed by the AAMC said they were concerned about the number of clinical training sites available for their students, with 24 percent of schools citing competition from offshore medical schools.

AUC signed its contract with New York's Nassau in 2008. Since then, the public Stony Brook University School of Medicine has lost key training spots in areas such as pediatrics and obstetrics, says Latha Chandran, Stony Brook's vice dean of undergraduate medical education.

"It is becoming more difficult to place medical students into clinical rotations at hospitals within our region that have arrangements with medical schools in the Caribbean," says Kenneth Kaushansky, dean of the medical school.

The training slots, known as clerkships, can lead to the student's being taken on after graduation as a resident at the same hospital, the first step toward becoming a licensed physician.

## Residencies

"Once we get students in those hospitals to do clerkships, they want them as residents," says Joseph Flaherty, Ross's dean, who came to the Caribbean after serving as dean of the medical school at the University of Illinois.

To obtain a license, medical graduates from U.S. schools need to spend a year or more in a residency program, according to state regulations. Some 25 states, including New York, require three years for graduates of overseas schools, even if they're U.S. citizens. To become a specialist such as a neurosurgeon can take as many as seven years of residency.

Though the U.S. needs more doctors, it has only a limited number of residencies after Congress in 1997 effectively froze the number of positions Medicare would help support.

Graduates are matched with hospitals that want them via an algorithm refined by Alvin Roth, the Stanford University economist who shared the Nobel Memorial Prize in Economic Sciences in 2012.

The National Resident Matching Program says 94 percent of fourth-year students schooled in the U.S. landed a first-year match in 2013, while 53 percent of U.S. citizens trained internationally did.

## Getting Matches

DeVry students fare better than the average foreign-trained student. Of the 914 Ross students who applied for residency in 2013, 76 percent, or 699, earned places. Another 41 had preliminary one-year spots, which would require the students to win a second residency in order to be eligible for a medical license in 48 states.

Of the 268 AUC students who applied for residency, 212, or 79 percent, got matches, and seven more had one-year slots. The remainder of the students failed to win a residency.

In this year's match, the biggest contingent of residents from AUC -- 12 -- went to Nassau. California's Kern hospital took six Ross students, according to Ross's website.

Those who fail to match can try again the following year, but more than half of those fail the second time, according to 2013 data from the matching program.

## Other Jobs

"It gets harder the second time and near impossible the third time," says Eric Scher, vice president of medical education at Henry Ford Health System in Detroit, which is affiliated with Wayne State University.

Some graduates pursue related fields such as working in insurance or public health, Ross's Flaherty says. They could also earn a master's degree in business, public health or health education, he says. St. George's offers free tuition for a master's of public health to those who fail to match.

Adams, the former paramedic, has high hopes that his AUC education will lead to a residency that will take him to pediatric cardiothoracic surgery, even after he received mediocre grades his first semester as he and his family acclimated to St. Maarten.

The former Eagle Scout attended college while working full-time, mostly at Primary Children's Medical Center in Salt Lake City, where he became inspired by a cardiothoracic surgeon.

"What keeps me focused on this goal is the difference that these surgeons make in the lives of these precious children," says Adams, whose current debt includes about $60,000 for his graduate degree.

## Aspiring Oncologist

To become a pediatric cardiothoracic surgeon, Adams would need to complete three residencies that could take nine years after medical school.

"I realize it's a very small minority getting very, very, very good match spots," he says. "But it's what I have to hold on to."

Carina Crookston, a 36-year-old aspiring oncologist and mother of three from Minnesota, had sticker shock just from the cost of living in St. Maarten. Her family's first air-conditioning bill was $700 and had to be paid at the utility office in cash. A gallon of milk cost about $7, more than twice the price back home.

Crookston shared a two-bedroom apartment with her daughters, 3-year-old Piper and 14-year-old Andi, and her 22-year-old sister, Michelle, who cared for the girls. Her husband, a computer programmer, and

teenage son returned to Minnesota, where work was steadier.

## Debt Doubling

Crookston, who incurred $176,000 in federal loans for her first five semesters, is now back there as well, preparing for exams that she hopes will lead to a clerkship. Her debt may double before she graduates.

"We have to have a degree of faith in ourselves and hope for success," says Crookston, who watched a younger sister die of cancer when they were children. "You hope for the best."

Shapiro says the vast majority of DeVry students will make very good doctors, even if they're taking on more risk than U.S. students.

"It's not compulsory," Shapiro says of medical education. "You can go or not go. You have to make your own judgments."

***Get your free issue of Bloomberg Markets!* SUBSCRIBE TODAY**

To contact the reporter on this story: Janet Lorin in New York jlorin@bloomberg.net.

To contact the editors responsible for this story: Laura Colby at lcolby@bloomberg.net; Lisa Wolfson at lwolfson@bloomberg.net

®2013 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# EXHIBIT-7

**Ross University School of Medicine – Overview**

Before you read this, it is the opinion of this author that anything that is published by Ross University is not credible. Ross University School of Medicine is a Caribbean medical school, owned and operated by DeVry Inc, a publicly traded company that owns many online Universities, including two for-profit medical schools in the Caribbean, the American University of Caribbean (AUC) and Ross University School of Medicine(RUSM). DeVry Inc. is currently being investigated by the offices of the attorneys general of Illinois and Massachusetts for its use of student loans, its compensation practices, and accounting malpractice. The company has also been under several investigations by both federal and state authorities in the past. Based on published reports by DeVry Inc., Ross University School of Medicine's attrition rate is about 10 times (27% vs. 3%) that of medical schools operating in the US. Furthermore, of those students remaining, only 52% graduate on time. But the actual attrition rate is much higher since the stated rate can neither be verified nor can it be trusted. The company has also been under several investigations by both federal and state authorities in the past.

There have been many lawsuits filed by students against Ross University and its parent company, DeVry Inc., and even many more against DeVry Inc. alone. But the voices of Ross students have been silenced within the halls of justice. Note that these lawsuits were filed by those students who could afford an attorney. The majority of students who have been victims of Ross University's abuses are unable to seek justice because they cannot afford to do so.PASER online. PASER only covers a few courts . There are other lawsuits that are not accessible online.

Recent Lawsuit Filed by Students Against Ross University and Devry Inc:

Philp vs. Ross University: Read More;

Blair Vs. Ross University: Read More;

Greene Vs. Ross University: Read More;

Archut Vs. Ross University: Read More;

Goddard Vs. Ross University:(employee) Read More;

 Scott Vs. Ross University: Read More;

Dasrath Vs. Ross University: Read More;

Weitzman Vs. Ross University;

 HortonVs. Ross University;

Other cases that we couldn't access online;

## When you file a complaint with Ross

When you file a complaint with Ross University, Ross does not usually respond. If, however, the complaint could be damaging to the school, then Ross may contact you through the Office of the Ombudsman. The Ombudsman works for Ross. It is his job to protect the university from complaints and/or allegations. The Ombudsman will first recommend that you sign a non-disparagement agreement mediated through Ross' attorney, William Gyves, so you can continue your education. Their attorney always chooses the New Jersey court as the venue for any problems that may arise from the agreement. The New Jersey court has provided 100% favorable judgments for Ross in the past with no wins for the students. This is called forum shopping: choosing New Jersey as a venue to provide Ross University with a favorable judgment.

If you do sign the agreement, you are giving up your right to file a complaint. Then they make your life a living hell. For example, they will delay scheduling your rotations, or they may contact your clinical supervisors to disparage you, or they will place you into a low-end affiliated hospital where you'll not receive any clinical experience, essentially undermining your chances for success. Even if you decide to transfer to another Caribbean medical school, Ross will contact your new school to increase your chances of dismissal.

If you don't sign the agreement, they will find a way to kick you out of the program. If you file a lawsuit against them, they have deep pockets, a legal team fighting for them, and the patience to drag out your case until you have become financially, emotionally, and psychologically exhausted. Students have lost most lawsuits against Ross/DeVry because the judges often side with the major corporations.

## Ross University – High Enrollment & Failure Rate

Prospective medical students who will be taking on huge loans to finance their medical education at Ross University need to ask themselves two questions:

1) What is the average fail rate of students for semesters 1 to 4 since 2008, and

2) What is the average enrollment rate for students since 2008?

### High Enrollment Rate

No one knows the exact enrollment numbers except Ross University, which refuses to disclose any information. According to Ross University "Ross University enrolls approximately 350 students in each incoming class. Lecture halls are designed to hold approximately 350-400 students". However, based on personal experience and personal statements from students, it is believed that since 2009 the average enrollment each semester at Ross University is greater than 600 students. But again, no one knows the exact numbers except Ross.

Furthermore, the enrollment numbers will vary since one needs to determine if the numbers reflect only new students for that semester or if they include some of the many who are repeating that semester all over again.

The lecture halls Ross University can hold a maximum of 300 students, the Anatomy Lab holds 50 to 60 students, and the library holds between 75 – 100 students. However, with an average enrollment of greater than 600 students each semester, this leads to overcrowding. Trailers have to be brought in to handle some of the overflow, but most of the time the students stay home and watch the video lecture.

In the United States a student must attend class no less than 60% of the time. But in Dominica, where there is no oversight, the students are forced to Mediasite due to overcrowding, which is online delivery of the videotaped lectures by Ross University, using Devry's Inc. technology.

**High Failure Rate for Semesters 1-4**

According to Ross University, only 57% (percent) of Ross University School of Medicine students finished their program. However, no one knows the exact number of students who fail semesters 1 to 4 at Ross University except Ross University.The school refuses to disclose detailed information and this information is critical to prospective students in order to make an informed enrollment decision. According to Ross University "The current retention rate for Foundations of Medicine students is about eighty percent.  Ninety-five percent of students who pass semester 1 and 2 without repeating any courses go on to graduate". But statement made by Ross University should be taken with a grain of salt.

When pressed for answers, Ross University refuses to comply and submit exact figures. The Dominican Medical Board would not disclose this information either, though internal board meeting memos indicate their concerns about the Ross University's high attrition rate.

Based on personal experience and personal statements from other students, it is believed that the average failure rate for semesters 1 to 4 at Ross University is between 40 – 50%.

**Ross University – Misinformation & Misinterpretation of Facts**

DeVry Inc., the parent company of Ross University, is currently under investigation by the offices of the attorney generals of Illinois and Massachusetts for its compensation practices, accounting mismanagement, and its use of student loans. In the past the company has also been under several investigations by both federal and state authorities. Therefore one needs to question the legitimacy of the claims made by Ross University when its own parent company is under so much scrutiny.

Furthermore, many of the data has been published by Ross University or its parent company, Devry Inc., cannot be independently verified and perspective students are given a false perception of the school. Ross University claims that medical students USMLE Step 1 first-time pass rate was over 95%. But a 95% pass rate for 320 students is not the same as a 95% pass rate for 600 students. According to Ross University Student Handbook, to be eligible to take the USMLE Step 1 Exam, a student must have: (1) passed all courses in the basic science curriculum during the first four semesters; (2) have successfully completed the fifth semester AICM course; and (3) have passed National Board of Medical Exams ("NBME").

When I first started Ross University School of Medicine, we had over 650 students at the white coat ceremony. By the time I was in my 5th semester, there were only 325 students left from the 650 we started out with—a 50% failure rate! Furthermore, those who fail are forced to repeat ALL their classes instead of the one they didn't pass. So when those students repeat and pass that class, then it looks as if the numbers were larger than they really were. Plus, they are charged over $15,000 per semester for tuition. When the students have to repeat, they have to pay that whole cost again. All this just brings more money into the bureaucrats' pockets instead of working to help the students learn. Ross University has three enrollment dates per year. The other two enrollments the year I started brought in 650 and 600 students respectively, for a total of 1900 students that year. From those 1900 students, just 900 graduated (there were 900 graduates last year). And from the 900 who graduated, about 500 were matched with a residency program.

Again, when Ross University School of Medicine advertises that its passing rate for USMLE Step 1 is greater than 90%, they fail to mention that almost half of the student who originally enrolled into the program don't even make it into semester 5.

Here is the adjusted rate based on total number of enrollments that I believe is more in line with the reality at Ross University:

Here is the adjusted rate based on total number of enrollments that I believe is more in line with the reality at Ross University:

Sem 1-4 Pass Rate – 50%

NBME COMP Pass Rate (1st attempt) – 50%

USMLE Step -1 Pass Rate – 45%

USMLE Step -2 Pass Rate – 42%

Residency – 40%

**Ross Ownership:**

Ross University School of Medicine is a Caribbean medical school, owned and operated by DeVry Inc, a publicly traded company that owns many online Universities, including two for-profit medical schools in the Caribbean, American University of Caribbean(AUC) and Ross University School of Medicine(RUSM).

Even though DeVry is the Ross University School of Medicine's ultimate corporate parent, Ross University School of Medicine is not a direct subsidiary of DeVry Inc. In fact, several corporate entities separate DeVry and Ross University School of Medicine. DeVry wholly owns DeVry Medical International, Inc. (DMI). DMI, in turn, wholly owns Ross University Services, Inc. (RUSI). RUSI owns 99 % of International Education Holdings, Inc. (IEHI), with DeVry owning the remaining 1% of that entity. IEHI wholly owns Global Education International BV, which in turn owns two additional corporate entities through which Ross University School of Medicine is operated. This intermingling of ownership helps protect DeVry Inc. against any lawsuit that is filed against Ross University.

**Ross University Administrators**

Ross University administration is governed by Devry Inc. Ross University was acquired by DeVry Inc. in 2003. However, as a publicly traded company, DeVry seems more interested in their stock prices than the quality of their medical education. DeVry Inc. is headquartered in Chicago, Illinois. It is here that policy decisions are made for the university, even though Chicago is about 2400 miles away from Ross University main campus in Dominica. Most of the student tuition and taxpayer funds end up here.  In fact, the past four Ross university presidents retired as millionaires.

**Ross University Millionaire Club:**

Neal Simon: President of Ross University: 2000-2004 Simon started AUA Medical School and was sued by Ross University for copyright infringement, misappropriation of trade Secrets and more. He then sold AUA to an Indian firm for over $80 Million.

Thomas Shepherd: President of Ross University: 2004-2011

Andrew Jeon: President of Ross University: 2011-2013

William Hughson: President of Devry Medical Int.: 2013

Steven Riehs: President of Devry Medical Int.: Present

## Ross University School of Medicine – The Business of Medical Education

Ross University School of Medicine is a for-profit, publicly traded corporation. Unlike a traditional medical school, the goal at Ross University School of Medicine is to increase profit by raising the enrollment rate and using Mediasite technology to reduce infrastructure and staff related costs in order to minimize cost and satisfy regulators. Masquerading under the pretense of a traditional medical school, Ross University School of Medicine utilizes Mediasite technology to provide medical students with distance learning in order to shunt any actual cost of running a real medical school and to prevent regulatory obstacles.More than $150 million a year in government-guaranteed aid is granted to Ross University School of Medicine. Ross University represents about 4,500 students, which is double the size of the biggest US medical school. Last year, DeVry, better known for its tech training schools, reported $165.7 million in net income after taxes. But the company also reported an additional $140 million in tax-free income from the Ross University operations . Ross achieves this by using Mediasite/distance learning to admit more students, to fail more students, and to open new campuses to increase enrollment. Again, the end result is to generate a greater profit for Devry Inc. and Ross University executives.

Federal regulators are now taking a closer look at evidence that suggests taxpayers and students may be getting shortchanged by Devry Inc. and by Ross University. DeVry Inc. is being investigated by the offices of the attorneys general of Illinois and Massachusetts, for its use of student loans and its compensation practices, and accounting malpractice.

## Ross University School of Medicine – No Accountability & No Oversight

Ross University is not fully regulated by laws governing US educational institutions. In 2009, the US Government Accountability Office (GAO) was mandated by the US Congress to collect data on those Caribbean medical schools receiving Title IV federal loans, Ross University being included. It took GAO two and a half years to publish a report, and they even had difficulty collecting the actual data. The data that was published by GAO was an aggregate of information that was issued by the four Caribbean medical school receiving Title IV federal loans. The published report was damaging to Ross and helped the Department of Education decide to refuse funding for Ross University School of Medicine campus in Grand Bahamas. According to recent lawsuit filed against Ross University" Ross University School of Medicine have engaged in a fraudulent scheme, common course of conduct and conspiracy to use deceptive and otherwise questionable sales and marketing practices to increase enrollment at the for-profit college and receive increased tuition payments from students who acquired funds through Title IV of the Higher Education Act of 1965. Defendants have participated in such fraudulent practices as misrepresenting to prospective students, and students, information about the student's likelihood of success, the colleges accreditation, graduation rates, its students' prospective employment and salary qualifications, duration and cost of the program, and financial aid."

**Ross University Administrative office Miami**

Ross University administrative office in Miami is the main administrative hub for RUSM. Clinical coordination is processed at this location. Calls and emails are not returned and students are given the runaround. The office is understaffed, which doesn't help the situation at all and very unresponsive to complaints or questions about clinical assignments. The Dean's Office for Ross University is no longer in Dominica. It is now in Miami, 1500 miles away from the main campus in Dominica.

The MERP (Medical Educational Review Program) is handled through the Miami office. This one semester course is pretty worthless because even with the course, the failure rate stays the same as those who never took the class. There is little advantage to the student at all.

**Ross University Administrative office New Jersey**

Ross University administrative office in New Jersey is where the Office of Student Finance is located and is mainly in charge of processing the financial aids. In order to attend Ross University School of Medicine, an average student borrowed well over $270,000. These loans are guaranteed by the federal government. But Ross University has lower pass rate and higher attrition rate than US medical schools.

High enrollment and withdrawal is driving up the amount of federal dollars flowing to for-profit institutions, including Ross University. Despite dismal student outcomes, for-profit institutions, like Ross University, are raking in record profits. For-profit college revenues are largely made up of the taxpayer dollars intended to support student success.

Note that at Ross University, a student loan is processed very efficiently, but that same efficiency falls by the wayside when clinical rotations are assigned. The office is very cooperative when it comes to getting their loan money.

**Ross University School of Medicine – The Business of Medical Education**

Ross University School of Medicine is a for-profit, publicly traded corporation. Unlike a traditional medical school, the goal at Ross University School of Medicine is to increase profit by raising the enrollment rate and using Mediasite technology to reduce infrastructure and staff related costs in order to minimize cost and satisfy regulators. Masquerading under the pretense of a traditional medical school, Ross University School of Medicine utilizes Mediasite technology to provide medical students with distance learning in order to shunt any actual cost of running a real medical school and to prevent regulatory obstacles.More than $150 million a year in government-guaranteed aid is granted to Ross University School of Medicine. Ross University represents about 4,500 students, which is double the size of the biggest US medical school. Last year, DeVry, better known for its tech training schools, reported $165.7 million in net income after taxes. But the company also reported an additional $140 million in tax-free income from the Ross University operations . Ross achieves this by using Mediasite/distance learning to admit more students, to fail more students, and to open new campuses to increase enrollment. Again, the end result is to generate a greater profit for Devry Inc. and Ross University executives.

Federal regulators are now taking a closer look at evidence that suggests taxpayers and students may be getting shortchanged by Devry Inc. and by Ross University. DeVry Inc. is being investigated by the offices of the attorneys general of Illinois and Massachusetts, for its use of student loans and its compensation practices, and accounting malpractice.

## Ross University School of Medicine – No Accountability & No Oversight

Ross University is not fully regulated by laws governing US educational institutions. In 2009, the US Government Accountability Office (GAO) was mandated by the US Congress to collect data on those Caribbean medical schools receiving Title IV federal loans, Ross University being included. It took GAO two and a half years to publish a report,and they even had difficulty collecting the actual data. The data that was published by GAO was an aggregate of information that was issued by the four Caribbean medical school receiving Title IV federal loans. The published report was damaging to Ross and helped the Department of Education decide to refuse funding for Ross University School of Medicine campus in Grand Bahamas.According to recent lawsuit filed against Ross University " Ross University School of Medicine have engaged in a fraudulent scheme, common course of conduct and conspiracy to use deceptive and otherwise questionable sales and marketing practices to increase enrollment at the for-profit college and receive increased tuition payments from students who acquired funds through Title IV of the Higher Education Act of 1965. Defendants have participated in such fraudulent practices as misrepresenting to prospective students, and students, information about the student's likelihood of success, the colleges accreditation, graduation rates, its students' prospective employment and salary qualifications, duration and cost of the program, and financial aid."

## Ross University Faculty & Campus Overview

There are two main campuses for Ross University, one on the Caribbean island of Dominica, and the other in Miami. The Dominica campus covers semesters 1 to 4 of the medical program and Miami campus covers semester 5 & AICM. The office of the dean is located in Miami, 1500 miles away from Dominica campus.

After the takeover of Ross University by Devry Inc., Ross University in Dominica increased enrollment from 200 students per class to over 600 students per class. During the same period, classroom size remained the same, holding a maximum of 300 students per classroom. As a result, many students, including myself, were forced to stay at home, use the library, and/or watch Mediasite.

The overcrowding became so out of control that Ross University School of Medicine sent out an email, offering free tuition for one semester to those who decided to postpone their education, sighting infrastructure limitations.

**Ross University Substandard quality of Medical Education**

According to Ross University, only 57% (percent) of Ross University School of Medicine students finished their program. Whereas the attrition rate for a US medical school is around 3%, the high attrition rate correlated to substandard quality of medical education at Ross University School of Medicine.

**Ross University Faculty & Campus**

There is a lack of quality education at Dominica. Many instructors at Ross University do not follow a US based system of medical education or standards, nor do they follow the guidelines provided by the accreditation agencies.

The faculty, comprised of people from the United States, India, Africa, etc., do not make themselves accessible to their students as is expected in the United States. They are not approachable after lecture. In fact, some students are given what is known as a professionalism card if they contact their teachers with questions.

If you receive three professionalism cards, you are kicked out of the program. Whereas instructors in a typical medical school in the US are actively involved in a student's success and achievements, instructors at Ross University display a complete disregard for the student's learning and academic success, plus they lack the time to meet with individual students because of such a large student body.

Students have tried to help one another learn by offering peer tutoring. But even here the tutors are told not to give the students all the answers. The university even frowns on students sharing their class notes with one another.

Whereas the attrition rate for a US medical school is around 3%, the attrition rate for Ross University is between 40 – 50%, which corresponds to substandard quality of medical education at Ross University.

The Dominica campus has many problems. The lecture halls hold a maximum of 300 students, the lab holds 50 to 60 students, and the library holds between 75 – 100 students. After the takeover of Ross University by Devry Inc., Ross University in Dominica increased enrollment from 200 students per class to over 600 students per class. During the same period, classroom size remained the same, holding a maximum of 300 students per classroom. The lecture halls hold a maximum of 300 students, the lab holds 50 to 60 students, and the library holds between 75 – 100 students.

However, with an average enrollment of 650 students each semester, this leads to overcrowding. Trailers have to be brought in to handle some of the overflow, but most of the time the students stay home and watch the video lecture. In the United States a student must attend class no less than 60% of the time. But in Dominica, where there is no oversight, the students are forced to Mediasite due to overcrowding, which is online delivery of the videotaped lectures by Devry Inc technology. The video lectures at Dominica are not interactive. They are recorded live, and an hour later they are ready to download and watch. A student can watch the video as many times as necessary, but this doesn't help the medical student who needs that crucial interaction with the instructor.

For example, how can a student work on a corpse in anatomy class via a video? How is this good teaching? A medical student needs that close clinical contact that can only happen in the classroom and in the lab.

By any measure, Ross University provides inadequate training to its students. This is particularly true with regards to hands-on experience. Ross claims to have a full-fledged teaching hospital. This is absolutely not true. If it had a teaching hospital it wouldn't have to pay U.S. schools to provide a year of clinical training for its students. Ross has only a very small clinic that cannot possibly accommodate over 600 students.

Students at Ross University who attended peer tutoring also reported that they were only given a tiny PBL (problem based learning) room that normally would hold up to 10 people. Instead, they would fit, on the average, 50-60 people. Students would sometimes get up on tables in the next room and peer through the windows above in order to watch the tutor teach. There was a 2-3 hour wait just to get a seat for the tutor session, and the overcrowding was so bad that students sat in the hallway just to listen. Students weren't allowed to ask for a bigger room because they were told that if the authorities found out, they'd force them to stop meeting since it was a 'fire hazard.'

Ross University Medical School campus in Miami is located at Miramar campus of Devry and it is a college within a college. Miramar campus consists of Chamberlain college, Devry University, and Ross University. It is anything but a real medical school. The Miami The Ross University campus in Miami handles the 5th semester students for AICM as well as MERP. The semester is divided into both lecture time and clinical work. However, the clinical experience is often a joke. Many students are sent to private Spanish-speaking clinics, where students cannot understand the patients, nor can the students be understood. As with the Dominica campus, the faculty at the Miami campus is not approachable either, and ex-Ross graduates who are still working on their residencies are often used as guest lecturers.

**Ross University Miami Campus Map**

As stated earlier, to be eligible to take the USMLE Step 1 Exam, a Ross student must have: 1) passed all courses in the basic science curriculum during the first four semesters; 2) successfully completed the fifth semester AICM course; and 3) passed the National Board of Medical Exams (NBME). However, only 50% of the students pass semesters 1 to 4, and of those, only 50% pass the NBME COMP exam the first time, with the average student failing the exam twice. When Ross advertises its passing rate for USMLE Step 1 as greater than 90%, they fail to mention that almost half of the student who originally enrolled into the program don't even make it into semester 5.

Furthermore, where the average medical school determines a passing rate according to all students attending per semester, Ross manipulates the numbers and gathers its passing rate by including the students who had to repeat from the semester before.

**<u>Ross University – Dominica Campus Highlights:</u>**

High Attrition Rate: Read More;

Overcrowding;

Poor Teaching Facilities;

Poor Education and Training Standards;

Absence of in-campus hospital;

Unsafe living environments: Read More;

Uncooperative Faculty and Administration;

Poor academic support;

Inadequate teaching materials;

Lack of oversight

**<u>Ross University Curriculum Overview</u>**

Ross University curriculum consists of four-year program, divided into a basic science curriculum followed by hands-on clinical experience.

Ross students have 16 straight months of concentrated coursework on Dominica, followed by a fifth semester of intense test preparation in Miami or Saginaw, Mich. Once students pass Step 1 of the U.S. Medical Licensing Exam, they're assigned to two years of clinical rotations in hospitals around the country that have contracts with Ross. Since 2013,

Some students bail within days of arriving on Dominica, where there is little shopping and few restaurants. Others spend extra time on the remote island, repeating failed courses and running up debt.

The average attrition rate for a US medical school is 3%. The attrition rate for Ross University is 40 – 50%. This is so unusual that even the Dominican Medical Board, a third world agency, has questioned why this is so. Ross' screening process is poor as well. These students incur huge debts in this idealistic pursuit of a degree they will never attain, benefiting Ross, not the student.

**Ross University Medical Education Review Program (MERP)**

About 35% of all students who apply for Ross University School of Medicine (RUSM) are forced to attend the Medical Education Review Program, known as MERP. MERP program is for fifteen weeks, and it's supposed to help students matriculate into the medical program. There is no clear criterion for how students are chosen and with attrition rate as high as 50%, there is no data to support that this program even benefits the students who attend. It seems like just another way for Ross University and its parent company, Devry.Inc, to make extra money.

**Ross University Curriculum Foundation of Medicine (FOM)**

Ross University's medical program at the Dominica campus originally consisted of a four-semester track. However In 2013, the Basic Science Program (Foundation of Medicine) split into two tracks: the Curriculum and the Accelerated Curriculum. The Curriculum is a five-semester program for those who can't go through the fast track. Students are encouraged to take this track by being offered a 25% discount for the 5th semester, which still brings in more money for the school. The Accelerated Curriculum is what used to be the normal 4-semester track. By the end of the first semester, all students need to decide which track they will follow.

The teaching program at Ross is not at par with its counterpart in the United States. Many of the teachers at Dominica hold PhDs, not MDs; therefore, students are not being taught the core of medicine. Teachers in the US primarily hold MDs. The failure rate for semesters 1 to 4 is very high, and students who fail even one course by a half of a percentage point are required to repeat the entire semester. In the United States, students are only required to repeat their failed class.

Many of the university's teachers don't speak English well. They come from third-world countries where their teaching styles are much different from how classes are taught in the US. Their teaching materials are not adequate, PowerPoint presentations are poor, and textbooks don't often cover the teaching points, leaving students to feel lost and left out because of a lack of proper training.

The testing for each semester consists of three minis and a final. The minis are made excessively difficult, far beyond what is necessary. Many students fail and are forced to repeat the class, which brings more money into the school. The minis are multiple-choice. If a student wishes to know what the correct answer is to a given problem after the test, the teachers refuse to answer. How can students know how to improve themselves if they are not given the necessary help to learn and correct their errors? When pushed for a reason why there was this lack of information, one instructor said that DeVry has told the teachers not to talk about the results with the students. This is a disturbing trend, which again confirms that Ross University is not interested in educating students but rather to profit from students repeating classes and accessing Title IV funds.

Being a poor island country, Dominica cannot handle the heavy strain on its power supply. Sporadic power outages are common. The university has generators to supply its needs, but because of student overcrowding, many are forced to study at home. A sudden outage can cause computers to shut down, keeping students from watching class lectures or from keeping up-to-date with their studies.

## Ross University Clinicals & Clerkship Overview

At Ross University less than one-third of the students finish in four years, compared to nearly 100% at US medical schools. Since Ross University, like other Caribbean medical schools, doesn't have a teaching hospital, it pays hospitals stateside for students' clinical training, with wide variations in quality. The American Medical Association opposes rotation payments by schools and said last year that it would ask state and federal regulators to outlaw such practice. This past June, the Texas legislature prohibited foreign schools from operating in their state.

## Ross University Hospital Affiliations & Backlog

After passing semesters 1 to 4, the NBME Comp Exam, the AICM, and the USMLE Step 1 exam, Ross students vie for clinical rotations at more than 50 contracted locations nationwide. However, placement into an affiliated hospital's clinical program comes with a price. Instead of being put into a hands-on learning situation, many clinical students are only allowed to watch, or they are given menial tasks to do. They fail to receive the necessary clinical experience that will allow them to be successful practitioners. Therefore, when these students move into a residency program, they aren't prepared and are sometimes dismissed.

Furthermore, Ross University has failed to invest adequate money into securing quality clinical spots for its students. Currently, there are hundreds waiting for clinical rotations because there are only a few clinical spots available. Ross University Clinical Reference Guide doesn't provide specifics, but as stated by the former registrar of Ross University, "There are simply not enough sites, and that problem is not going to go away anytime soon."  And when it's time to place you in a hospital, according to Salvatore Compaccia, an attorney who filed a lawsuit against Ross University on behalf of his client, "Ross takes your money, and then they create an excuse to get rid of you."

Students doing clinicals in the States continue paying tuition to Ross, which at more than $30,000 a year is comparable to that of private US medical schools. Yet Ross students say they have virtually no contact with the school's faculty. That means they're on their own if problems arise.

**Ross University Clinical Quality Compromised**

The quality of clinical education that a Ross University School of Medicine student receives is below average. For Example, a Detroit-area graduate was given a six-week psychiatry rotation that was supervised by a surgeon. The student was given an assignment on cardiovascular disorders, but was never given an opportunity to interview any psychiatric patients, virtually receiving no clinical experience. To make matters worse, while training in Miami, this student was unable to communicate with most of the patients at the Spanish-speaking clinic because he knew no Spanish. There was never any oversight by Ross during the two years that he worked at the clinic.

One student received "very high evaluations" from his supervisors during his clinical rotations in Miami, New York, and Chicago, and he passed his mandatory USMLE Step 2 exam. But three weeks into a residency in internal medicine and pediatrics at Virginia Commonwealth University School of Medicine, the student was suspended from all clinical activities because of poor performance. A few months later he voluntarily withdrew. He didn't realize until he started his residency that he really didn't know a whole lot. When he met with the dean at the college, he was shocked when she suggested he go back to Ross University to tell them how poor his training had been.

**About Us**

Rather than spreading false propaganda in favor of  Ross University School of Medicine in order to mislead and trick many unsuspecting perspective students, by creating this website, our goal is to provide the perspective students with an alternative view point in order to help them making more informed decision.

There are many forums currently active on the web dealing with off-shore medical education, and some are exclusively devoted to American University of Caribbean(AUC)  However, unlike Valuemd and other paid advertiser Caribbean Medical Schools , this website is not controlled or is in any shape or form connected to Ross University.

**Disclaimer**

The Terms

RossUniversity.info is  for education purposes only, there are no goods or services provided on this site. RossUniversity.info is not the official site of any corporation or business.  RossUniversity.info contains opinions of the author.

RossUniversity.info is not associated/affiliated with Ross University, Ross University School of Medicine(RUSM), Ross Health Science. Inc, or Devry. Inc. These terms and conditions (the "Terms") govern your use of the RossUniversity.info website (the "Website"). If you do not agree with these Terms, do not use this Website. These Terms are subject to change without notice at any time.

Except as stated herein, none of the Materials may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means, including, but not limited to, electronic, mechanical, photocopying, recording, or otherwise, without the prior express written permission of RossUniversity.info.

No part of the Website, including logos, graphics, sounds or images, may be reproduced or retransmitted in any way, or by any means, without the prior express written permission of RossUniversity.info. You also may not, without RossUniversity.info's prior express written permission, "mirror" any Material contained on this Website on any other server. Nothing on this Website shall be construed as conferring any license under any of RossUniversity.info 's or any Third Party Provider's intellectual property rights, whether by estoppel, implication, or otherwise. You acknowledge sole responsibility for obtaining any such licenses.

Any unauthorized use of any Materials contained on this Website may violate copyright laws, trademark laws, the laws of privacy and publicity, and communications regulations and statutes. All information contained on this site is protected by copyright laws. Duplication of any material and/or content for anything other than your own personal use is strictly prohibited without the explicit consent of RossUniversity.info.

In accordance with copyright laws, it is also prohibited to post/distribute/sell any copyrighted material to this website without the permission of the original author and/or the current owner of the copyrights. Paraphrasing and short quotes are permitted; however, we strongly encourage the proper citation of the source and remind the users that RossUniversity.info will not be liable for the possible consequences of any such actions.

**Limitation of Liability**

This Website could include inaccuracies or typographical errors. RossUniversity.info SHALL NOT BE LIABLE FOR ANY DAMAGES SUFFERED AS A RESULT OF USING, MODIFYING, CONTRIBUTING, COPYING, DISTRIBUTING, OR DOWNLOADING THE MATERIALS. IN NO EVENT SHALL RossUniversity.info BE LIABLE FOR ANY INDIRECT, PUNITIVE, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGE (INCLUDING LOSS OF BUSINESS, REVENUE, PROFITS, USE, DATA OR OTHER ECONOMIC ADVANTAGE) HOWEVER IT ARISES, WHETHER FOR BREACH OR IN TORT, EVEN IF RossUniversity.info HAS BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. YOU AGREE TO HOLD RossUniversity.info HARMLESS FROM, AND YOU COVENANT NOT TO SUE RossUniversity.info FOR, ANY CLAIMS BASED ON USING THE WEBSITE. Changes are periodically made to the Website. Any action related to these Terms will be governed by US law. No choice of law rules of any jurisdiction will apply.

# EXHIBIT-8

**Disclaimer**

The Terms

RossUniversity.info is  for education purposes only, there are no goods or services provided on this site. RossUniversity.info is not the official site of any corporation or business.  RossUniversity.info contains opinions of the author.

RossUniversity.info is not associated/affiliated with Ross University, Ross University School of Medicine(RUSM), Ross Health Science. Inc, or Devry. Inc. These terms and conditions (the "Terms") govern your use of the RossUniversity.info website (the "Website"). If you do not agree with these Terms, do not use this Website. These Terms are subject to change without notice at any time.

Except as stated herein, none of the Materials may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means, including, but not limited to, electronic, mechanical, photocopying, recording, or otherwise, without the prior express written permission of RossUniversity.info.

No part of the Website, including logos, graphics, sounds or images, may be reproduced or retransmitted in any way, or by any means, without the prior express written permission of RossUniversity.info. You also may not, without RossUniversity.info's prior express written permission, "mirror" any Material contained on this Website on any other server. Nothing on this Website shall be construed as conferring any license under any of RossUniversity.info 's or any Third Party Provider's intellectual property rights, whether by estoppel, implication, or otherwise. You acknowledge sole responsibility for obtaining any such licenses.

Any unauthorized use of any Materials contained on this Website may violate copyright laws, trademark laws, the laws of privacy and publicity, and communications regulations and statutes. All information contained on this site is protected by copyright laws. Duplication of any material and/or content for anything other than your own personal use is strictly prohibited without the explicit consent of RossUniversity.info.

In accordance with copyright laws, it is also prohibited to post/distribute/sell any copyrighted material to this website without the permission of the original author and/or the current owner of the copyrights. Paraphrasing and short quotes are permitted; however, we strongly encourage the proper citation of the source and remind the users that RossUniversity.info will not be liable for the possible consequences of any such actions.

**Limitation of Liability**

This Website could include inaccuracies or typographical errors. RossUniversity.info SHALL NOT BE LIABLE FOR ANY DAMAGES SUFFERED AS A RESULT OF USING, MODIFYING, CONTRIBUTING, COPYING, DISTRIBUTING, OR DOWNLOADING THE MATERIALS. IN NO EVENT SHALL RossUniversity.info BE LIABLE FOR ANY INDIRECT, PUNITIVE, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGE (INCLUDING LOSS OF BUSINESS, REVENUE, PROFITS, USE, DATA OR OTHER ECONOMIC ADVANTAGE) HOWEVER IT ARISES, WHETHER FOR BREACH OR IN TORT, EVEN IF RossUniversity.info HAS BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. YOU AGREE TO HOLD RossUniversity.info HARMLESS FROM, AND YOU COVENANT NOT TO SUE RossUniversity.info FOR, ANY CLAIMS BASED ON USING THE WEBSITE. Changes are periodically made to the Website. Any action related to these Terms will be governed by US law. No choice of law rules of any jurisdiction will apply.

# EXHIBIT-9

# Tampa Bay Times

## Investigators want to know if the quality of offshore medical schools justifies the cost

 **Kris Hundley, Times Staff Writer**

**Friday, December 25, 2009 3:27pm**

Ross University School of Medicine may be the biggest medical school you've never heard of.

For decades, the school on the Caribbean island of Dominica has been accepting U.S. students whose poor test scores make it impossible for them to get into medical schools in the States.

And though Ross is 1,500 miles from the mainland, U.S. residents who attend the school, and about two dozen other offshore medical schools, qualify for federal student loans.

That has meant more than $150 million a year in government-guaranteed aid for Ross, which has about 3,500 students, double the biggest U.S. medical school.

Ross and other foreign medical schools say they're responding to U.S. demand for new doctors as the population ages.

And there's no question that these schools have produced thousands of practicing physicians. There are more than 80 Ross graduates in the Tampa Bay area alone.

But federal regulators are taking a closer look at evidence suggesting taxpayers and students may be getting shortchanged by foreign medical schools.



• At Ross, fewer than one-third of the students finish in four years, compared to nearly 100 percent at U.S. medical schools.

• Since Ross, like other Caribbean medical schools, doesn't have a teaching hospital, it pays hospitals stateside for students' clinical training, with wide variations in quality.

• Students of foreign medical schools like Ross graduate with higher average debt, $235,000 compared to the average $158,000 owed by graduates of U.S. medical schools, according to an August report to Congress by regulators.

• About 20 percent of Ross graduates fail to land a residency, the key to a license to practice in the United States. If they cannot pay their student debts, taxpayers are left holding the bag.

Steven Moxley, a former Navy corpsman, graduated from Ross in 2005 but can't get a residency due to low test scores. Now 54, with $250,000 in unpaid loans, Moxley is working construction jobs in the Washington, D.C., area and renting a room from his son.

"I'm living hand-to-mouth," he said. "I've got debt out the ying-yang."

## Started in a motel

Robert Ross, a commodities trader in New York, opened his medical school in 1978 in a motel in Dominica's capital at the suggestion of an employee whose son couldn't get into medical training in the States. By 2000, Ross had sold majority interest in both the medical school and an affiliated veterinary school in St. Kitts to a group of New York investors. Three years later, both schools were acquired by DeVry for $310 million.

Ross is the only offshore medical school owned by a publicly traded corporation, which must disclose more financial data than privately owned schools.

Last year, DeVry, better known for its tech training schools, reported $165.7 million in net income after taxes. But the company also reported an additional $140 million in tax-free income from the Ross operations.

In order to qualify for federal student loans, schools must report how many students default on their debt over the two years immediately after leaving school.

Ross says less than one percent of its medical students fail to pay their loans during this time frame, but critics question how meaningful that is.

"Lots of schools have developed very sophisticated hand-holding techniques to help their graduates or dropouts get through the two-year window without defaulting," said Barmak Nassirian, spokesman for the American Association of Collegiate Registrars and Admissions Officers. "The student can be making $5 a month payments and the school can come out looking fabulous."

Ross graduate Robb Holley, a pediatrician who is interim director of newborn medicine at Tampa General Hospital, expects to have no problem paying off his $200,000 in school loans but is not in a hurry.

"I could do it earlier, but I just bought a house," the 41-year-old Tampa native said.

The situation is different for Amer Alata, who got his M.D. from Ross in 2007, then quickly washed out of an internal medicine residency — and his prospects of becoming a physician. Now saddled with $470,000 in debt, he's teaching part-time but has never been able to afford a payment, making him one of Ross' official defaults.

"I'm in a state of paralysis," said Alata, 30, who lives outside Detroit. "The worst part is that I know I am not alone."

A spokeswoman for Ross, which has offices in North Brunswick, N.J., declined to discuss Alata's case but defended the institution's "high-quality education and successful student outcomes, comparable with U.S. medical schools."

"At a time when our country is in desperate need of quality physicians, they will help fulfill the unmet need and make important contributions to society," said Ross' Rebekah Herbison.

## The curriculum

No one disputes that it's easier to get into Ross than a U.S. medical school. Ross accepts scores on the MCAT, the standardized test all medical school applicants must take, as low as 17, compared to an average of nearly 31 at U.S. medical schools.

Like all medical schools, Ross divides its four-year program into a basic science curriculum followed by hands-on clinical experience. But U.S. medical students usually spend two years in the classroom followed by two years in a

teaching hospital on the same campus.

Ross students have 16 straight months of concentrated coursework on Dominica, followed by a fifth semester of intense test preparation in Miami or Saginaw, Mich. Once students pass Step 1 of the U.S. Medical Licensing Exam, they're assigned to two years of clinical rotations in hospitals around the country that have contracts with Ross.

Like U.S. medical students, once Ross enrollees complete their clinicals and pass another standardized exam, they graduate with an M.D. degree, then go on to post-graduate residency training before becoming a licensed physician.

Many Ross students don't make it that far. Even after six years, only 66 percent of entering students graduate.

Some students bail within days of arriving on Dominica, where there is little shopping and few restaurants. Others spend extra time on the remote island, repeating failed courses and running up debt. Ashley Sullivan, who had a 4.0 GPA during her two years at Ross, said one classmate was allowed to repeat three semesters he had failed. "He's a dear friend, but I'm not sure I'd want him taking care of me," she said.

Sullivan lost faith in her physician-educators at Ross after they misdiagnosed her swollen arm as an allergic reaction. When she returned home to Houston, doctors there discovered she had a massive blood clot. Once recovered, Sullivan returned to Dominica only to learn that Ross was reneging on a promise that she could do her clinical rotation in a Houston hospital not officially affiliated with Ross.

"My confidence in Ross had been obliterated and so I left," she said.

Now $100,000 in debt, Sullivan, 29, is working in management consulting for oil and gas companies.

"I realized I wouldn't have been proud of myself if I graduated from Ross," said Sullivan, whose parents are helping with her loan repayments, keeping her out of the default category. "It was a horrible experience."

**Hospital placement**

After finishing their coursework and passing the USMLE Step 1 exam, Ross students vie for clinical rotations at more than 70 locations nationwide that contract with the school.

Michael Rendon, registrar at Ross from 2006 to 2007, said finding suitable clinical training sites was always a challenge.

"Clinicals is the school's Achilles' heel," said Rendon, now registrar at Texas A&M University at Corpus Christi. "There are simply not enough sites, and that problem is not going to go away anytime soon."

Anand Dasrath, 52, says he was forced out of Ross because of the shortage of clinical sites. A pharmacist from New York City, Dasrath finished his studies on Dominica with nearly a 3.0 GPA, but was told he flunked the semester in Miami, though he never received a formal grade.

Back working as a hospital pharmacist, Dasrath, who took on about $60,000 in loans for school, is suing Ross for age discrimination and breach of contract. His lawyer, Salvatore Compaccia, said, "Ross takes your money, then when it's time to place you in a hospital, they create an excuse to get rid of you."

A crisis arose in February when two New York hospitals where Ross had paid for 135 training slots closed, sending students scrambling. Graduates say there are always last-minute scheduling changes that can mean cross-country relocations and sites with widely disparate opportunities.

Students doing clinicals in the States continue paying tuition to Ross, which at more than $30,000 a year is comparable to that at private U.S. medical schools. Yet Ross students say they have virtually no contact with the school's faculty. That means they're on their own if problems arise.

Alata, the Detroit-area graduate, said he had a six-week psychiatry rotation supervised by a surgeon. "He gave me an assignment on cardiovascular disorders," Alata said. "I never had the opportunity to interview a psychiatric patient.

There was no clinical experience whatsoever."

During training in Miami, Alata, who speaks no Spanish, was unable to communicate with most of the patients.

"Ross is supposed to monitor those sites, but in two years, I never saw anybody come to visit or ask me about them," he said.

Some students say they thrived despite the loose structure. Holley, the TGH pediatrician, said he sought out the toughest rotations and got valuable experience at his assignments.

"The patients I saw in New York City were from all over the world, and I saw all kinds of diseases I would not see in Tampa," he said. "I'm really glad I did it. It made for a well-rounded experience."

Dr. Mamatha Geddam, who recently joined a family medicine practice in St. Petersburg, also had all her Ross rotations in New York City. She said the students helped each other through.

"It would have been helpful to have an academic adviser because we were quite a big herd," she said. "But we learned from whoever had done it before."

**Not ready for residency**

Alata said he received "very high evaluations" from supervisors during his clinical rotations in Miami, New York and Chicago and passed his mandatory USMLE Step 2 exam.

But three weeks into a residency in internal medicine and pediatrics at Virginia Commonwealth University School of Medicine, Alata was suspended from all clinical activities because of poor performance. A few months later he voluntarily withdrew.

"Once you start your residency, you find out how little you know," Alata said. "It was a complete shock when I sat down with the dean and she said I should go back to Ross and tell them how inadequate my training was."

Officials at the Virginia college declined to comment.

Directors of residency programs at the University of Florida College of Medicine in Jacksonville and Bayfront Medical Center in St. Petersburg, both of which have accepted Ross graduates, said they've seen these students succeed.

"Once they're here, we're in training mode and they do fine," said Dr. David Parrish, head of family practice residency at Bayfront, which has three Ross grads.

But Dr. Peter Fabri, former dean of graduate medical education at USF College of Medicine, said his school has had a different experience.

"The quality of clinical education Ross students get is very, very unpredictable," said Fabri, a professor of surgery who retired as dean in September. "We've had some Ross students whom I'm told are superb, but we've also had a number from Ross who ended up being dismissed because they just didn't have it. And it's rare that any residents are dismissed."

**More schools coming**

Fabri, who has served on national commissions on graduate medical education, said students from foreign medical schools are going to be at a growing disadvantage.

Five new U.S. medical schools, including the University of Central Florida and Florida International University, have begun enrolling students and four more schools are in the permitting process. Those new graduates will make it tougher to get residency slots, which have not increased.

"I have not encouraged our program directors to take students from Caribbean schools," Fabri said. "And now that the competition is greater, I'm telling them to be very, very thoughtful."

In a report to Congress in August, the group that accredits offshore medical colleges recommended that the schools raise standards and improve reporting on everything from test scores to graduation rates to total cost.

Rendon, the former Ross registrar, said he agrees with the need to stiffen entrance requirements.

"We want doctors but we can't give that kind of money to everyone who's chasing a dream of being an M.D.," he said. "We need to be a little bit more discriminating about who those tax dollars go to."

*Times researcher Shirl Kennedy contributed to this report. Kris Hundley can be reached at khundley@sptimes.com or (727) 892-2996.*

---

**FAST FACTS**

**Ross University School of Medicine**

For-profit, foreign medical school in Dominica (also has sister veterinary school in St. Kitts)

**Founded:** 1978

**Owner:** DeVry Inc. (acquired in 2003 for $310 million)

**Enrollment:** about 3,500

**Student profile:** 56 percent male, most U.S. residents, average age 27 (two years older than U.S. medical students)

**Tuition:** More than $30,000 per year

**Percent of revenue from federal student loans:** 81 percent

**Four-year graduation rate:** 30.6 percent

**Six-year graduation rate:** 66 percent

**Percent of graduates who secure residency training:** 80 percent (2006-07)

Source: Corporate financial filing August 2009 and 2008 Ross survey

---

Investigators want to know if the quality of offshore medical schools justifies the cost 12/25/09

© 2013 Tampa Bay Times

**Sponsored From Around the Web**


How Cruise Ships Fill Their Unsold Cabins


These 5 Signs Warn You That Cancer Is Starting Inside Your Body


How Penny Stocks Create Millionaires Every Day


What Happens When You Take a Testosterone Supplement



A New Solution That
Stops Snoring and Lets
You Sleep

# EXHIBIT-10

Case 3:13-cv-06121-AET-TJB   Document 15-2   Filed 11/01/13   Page 75 of 130 PageID: 722

# BUSINESS

Front Page | News | Sports | **Business** | Lifestyles | Opinion | A&E

Home > Featured Articles > **Practices**

## Illinois, Massachusetts issue subpoenas to DeVry

April 16, 2013 | Tribune staff report



Downers Grove-based DeVry Inc., operator of private colleges ⬈ and training schools, said in an SEC filing that its practices are being investigated by the attorneys general in Illinois and Massachusetts.

Illinois Attorney General Lisa Madigan earlier this month subpoenaed information about DeVry's compensation practices, investigating whether DeVry is in compliance with a federal law that bans higher education entities who accept federal financial ⬈ aid from giving incentives to employees for hitting enrollment targets.



## $0.01 Web Hosting

www.HostGator.com/1Penny

Get Your First Month for 1 Cent. Try Our Award-Winning Service Now!

Madigan's office is seeking information on enrollments after January 2002, DeVry said Monday afternoon.

Massachusetts is seeking documents on periods after 2007 in connection ⬈ with an investigation into whether DeVry caused false claims and/or false statements to be submitted to the state relating to student loans, guarantees, and grants provided to DeVry's Massachusetts students.

DeVry said it could not predict the impact of the investigations on its business ⬈.

"DeVry is approaching them with a view toward transparency and an interest in demonstrating the compliant nature of its practices in cooperation with the authorities," the company said in a filing with the SEC.

# EXHIBIT-11

# Ross University

## SCHOOL OF MEDICINE

### PORTSMOUTH, DOMINICA

#### WEST INDIES

Date Printed:  7/25/12

Official Transcript

---

**Name : Amini, Behzad**
**Student ID : @00214890**

**Matriculation Date : 01/12/2009**

**Date Of Birth : 2/3/69**
**Major : Medicine**

---

| Course | Course Title | Grade | Credit |
|--------|-------------|-------|--------|

**Basic Science**

**Spring 2009**

| | 1/12/09 | | 4/24/09 | | |
|---|---|---|---|---|---|
| MANT | 1111 | Dev/Microscopic Anatomy I | | A | 3.00 |
| MANT | 1141 | Gross Anatomy I | | C | 3.00 |
| MBEH | 1151 | Doctor, Patient & Society I | | C | 2.00 |
| MBIO | 1121 | Biochemistry & Genetics I | | B | 3.00 |
| MPHY | 1131 | Medical Physiology I | | B | 3.00 |

| | Earned Credits | GPA QP | QP Credits | GPA |
|---|---|---|---|---|
| SEMESTER : | 14 | 40.00 | 14 | 2.85 |
| CUMULATIVE : | 14 | 40.00 | 14 | 2.85 |

**Summer 2009**

| | 5/11/09 | | 8/21/09 | | |
|---|---|---|---|---|---|
| MBIO | 1222 | Biochemistry & Genetics II | | B | 3.00 |
| MANT | 1242 | Gross Anatomy II | | A | 3.00 |
| MPHY | 1232 | Medical Physiology II | | B | 3.00 |
| MANT | 1212 | Dev/Microscopic Anatomy II | | A | 3.00 |
| MBEH | 1252 | Doctor, Patient & Society II | | B | 1.00 |
| MPHY | 1262 | Neuroscience | | A | 3.00 |

| | Earned Credits | GPA QP | QP Credits | GPA |
|---|---|---|---|---|
| SEMESTER : | 16 | 57.00 | 16 | 3.56 |
| CUMULATIVE : | 30 | 97.00 | 30 | 3.23 |

**Fall 2009**

| | 9/7/09 | | 12/18/09 | | |
|---|---|---|---|---|---|
| MMIC | 2311 | Clinical Med. Microbiology I | | A | 3.00 |
| MPAT | 2321 | Clinical Med. Pathology I | | B | 4.00 |
| MPHM | 2341 | Clinical Med. Pharmacology I | | A | 3.00 |
| MBEH | 2330 | Behavioral Science | | B | 5.00 |

| Course | Course Title | | Grade | Credit |
|--------|-------------|---|-------|--------|
| | Earned Credits | GPA QP | QP Credits | GPA |
| SEMESTER : | 15 | 51.00 | 15 | 3.40 |
| CUMULATIVE : | 45 | 148.00 | 45 | 3.28 |

**Spring 2010**

| | 1/11/10 | | 4/23/10 | | |
|---|---|---|---|---|---|
| MPHM | 2441 | Clinical Med. Pharmacology II | | C | 3.00 |
| MPAT | 2421 | Clinical Med. Pathology II | | B | 4.00 |
| MMIC | 2411 | Clinical Med. Microbiology II | | B | 3.00 |
| MCLM | 2430 | Intro. to Clinical Medicine | | B | 5.00 |

| | Earned Credits | GPA QP | QP Credits | GPA |
|---|---|---|---|---|
| SEMESTER : | 15 | 42.00 | 15 | 2.80 |
| CUMULATIVE : | 60 | 190.00 | 60 | 3.16 |

---

**Clinical Science**

**Summer 2010**

| | | | | | |
|---|---|---|---|---|---|
| CAIC | 5010 | Advanced Intro. to Clin. Med. | | B | 12.00 |

| | Earned Credits | GPA QP | QP Credits | GPA |
|---|---|---|---|---|
| SEMESTER : | 12 | 36.00 | 12 | 3.00 |
| CUMULATIVE : | 72 | 226.00 | 72 | 3.13 |

---

**Clinical Science**

**Academic Year 2010 - 2011**

| | | | | | |
|---|---|---|---|---|---|
| CFPC | 5001 | Family Medicine Core | | A | 6.00 |
| | | 05/23/2011---07/01/2011 | | | |
| COGC | 5003 | OB/GYN Core | | C | 6.00 |
| | | 08/01/2011---09/09/2011 | | | |

---

**TO VERIFY: TRANSLUCENT GLOBE ICONS MUST BE VISIBLE WHEN HELD TOWARD A LIGHT SOURCE**

In accordance with the Family Educational Rights and Privacy Act of 1974, as Amended, this document may not be released to others without the written consent of the student.

Kristal Booth
Registrar

This officially sealed and signed transcript is printed on blue SCRIP-SAFE® security paper with the name of the institution printed in white across the face of the document. A raised seal is not required. When photocopied the name of the institution appears on one line and the word COPY appears on the next. A BLACK ON WHITE OR A COLOR COPY SHOULD NOT BE ACCEPTED!

CONFIDENTIAL DOCUMENT DO NOT REPRODUCE

# Ross University

## SCHOOL OF MEDICINE

### PORTSMOUTH, DOMINICA

### WEST INDIES

Date Printed:     7/25/12

Official Transcript

Name : Amini, Behzad
Student ID : @00214890     Matriculation Date : 01/12/2009

Date Of Birth : 2/3/69
Major : Medicine

| Course | Course Title | | Grade | Credit | Course | Course Title | Grade | Credit |
|--------|-------|------|-------|-------|--------|------|------|------|
| | Earned Credits | GPA QP | QP Credits | GPA | | | | |
| **SEMESTER :** | 12 | 36.00 | 12 | 3.00 | | | | |
| **CUMULATIVE :** | 84 | 262.00 | 84 | 3.11 | | | | |

**Academic Year 2011 - 2012**

| Course | | Course Title | Grade | Credit |
|--------|------|------|------|------|
| CPDC | 5004 | Pediatrics Core | A | 6.00 |
| 09/12/2011---10/21/2011 | | | | |
| CPSC | 5005 | Psychiatry Core | C | 6.00 |
| 11/07/2011---12/16/2011 | | | | |
| CMDC | 5002 | Medicine Core | A | 12.00 |
| 01/02/2012---03/23/2012 | | | | |

| | Earned Credits | GPA QP | QP Credits | GPA |
|--------|------|------|------|------|
| **SEMESTER :** | 24 | 84.00 | 24 | 3.50 |
| **CUMULATIVE :** | 108 | 346.00 | 108 | 3.20 |

**Total Credits     108**

No Entries Below This Line

Comments:     Withdrew 03/23/2012

In accordance with the Family Educational Rights and Privacy Act of 1974, as Amended, this document may not be released to others without the written consent of the student.

Kristal Booth
Registrar

This officially sealed and signed transcript is printed on blue SCRIP-SAFE® security paper with the name of the institution printed in white type across the face of the document. A raised seal is not required. When photocopied the name of the institution appears on one line and the word COPY appears on the next. A BLACK ON WHITE OR A COLOR COPY SHOULD NOT BE ACCEPTED!

CONFIDENTIAL DOCUMENT DO NOT REPRODUCE

# EXHIBIT-12



# ST. MICHAEL MEDICAL CENTER INC.

620 N.E. 128 ST.
N. MIAMI, FL 33161
PHONE (305) 981-1015
FAX (305) 981-1016

July 25, 2011

RE:  Mr. Ben Amini

Dear Program Director,

I write this recommendation letter on behalf of Mr. Amini's application for a residency position in your post-graduate medical education program.  Mr. Amini completed his first 3rd year rotation of Family Medicine at our clinic in Miami, Florida from June to July 2011.  I have had the opportunity to observe Mr. Amini's medical knowledge, clinical skills, interpersonal skills and work ethic, and, in my opinion, Mr. Amini is an outstanding candidate who has earned my highest possible recommendation.

Mr. Amini displayed an expanse of medical knowledge far greater than his peers and was astute whenever he participated in clinical discussions.  He showed initiative by pursuing his own independent study of topics under discussion and was continually motivated to gain a deeper understanding of clinical topics.  Despite having an impressive knowledge base, Mr. Amini also accepted suggestions for improvement with gratitude and humility.

During clinical cases, Mr. Amini consistently demonstrated his ability to think quickly on his feet and make critical decisions accurately and efficiently.  He was perceptive in his diagnosis of patients, and his technique and judgment were always sound and professional.  Overall, his performance of clinical skills exceeds those of a third year medical student.

Mr. Amini also exhibited excellent interpersonal skills in his communication with patients and their families.  He was confident, yet reassuring and gentle, and, more importantly, he showed patients kindness and respect.  I observed the manner in which Mr. Amini interacted with patients and nursing staff, and was impressed with his ability to develop a rapport with everyone – from every patient to every member of our nursing staff.  He is exceptional when it comes to patient management and works well as a member of any medical team. Undoubtedly, Mr. Amini is one of the most well-liked and well-respected of medical students in the many years at our clinic.

Throughout his busy rotation schedule, Mr. Amini showed his resilience to working long hours and working under pressure.  He was often one of the first students to arrive and one of the last students to leave.  Mr. Amini was able to follow through and prioritize detailed tasks to accomplish set goals with utmost excellence and professionalism.  Despite having little personal time for his own, Mr. Amini was always willing to help others whenever possible – from a patient who needed a kind word, to a colleague who needed some encouragement, to one of our nursing staff who needed some levity.  Mr. Amini's impressive ability to find commonality with individuals from a diverse pool of backgrounds is a testament of his compassion for others. And, throughout his rotation, Mr. Amini has demonstrated his ability to lead using all the admirable qualities discussed above and Mr. Amini's demonstrated courage to lead by example.

In summary, Mr. Amini is one of the best students I have worked with in the last several years. He is academically strong, displays great clinical skills, is a creative and divergent thinker and has an exceptional work ethic. He is also genuinely kind and humble, and possesses impressive leadership skills.  It is without reservation that I give Mr. Ben Amini my highest possible recommendation for your residency program.  I am highly confident he will be an outstanding asset to your program.

Joseph M. Lemaire, M.D., PhD

# EXHIBIT-13



**UNITED STATES MEDICAL LICENSING EXAMINATION** ®

**STEP 1 SCORE REPORT**

This score report is provided for the use of the examinee.

Third party users of USMLE information are advised to rely solely on official USMLE transcripts.

**Amini, Behzad**

**USMLE ID:   0-817-255-3**                              **Test Date:   April 30, 2011**

The USMLE is a single examination program consisting of three Steps designed to assess an examinee's understanding of and ability to apply concepts and principles that are important in health and disease and that constitute the basis of safe and effective patient care. Step 1 is designed to assess whether an examinee understands and can apply important concepts of the sciences basic to the practice of medicine, with special emphasis on principles and mechanisms underlying  health, disease, and modes of  therapy.  The inclusion of Step 1 in the USMLE sequence is intended to ensure mastery of not only the sciences underlying the safe and competent practice of medicine in the present, but also the scientific principles required for maintenance of competence through lifelong learning. Results of the examination are reported to medical licensing authorities in the United States and its territories for use in granting an initial license to practice medicine. The two numeric scores shown below are equivalent; each state or territory may use either score in making licensing decisions. These scores represent your results for the administration of Step 1 on the test date shown above.

| | |
|---|---|
| **PASS** | This result is based on the minimum passing score recommended by USMLE for Step 1. Individual licensing authorities may accept the USMLE-recommended pass/fail result or may establish a different passing score for their own jurisdictions. |

| | |
|---|---|
| **215** | This score is determined by your overall performance on Step 1. For recent administrations, the mean and standard deviation for first-time examinees from U.S. and Canadian medical schools are approximately 221 and 24, respectively, with most scores falling between 140 and 260. A score of 188 is set  by  USMLE to pass  Step 1. The standard error of measurement (SEM)‡ for this scale is six points. |

| | |
|---|---|
| **91** | This score is also determined by your overall performance on the examination. A score of 75 on this scale, which is equivalent to a score of 188 on the scale described above, is set by USMLE to pass Step 1. The SEM‡ for this scale is two points. |

‡Your score is influenced both by your general understanding of the basic biomedical sciences and the specific set of items selected for this Step 1 examination. The Standard Error of Measurement (SEM) provides an index of the variation in scores that would be expected to occur if an examinee were tested repeatedly using different sets of items covering similar content.

**INFORMATION PROVIDED FOR EXAMINEE USE ONLY**

The Performance Profile below is provided solely for the benefit of the examinee.
These profiles are developed as self-assessment tools for examinees only and will not be reported or verified to any third party.

**USMLE STEP1 PERFORMANCE PROFILE**

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **Behavioral Sciences** | | xxxxxxxxxxxxxxxxxxxx | |
| **Biochemistry** | | xxxxxxxxxxxxxx | |
| **Cardiovascular System** | xxxxxxxxxxxxxxxxxxxxxx | | |
| **Gastrointestinal System** | xxxxxxxxxxxxxxxxxxxxxx | | |
| **General Principles of Health & Disease** | | xxxxxxxxxxx | |
| **Genetics** | | xxxxxxxxxxxxxxxxxxxxxxxx | |
| **Gross Anatomy & Embryology** | xxxxxxxxxxxxxxxxxxx | | |
| **Hematopoietic & Lymphoreticular Systems** | xxxxxxxxxxxxxxxxxxxxx | | |
| **Histology & Cell Biology** | | xxxxxxxxxxxxxxxxx | |
| **Microbiology & Immunology** | | xxxxxxxxxxxxxxxx | |
| **Musculoskeletal, Skin & Connective Tissue** | xxxxxxxxxxxxxxxxxxxxx | | |
| **Nervous System/Special Senses** | xxxxxxxxxxxxxxxx | | |
| **Nutrition** | xxxxxxxxxxxxxxxxxxxxxxxxx | | |
| **Pathology** | | xxxxxxxxxxx | |
| **Pharmacology** | xxxxxxxxxxxxxxxx | | |
| **Physiology** | | xxxxxxxxxxxxx | |
| **Renal/Urinary System** | xxxxxxxxxxxxxxxxxxxxx | | |
| **Reproductive & Endocrine Systems** | | xxxxxxxxxxxxxxxxxx | |
| **Respiratory System** | xxxxxxxxxxxxxxxxxxx | | |

The above Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. The band width for a given content area is the same for all examinees. An asterisk indicates that your performance band extends beyond the displayed portion of the scale.  Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because Step 1 is designed to be integrative, many items contribute to more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

**This profile should not be compared to those from other Step 1 administrations.**

Additional information concerning the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials.*

# EXHIBIT-14

On Jul 27, 2010, at 6:43 AM, "Amini, Behzad" <BehzadAmini@rossmed.edu> wrote:

I am writing to ask why there have been recent changes to our grading schedule when we are already three months into the semester. Dr. Coutinho has informed us that our midterm score has changed from 20% to 16%, and our final exam in now worth much more than originally stated in the syllabus. This is the second time that such a change to the 5th semester syllabus has been implemented during the semester. This means that 4% of my A from the midterm has now disappeared, and that 4% has moved to my final exam.

I have never heard in all my school experience, and have heard of no one else at any educational institution, where the institution, especially a medical school, can change the applied percentage of an already administered and scored exam and allocate the percentage elsewhere during the middle of the semester. I have read the entire student handbook and policy manual, and I do not find any mention of the school having the right to do so.

This change will have negative consequences for the students, especially those who will fail as a result of this change, forcing them to repeat the semester all over again.

It is now understood that Ross has to fail students for the following reasons:

1. To make more money (the school has made a lot of money selling their stock: http:/biz.yahoo.com/t/14/6527.html)
2. To delay the backlog of students up for rotation since the large numbers of admitted students don't allow for enough rotation spots.

Again and again, Ross University has breached its contract in order to make a profit. Tuition has been raised twice within the last year without proper justification. This has to stop. This is an academic crime. I therefore have no choice but to file a lawsuit against Ross University. We will also report this incident to the Department of Education, and to any related accreditation agencies across the US, including the Medical Board of California. I am also forwarding this email to Kris Hundley, Staff Writer for the St. Petersburg Times.

I hope my actions will not cause any retaliation as I am only exercising my rights under the Constitution of the United States.

Sincerely,

Ben Amini
(818)602-4444


Edited Version.

# EXHIBIT-15

From: Shepherd, Dr. Thomas
Sent: Thu 8/12/2010 9:06 AM
To: Amini, Behzad
Subject: Reply to your July 27 2010 Email

Dear Mr. Amini,

I am in receipt of your email of July 27, 2010.  **By now, you no doubt are aware that Dr. Enrique Fernandez has addressed the grading issue raised in the first paragraph of your email. As you know, this issue can be traced back to a regrettable typographical error.**  I trust that you have found satisfactory Dr. Fernandez's explanation of and proposed resolution to that issue.  If not, please let me know.

As for the balance of your email, I welcome the opportunity to address the concerns expressed therein and the misconceptions underlying your assertions regarding this school.  If you are interested in doing so, kindly let me know when you are available and I will arrange for a mutually convenient time to either meet or speak.

Finally, let me address the suggestion that you might be "retaliated against for exercising [your] rights under the constitution of the United States."  I certainly am not aware of any instances of retaliation against you nor do you report that you have been retaliated against to date.  **Moving forward, let me be absolutely clear: I encourage you to report to me personally any instances in which you believe you have been retaliated against so that I can immediately investigate the matter, promptly report back to you and take whatever action may be necessary under the circumstances.  If for whatever reason you are uncomfortable reporting any such incidents to me, there are other avenues open to you to report those instances to another member of the Ross administration.  Rest assured that Ross does not and will not tolerate any unlawful retaliation against persons affiliated with the school.**

**In closing, I look forward to hearing from you so we can schedule a time to address these and any other issues you wish to raise with me.**

Sincerely yours,
Dr. Tom Shepherd
Thomas C. Shepherd, DHA
President Ross University

630 US Highway 1

North Brunswick NJ 08902

Phone: 732-509-4600 x2675

Fax: 732-509-4842

Email: tshepherd@RossU.edu <mailto:tshepherd@RossU.edu>

Assistant: Jean Kraemer

# EXHIBIT-16

**Agenda Item 29      Consideration of Request for Recognition of Ross University**

Dr. Mark Servis, UC Davis School of Medicine and medical consultant to the Board, reported the Board currently recognizes Ross University's main campus located in Dominica, West Indies.  In January 2009, Ross opened a branch campus in the Bahamas to provide medical education for the third and fourth semesters of medical school.  Dr. Servis and staff have reviewed the Ross Grand Bahama's application and determined that it meets the criteria pursuant to Section 1314.1 (a)(2) of Title 16 of the California code of Regulations.  As such, they recommended that the Board approve Ross University's Freeport, Grand Bahama campus to provide medical school education for semesters 3 and 4 only at this time.  He recommends retroactive recognition to January 2009.

Dr. Servis noted an unsolicited complaint was received from a student that made a number of allegations about the main campus program in Dominica.  He and staff recommend site visits to Ross University's main campus, the Bahamas campus and several representative teaching hospitals in the United States where students receive clinical training as part of Ross University's reevaluation by the Board.

On Sept 8th 2010
Dear Ms. Parker,

I spoke to you on the phone and I am writing to inform you that within the next few days, I will send you a detailed report outlining the reason why Ross University should not be given approval for the Freeport site. In the meantime, I have decided to send you the following information which raises serious concerns about the university's request for California approval.

Ross University recently emailed a notice to students, offering them free tuition (worth $15,000) if they chose not to attend the next semester's classes because of limitations in their infrastructure. Furthermore, another student informed me that about 40 students have been accused of not registering for classes when they already had registered.

Should Ross University be asking California to approve a site if they are having problems managing their current location and the current number of enrolled students? It is apparent that Ross administrators are more concerned about making money than building vital infrastructure necessary for educating their medical students.

Approving the Freeport site is like opening Pandora's Box. Ross will haul in thousands of media sited doctors, landing them on California's doorstep. The systemic problems at Ross University need to be addressed before they are approved. Under their current leadership, Ross has become an ailing institution that may require government and legal intervention in order to make any sustainable changes.

Thank you for your time,
Ben Amini

From: Ross Student Service Center [mailto:rosssurveys@rnmk.com]
Sent: Fri 8/27/2010 5:44 PM
To: Giggey, Kristan
Subject: September Leave of Absence Opportunity


Dear Kristan,

I hope your summer has gone well.  Though we know you are readying your return to Dominica for 3rd semester I am writing to inform you of an opportunity available to a small number of students.   Due to our commitment to ensure the proper ratio of infrastructure to student population on campus, and some recent construction delays affecting that, we are asking a limited number of students (on a first-come, first-served basis), to voluntarily accept a one semester leave of absence for this September, returning in January 2011.

As we realize this leave will pose a disruption just 10 days prior to the first day of classes, we are offering a full-tuition waiver for the January 2011 semester to those students who accept this opportunity, a savings of $15,650.  Furthermore, to defray other non-tuition related costs, we will also cover any flight change fees and any documented lease costs in Dominica associated with your leave.

Students who wish to avail themselves of this opportunity must complete this two question survey by no later than 3pm EST on Tuesday, August 31st.

Click here to take this survey.

Again, please note that we can only accommodate a limited number of students, and this opportunity will be granted on a first-come, first-served basis.  If you are certain that you wish to move ahead at this time, please complete the attached Leave of Absence Form, fax it to 732-509-4820 or email to Registrar@RossU.edu and we will contact you on Monday to let you know if your request is approved.

If you have any questions, please contact our Student Service Center at StudentServiceCenter@RossU.edu.  We thank you for your consideration of this opportunity as we continue to expand our academic facilities and enhance our program of medical education.

Dominica Leave of Absence Form

Sincerely,
Hal McCulloch, PhD
Senior Vice President of Administration
Ross University

# EXHIBIT-17

From: Legal <Legal@nbme.org>
Subject: FW: Ross COMP cheating and extra time
To: "Ben Amini" <bccpda@yahoo.com>
Date: Wednesday, September 15, 2010, 1:14 PM

Behzad,

Can you please forward me your email you sent to Dr. Sheperd?  Thanks.


Dr. Sheperd,

I received a phone call from your secretary to arrange a time to meet. Dr. Minton requested that since these issues are shared concerns, he should also attend. We can have a webinar session if that would be more convenient for you.

I was recently informed by some fellow students that we have another problem: cheating on the 1st Comp. It appears that some had access to the Comp questions prior to the 1st Comp exam, allowing them to pass the test. The students who discovered this information did contact Ross to report the issue, but have received no response. I can provide you with a list of suspects at our meeting.

These allegations by students have to be investigated and the names of the individuals involved have to be published and reported to all the board agencies and NBME for cheating.

Ben Amini

Ms. Weaver,

My name is Behzad Amini and I am a 5th semester medical student at Ross University School of Medicine. I have been told by my colleagues that there is a file pertaining to the Comp exam questions that was distributed to some students, resulting in an unfair advantage for the exam taken on 05/20/2010. We have a list of possible suspects that may have been involved in this case.

Furthermore, the students at Ross who took the Comp exam on Sept 10th, had fifteen minutes less time to finish their exam compared to those who took the exam on Sept 13th. This is a clear violation of the standards set forth by NBME.

We respectfully request an investigation to these allegations. Ross University is notorious for cheating incidences.

On Sept 14th, I emailed our president Dr.Sheperd, and informed him about these issues. I have not yet been contacted.

I can be reached at 818-602-4444
My private email is at bccpda@yahoo.com

Respectfully,

Behzad Amini

# EXHIBIT-18

From: OIG Hotline [Oig.Hotline@ed.gov]
Sent: Tuesday, February 07, 2012 4:55 PM
To: Amini, Behzad
Subject: RE: Ross University Disregard for DOE guidelines

Mr. Ben Amini
BehzadAmini@rossmed.edu

Dear Mr. Amini:

This is in response to your email to the Inspector General's Hotline concerning Ross University.

After a careful review of your email, we have decided that the issues you raised may fall within the responsibilities of the Department's Federal Student Aid (FSA), Program Compliance.  Therefore, I have provided below information on how you may contact that office directly.

> Robin Minor
> Chief Compliance Officer
> FSA, Program Compliance
> U.S. Department of Education
> 830 First Street, NE - UCP III, 8th Floor
> Washington, D.C. 20202-5265
> E-mail: CaseTeams@ed.gov

If you need additional assistance, please feel free to contact that office on 202-377-4277.  I hope this information is helpful to you.

Sincerely,
Inspector General's Hotline/mh

ED/22510-12

-----Original Message-----
From: Amini, Behzad [mailto:BehzadAmini@rossmed.edu]
Sent: Tuesday, June 14, 2011 10:04 PM
To: Shepherd, Dr. Thomas
Cc: Perri, Dr.Nancy; Rios, Jorge; EngleM@GAO.GOV; CraddockC@GAO.GOV; BlandD@GAO.GOV;
Fernandez, Dr. Enrique; Donnelly, Tim; Flaherty, Joseph; OIG Hotline
Subject: Ross University Disregard for DOE guidelines

Dr. Sheperd,

The U.S. Department of Education secretary, Arne Duncan, made an announcement last week regarding programs that receive students' federal grants and loans because "prepare students for gainful employment in a recognized occupation" will have to pass at least one of three tests: 1) a student loan repayment rate of at least 35 percent; 2) a ratio of no more than 30 percent between debt that must be repaid each year and annual discretionary income; 3) a ratio of no more than 12 percent between debt and overall income. The imitative is design to help student with tools necessary to enter job market and successful employment.

My Step 1 score is above the average of ROSS student USMLE score(215) and I have never failed any courses. I also have an above Ross average GPA of 3.1. Getting into a good quality clinical rotation will provide me with the experience and opportunity to find a residency and to be able to pay back my student loan. I applied for two different track rotations last week and I was given the following response by Gary Belotzerkovsky(Fernandez): "I regret to inform you that all track spots have been filled" Now my question is this, what kind of answer is that? When is next track rotation is going to be available? 1 month? 2 month? 6 month? 1 year? 5 year? This is really disturbing.

I am glad that you have resigned from Ross. You and Fernandez have destroyed the basic fabric of this institution. I really hope that the next president doesn't follow your foot step and make necessary changes to help this ailing institution.

This email is forwarded to office of inspector general at DOE. Rest assure that at some point in time, DOE is going to put a stop to this fraud.

Ben Amini

# EXHIBIT-19

On Mon, Aug 15, 2011 at 10:12 AM, dr ngouamba <drngouamba@gmail.com> wrote:
Hi,

This is the first that i am hearing about this situation. To my knowledge, you should not be discriminated against.  As far as the conversation that we had on 8/12/11 at about 8:45am.  Yes, as is my duty to protect and try to ensure that you are getting the best experience possible I did inform you that on multiple occassions, the nurses, midwives, residents, patients, as well as, some of the other attendings feel that you are a good student but were reluctant to have you around secondary to your strong body odor.  I felt that you should be aware so that your experience is improve.  When we had this private discussion in my call room,  i did not feel, personally, that your body odor was strong, therefore if you did not get to go into that case and it was soon after i spoke with you, there may have been other reasons.
I will look into the matter and discuss it with the resident in question.   I have been told you have a pleasant attittude and seem knowledgable so barring that problem i do not see why you should discriminated against.
I am committed to my students and as your advocate i will try to make sure you are getting a fair and well rounded education.


-rashida

# EXHIBIT-20

LISA S. AMINI | ATTORNEY AT LAW

336 36th Street, Suite 217
Bellingham, WA 98225
Tel: 604.600.3718

MULTI-JURISDICTIONAL PRACTICE
New York Admitted: #4123402

**VIA EMAIL**

September 19, 2011

Dr. Steven Inglis
Chairman, Dept. of Obstetrics & Gynecology
Jamaica Hospital Medical Center
8900 Van Wyck Expressway
Jamaica, N. Y.   11418

Dear Dr. Inglis:

**RE.: CEASE AND DESIST**

I represent Mr. Behzad Amini and write with respect to the actions and statements of Dr. Rashida Ngouamba, a physician in the Department of Obstetrics & Gynecology ("OBGYN") at Jamaica Hospital Medical Center ("Jamaica").

Mr. Amini was assigned a six-week clinical rotation in OBGYN from August 1, 2011 to September 16, 2011. During his rotation, Mr. Amini experienced and witnessed conduct by Dr. Ngouamba that required his filing of a grievance. He inquired to Ms. Nancy Burke about how to file a complaint and was advised by her to contact you to initiate the process. Accordingly, on September 2, 2011, Mr. Amini notified you by email his intent to file a complaint against Dr. Ngouamba for discrimination, abuse and retaliation. He further forwarded to you a list of some of his grievances against Dr. Ngouamba. To date, you have not responded to Mr. Amini.

Although Mr. Amini has now completed his rotation in OBGYN, we have since discovered some more disturbing information: Dr. Ngouamba has continued her campaign against Mr. Amini by requesting and/or compelling persons under her influence to write letters to "kick him out". Notwithstanding your non-response to Mr. Amini's September 2, 2011 email, we view Dr. Ngouamba's most recent act as another incident of retaliation.

Let me explain to you in no uncertain terms what will happen if Dr. Ngouamba and/or any other person attempts to jeopardize, directly or indirectly, Mr. Amini's education, professional relationships with other individuals or medical departments at Jamaica, professional relationships with other individuals or medical departments outside Jamaica or

his future as a medical doctor.  In addition to whatever internal proceedings Mr. Amini has initiated against Dr. Ngouamba, we will not hesitate to vigorously challenge every allegation made against Mr. Amini by Dr. Ngouamba or those individuals influenced by her.  Dr. Ngouamba must understand that there is a bigger world out there than OBGYN at Jamaica; namely, the courtroom and/or a deposition room.  She will not have any influence when she is required to attend her deposition or is called to the witness stand; she will not have any influence when she, your department, the hospital or any other place Dr. Ngouamba has worked is compelled to hand over evidence under a subopoena duces tecum.  We will depose and subpoena each and every single individual who makes an allegation against Mr. Amini.

We will effectively utilize all discovery tools at our disposable to challenge the nefarious acts of Dr. Ngouamba and those she has influenced to act against Mr. Amini.  Moreover, we are highly confident we will be able to demonstrate a history of improper conduct by Dr. Ngouamba based on testimonial and other evidence.  And when we have demonstrated her egregious conduct, we will hold her, as well as your department, jointly and severally liable.  The fact that OBGYN has allowed Dr. Ngouamba to continue to work in a position of influence with knowledge of her past conduct makes your department equally liable for any and all injuries incurred by Mr. Amini.  We sent this letter to your attention with the expectation that you will apprise Dr. Ngouamba the grave consequences of her conduct.

In short, we hereby demand that your department and Dr. Ngouamba immediately cease and desist all attempts to expel, suspend, sanction or retaliate against Mr. Amini and any attempts that may jeopardize his ongoing professional relationships with other departments or staff at Jamaica.

Dr. Ngouamba's preferred approach of, inter alia, recklessly discriminating against Mr. Amini, disparaging him to other students, residents, physicians and other staff, and using her position to influence or compel subordinates to form a false opinion of Mr. Amini, will not be tolerated.  We have been authorized to take any and all steps necessary to protect Mr. Amini.  Please be guided accordingly.

Yours Truly,

LISA S. AMINI, Esq.

LSA:mf

# EXHIBIT-21

George J. Cotz
**Attorney at Law**
Member of NY & NJ Bars

180 Franklin Turnpike                                                    Phone 201-512-9961
Mahwah, New Jersey 07430                                                    Fax 201-512-9963
                                                                         cotzlaw2@aol.com

November 23, 2011

William S. Gyves, Esq
epstein becker
250 Park Avenue
New York, NY 10177

RE: Ben Amini / Ross University

Dear Mr. Gyves;

      I have several questions to which I would appreciate answers before proceeding further: is there any document executed by Mr. Amini that purports to bind him to a choice of law clause, choice of forum clause, or to arbitrate claims rather than litigate same in a court?

      Going forward, I have many concerns and questions about the process being applied against Mr. Amini, as it does not seem to be consistent with the Handbook or the Catolog. The school's apparent failure to follow its own procedures reinforces Mr. Amini's perception that he is being targeted, and certainly leads me to question the school's good faith.

      First, Ross ignored the requirements of §6.5 of the Handbook. The "Complaint" sent to him by Dr. Ippolito on October 21st did not "state the charge", but rather warned him that the Committee "would likely focus on" §6.3(1), leaving me at a loss as to the scope of the charges he must meet. The complaint does contain a summary of the charges, Mr. Amini has not been provided with the names of witnesses and the "supporting materials" gathered between September 27th and October 21st were not provided. Taken as a whole, what was served on Mr. Amini on October 21st cannot be regarded as a complaint within the meaning of the Handbook.

      Secondly, there seems to be a conflict between Appendix III, which suggests that the Grievance Committee functions as judge as well as prosecutor, and §6.4, which implies that a

separate, distinct and independent Conduct Board will be convened.    How can this be characterized as a fair proceeding if the body that has determined that a prosecution is warranted is also the body assessing guilt? I know that there is a long line of precedent for such a structure, going back to The Inquisition, but it is not a precedent that can bear close scrutiny.

Once Mr. Amini is served with specific charges, rather than a hint about what the committee might focus on; has been presented with a list of witnesses against him; and has been presented with all of the evidence against him, we will be prepared to respond within three class days as required; although we will need sometime for our expert to conclude his review of all the ESI evidence.

In the meantime, perhaps you can have TIG complete its report with the following: name of the author, with his/her CV; the address where Mr. Amini allegedly resided at the relevant times; the name of the program that Mr. Amini allegedly used to disguise his IP address; the factual basis for the author's assertions about Time Warner's practices regarding the assignment of IP addresses; the complete e-mail exemplars used by the expert from Mr. Amini's mailbox, including the complete display of the IP address as he did for the Curry e-mails; the websites that Mr. Amini allegedly owns.

We shall need extensive discovery from Ross, Gupta and Curry before we are able to proceed, and our expert will need access to the individuals' personal computers and telephones, as well as the University's servers. Perhaps we can agree on an expedited schedule for this.

Lastly, demand is hereby made that Ross University and its litigation control group, including Thomas Shepherd, place an immediate Litigation Hold on all computers, servers, back up tapes or disks, PDAs and cellphones covering the period commencing with Mr. Amini's enrollment at Ross and continuing into the future. Failure to do so will expose it, and them, to a possible action for spoliation.

Perhaps we can schedule a telephone conference sometime tomorrow to discuss our next steps.

Very truly yours,

GJC/hs

George J. Cotz

**Attorney at Law**

Member of NY & NJ Bars

180 Franklin Turnpike                                                Phone 201-512-9961
Mahwah, New Jersey 07430                                              Fax 201-512-9963
                                                                     cotzlaw2@aol.com


October 28, 2011


Dr Scott Ippoloito
Ross University School of Medicine
630 US Highway 1
Suite 300
North Brunswick, NJ 08902

RE: Ben Amini

Dear Dr. Ippolito;

  I represent your student, Ben Amini. I write at this time to advise you that I will be representing him in the upcoming disciplinary hearing, should you decide to proceed with it.

  There is a well-documented history of antagonism between Mr. Amini and the school, notwithstanding his excellent performance as a student. This is reflected most notably in the "Extension Agreement" for his USMLE 1 proffered in exchange for his perpetual silence about the school and its business practices. Now, the school has delayed advising him of this unfounded complaint until after his rotation at Jamaica Hospital had ended, and he was no longer in a position to readily get statements from witnesses or gather documentary evidence. This complaint was in your possession for over three (3) weeks, and Mr. Amini was only advised about it at 5:30 PM on the Friday when his Jamaica rotation ended. At that point, you certainly knew that potential witnesses had departed to new rotations elsewhere, and would be dispersed and difficult to locate; and as §6.5 only allows students three days to marshall a defense, this left him at a severe disadvantage.

  Moreover, you demanded that he answer the "Complaint" within three days without first conducting the pre-Answer conference required by your policy; you have tried to cover

your error by purporting to be reasonable.   More importantly, the Complaint did not identify witnesses, nor did it reference or include "the supporting materials gathered during the preliminary investigation" as required by §6.5 of your Handbook.

The fact that you "overlooked" his right to a "pre-Answer conference" with you gives further credibility to our claim that this is a vendetta, with a pre-ordained outcome, rather than a search for truth leading to the imposition of "justice".

In addition, you have not shared the results of TIG's investigation, thereby preventing Mr. Amini from knowing the evidence against him, once again suggesting that this proceeding is rigged.

Lastly, I remind you that Mr. Gupta has a well-known jealousy of my client, that was observed by many at Jamaica Hospital.  Had you done a proper investigation, you would have been aware of that.  And, had you made timely service of this complaint, he could have assembled witnesses to bear this out.

I urge you to drop this investigation, and relegate Mr. Gupta's file to the trash where it belongs.

Very truly yours,

GJC/hs

# EXHIBIT-22

**DRAFT - E&C - 07/27/10**

<u>**SETTLEMENT AGREEMENT**</u>

This Settlement Agreement (the "Agreement") is made this [**TO COME**] of July,

2010 by and between Ross University School of Veterinary Medicine, having offices at P.O. Box

334, Basseterre, St. Kitts, West Indies, and Michael Gary Greene, residing at 245 Atlantic

Avenue, Apt. 117, Long Branch, New Jersey.

<u>**RECITALS**</u>

**WHEREAS,** RUSVM is an educational institution offering a Doctor of

Veterinary Medicine degree program;

**WHEREAS,** Greene enrolled as a student at RUSVM in September 2006;

**WHEREAS**, RUSVM contracts with affiliated teaching hospitals to provide its

students with clinical training as part of the fourth year of its curriculum and to evaluate the

performance of RUSVM's students during that portion of its curriculum;

**WHEREAS**, RUSVM students participating in clinical training at affiliated

teaching hospitals remain enrolled as full-time RUSVM student and earn credits toward

graduation from RUSVM;

**WHEREAS**, based on the evaluations provided by the faculty at the affiliated

institutions, RUSVM makes the determination of its students' academic progress during the

clinical year;

**WHEREAS**, students failing to make satisfactory academic progress while

participating in clinical training at the affiliated institutions are subject to dismissal from

RUSVM;

**WHEREAS**, in June 2009 RUSVM placed Greene at the University of Missouri

College of Veterinary Medicine ("UMCVM") for his clinical year;

EC.38960.2

**WHEREAS**, Greene received a failing grade from UMCVM and subsequently was dismissed from RUSVM;

**WHEREAS,** a dispute has arisen between RUSVM and Greene with respect to Greene's dismissal from RUSVM;

**WHEREAS**, RUSVM has denied and continues to deny any wrongdoing in connection with Greene's dismissal;

**WHEREAS**, Greene remains committed to pursuing his education at a school of veterinary medicine other than RUSVM;

**WHEREAS**, RUSVM is supportive of Green's goal to pursue and complete his veterinary medicine education;

**WHEREAS**, having consulted with counsel, RUSVM and Greene have independently concluded that it is in their respective best interests to settle and resolve amicably and expeditiously any and all disputes and controversies that have been or could have been raised between them;

**NOW, THEREFORE**, in consideration of the mutual promises exchanged herein and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, RUSVM and Greene hereby memorialize their agreement as follows:

<u>**ARTICLE I.**</u>

<u>**Release**</u>

1.1     <u>**Greene's Release of RUSVM**</u> -- Except for RUSVM's obligations pursuant to this Settlement Agreement, Greene, together with his assigns, heirs, executors and administrators, hereby releases and discharges RUSVM and/or any of its parent or affiliated companies and any and all of its and their former and current members, principals, directors, officers, shareholders, employees, agents, attorneys, contractors, representatives, affiliates,

predecessors, successors and assigns from liability on and for all claims, demands, causes of

action, damages, costs, expenses, accounts, contracts, agreements, promises, compensation and

all other liabilities of any kind or nature whatsoever, direct or indirect, known or unknown, that

Greene may have had or now has for any reason whatsoever.

## ARTICLE II.

### Settlement Consideration

**2.1**      **Assistance of RUSVM's Faculty** -- In the event Green submits one or

more applications for acceptance by or transfer to a school of veterinary medicine other than

RUSVM, RUSVM shall, although otherwise under no obligation to do so, make the faculty

member(s) of Greene's choice available to provide Greene with a letter(s) of recommendation to

be submitted in connection with said applications, provided that Greene requests said letter(s)

through RUSVM in a manner consistent with the notice provision set forth below in Section

4.15.

**2.2**      **Assistance of Ross's Student Ombudsman** -- Although otherwise under

no obligation to do so, RUSVM shall make its Student Ombudsman available to confer with

Greene in connection with Greene's applications to schools of veterinary medicine other than

RUSVM, provided that Greene requests such assistance in a manner consistent with the notice

provision set forth below in Section 4.15.

**2.3**      **Assistance of RUSVM's Administration** -- Further, although otherwise

under no obligation to do so, RUSVM shall make a senior member of its administration available

to field questions from representatives of other schools of veterinary medicine to which Greene

may apply with respect to said applications, provided that Greene (a) where reasonably possible,

advise RUSVM in advance of such inquiries in a manner consistent wit the notice provision set

forth below in Section 4.15, and (b) refers all such inquiries in the first instance to RUSVM as

follows:

> Dr. David J. DeYoung
> Dean
> Ross University School of Veterinary Medicine
> P.O. Box 334
> Basseterre, St. Kitts, West Indies
> E-mail: ddeyoung@rossvet.edu.kn
> Telephone:  869-465-1080

**2.4**     <u>**No Assurances**</u> -- Greene expressly acknowledges and agrees that

RUSVM has made no representations to him that any assistance it may provide pursuant to

Sections 2.1, 2.2 and/or 2.3 above will ensure Greene's acceptance to any other school of

veterinary medicine.  Further, Greene expressly acknowledges and agrees that nothing provided

for herein is intended to reflect any intention on the part of RUSVM to suggest or otherwise

ensure Greene that any assistance RUSVM may provide to him pursuant to Sections 2.1, 2.2

and/or 2.3 above will result in Greene's acceptance to any school of veterinary medicine either in

the United States or elsewhere.

**2.5**     <u>**Limited Assumption of Tuition Costs**</u> -- In the event Greene is accepted

by and enrolls at a school of veterinary medicine other than RUSVM, RUSVM shall make timely

payment of Greene's tuition at that school in a total amount not to exceed U.S. $48,000.00.  It is

expressly understood and agreed that Greene himself is not entitled to receive a cash payment of

the $48,000.00 or any portion thereof in lieu of RUSVM's assumption of his tuition obligations.

Further, it is expressly understood and agreed that RUSVM's obligation to assume the cost of

Greene's veterinary school tuition in the referenced amount extends only to the first school of

veterinary medicine other than RUSVM at which Greene enrolls and that if, for whatever reason,

Greene enrolls in a second school of veterinary medicine, RUSVM shall have no continuing

obligation to pay any remaining balance of the $48,000.00 amount or any other amount to that second school or any other school in which Greene may subsequently enroll.

## ARTICLE III.

### Non-Disparagement

**3.1** **Non-Disparagement** -- Greene hereby covenants and agrees that he will not make any disparaging statements about RUSVM and/or any of its parent or affiliated companies and any and all of their former and current members, principals, directors, officers, shareholders, employees, agents, attorneys, contractors, representatives, affiliates, predecessors, successors and assigns.  For purposes of this section, a disparaging statement is any communication which, if publicized, would cause or tend to cause the recipient of the communication to question the business operations, integrity, reputation, competence and/or good character of the party to whom the communication relates.  It is expressly understood and agreed that any breach or threatened breach of the obligations set forth in this Section 3.1 shall constitute a material breach of the Agreement for which monetary damages shall be an inadequate remedy, thus entitling RUSVM to injunctive relief enjoining such conduct.

## ARTICLE IV.

### Miscellaneous

**4.1** **Legal Proceedings** -- In the event any party hereto commences a legal action to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs from the other party, in addition to whatever other relief that such party is awarded in such action.

**4.2** **Entire Agreement** -- This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof.  It supersedes any and all prior

agreements relating thereto. There are no other understandings or agreements between or among the parties with respect to the subject matter hereof except as set forth herein.

        **4.3**     <u>**No Oral Modification**</u> -- No condition or provision of the Agreement may be modified, waived or revised in any way except in a writing executed by the parties and referring specifically to this Agreement.

        **4.4**     <u>**Binding Effect**</u> -- This Agreement and all rights and duties set forth herein shall be binding upon and inure to the benefit of the parties hereto, as well as their respective successors and assigns.

        **4.5**     <u>**Governing Law**</u> -- This Agreement and its interpretation and performance shall be governed by the laws of the State of New Jersey, without giving effect to the conflict of law rules of that State.

        **4.6**     <u>**Venue**</u> -- Any action arising in any way out of the terms of this Settlement Agreement shall be brought in the Superior Court of the State of New Jersey for Middlesex County or the United States District Court for the District of New Jersey and the parties hereby consent to the jurisdiction of either court for purpose of any such action.

        **4.7**     <u>**Partial Invalidity**</u> -- In the event any provision of this Agreement is held to be contrary to or invalid under the laws of any country, state, municipality or other jurisdiction, such illegality or invalidity shall not affect in any way any of the other provisions hereof, all of which shall continue in full force and effect.

        **4.8**     <u>**Captions**</u> -- The captions set forth in this Agreement are intended solely for the parties' convenience and ease of reference and are not intended to modify, limit, describe or affect in any way the scope, content or intent of this Agreement.

**4.9**     __Signatures__ -- This Agreement may be executed simultaneously or in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.  The parties agree that signatures by facsimile or PDF shall be deemed original signatures.

**4.10**     __Authorization__ -- RUSVM hereby represents that its representative identified below is fully authorized to execute this Agreement on its behalf.

**4.11**     __Investigations__ -- The parties hereto acknowledge and agree that they have entered into this Agreement and have executed it without duress or coercion, and have done so with the full advice of counsel.  Each party further acknowledges and agrees that no other party has made any representations, warranties, promises, or agreements not set forth herein and no party relies in any way on any representation, warranty, statement of fact or opinion, understanding, disclosure or non-disclosure not set forth herein in entering into this Agreement and executing it, and that no party has been induced in any way, except for the consideration, representations, warranties, statements and covenants recited herein, to enter into this Agreement.

**4.12**     __Construction and Enforcement__ -- The terms of this Agreement are the product of negotiations between the parties through their respective counsel, if any, and the parties agree that those terms shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

**4.13**     __No Waiver__ -- The failure of any party to this Agreement to exercise and/or delay in exercising any power or right hereunder shall not operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise of any other power or right hereunder.  Further, the waiver by any party to this

Agreement of any right or remedy hereunder on any occasion shall not be construed as a waiver of any such right or remedy on any future occasion.

       4.14    **No Admissions** -- This Agreement shall not be taken or used, or be deemed admissible, as evidence in any action or proceeding except to enforce the terms of this Agreement.

       4.15    **Notices** -- All notices, requests, demands or other communications required or contemplated hereunder or relating hereto shall be in writing and forwarded by hand delivery, overnight delivery and/or regular mail as follows:

     (a)    **If to RUSVM:**

        Dr. David J. DeYoung
        Dean
        Ross University School of Veterinary Medicine
        P.O. Box 334
        Basseterre, St. Kitts, West Indies

        with a copy to:

        Gregory S. Davis, Esq.
        DeVry Inc.
        3005 Highland Parkway
        Downers Grove, Illinois 60515-5799

     (b)    **If to Greene:**

        Michael Gary Greene
        245 Atlantic Avenue, Apt. 117
        Long Branch, New Jersey 07740

       4.16    **Confidentiality** -- RUSVM and Greene shall treat the existence and contents of this Agreement, as well as the substance of the negotiations relating thereto, as being strictly confidential.  The parties represent that to date they have not disclosed and agree that hereinafter they shall not disclose the existence or contents of this Agreement to any third party other than their respective attorneys, auditors, tax advisors, insurers or immediate family

members, existing or prospective, on a strictly as-needed basis, or pursuant to a court order or

other valid legal process.  Further, no party, either by act or omission, shall knowingly permit the

disclosure of same to any third party.  In the event that a formal request is made to any party to

compel the dissemination of information regarding the existence of this Agreement, or the terms

and conditions of same, said party shall promptly notify the other party of such request so as to

afford the other party the ability (but not the obligation) to object and oppose the dissemination

of such information.  Any knowing and intentional violation of this confidentiality provision

shall constitute a material breach of this Agreement.

        **4.17**   **No Assignment** -- RUSVM and Greene represent and warrant that they

have not assigned or transferred and shall not assign or transfer any interest in the matters

released herein to any person or entity not a party to this Agreement.

        IN WITNESS HEREOF, the parties have signed this Agreement as of the dates

set forth below.


ROSS UNIVERSITY SCHOOL OF VETERINARY MEDICINE

By: _____
       Dr. David J. DeYoung                Date:  July    , 2010
       Dean



                                                  Date:  July    , 2010
_____
       Michael Gary Greene

# EXHIBIT-23

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE,

        Plaintiff,

v.                                     Case No. 10-10978
                                     Honorable Patrick J. Duggan

STEVEN L. WOODWARD,

        Defendant.
_____/

**OPINION AND ORDER DENYING PLAINTIFF'S RENEWED MOTION FOR A
PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION FOR
SANCTIONS AND TO DISMISS**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on  December 16, 2010 .

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
                    U.S. DISTRICT COURT JUDGE

On March 11, 2010, Plaintiff American University of Antigua College of Medicine

("AUA") filed this lawsuit against Defendant Steven L. Woodward ("Woodward"),

seeking to shut down Woodward's internet website with the domain name www.aua-

med.com.  Presently before the Court are the following motions: (1) AUA's Renewed

Motion for a Preliminary Injunction, filed November 1, 2010 (Doc. 45); and (2)

Woodward's Motion for Sanctions and Motion for Dismissal, filed November 8, 2010

(Doc. 51).  Responses have been filed to both motions and, on December 13, 2010, this

Court informed the parties that it is dispensing with oral argument with respect to the

motions pursuant to Eastern District of Michigan Local Rule 7.1(f).  For the reasons that follow, the Court denies the motions.

**Factual and Procedural Background**

AUA is a medical school located in Antigua which caters, in part, to students from the United States.  AUA maintains a website with the domain name: www.auamed.org.  Woodward is a former student of the medical school who was discharged without completion of his degree.  Woodward filed a lawsuit against AUA and others regarding his discharge, but was unsuccessful.  He started the aua-med.com website apparently to express his dissatisfaction with AUA and his belief that AUA engages in various forms of wrongful conduct and misrepresents the safety of the island on which it is located and its students' passage rates on the United States Medical Licensing Examination.

Contending that Woodward's website threatens injury to its reputation, AUA filed the instant lawsuit on March 11, 2010, alleging that Woodward's maintenance of the website and statements contained on the website violate federal and state law.  Specifically, AUA alleges: (I) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1); (II) infringement under the Anticybersquatting Consumer Protection Act of 1999 ("ACPA"),15 U.S.C. § 1125(d); (III) a violation of the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g; and (IV) defamation in violation of Michigan law.

On April 15, 2010, AUA filed a motion for preliminary injunction.  Woodward previously informed the Court that he would be departing the country on April 20, 2010,

2

due to an employment opportunity.  Therefore, the Court scheduled a hearing on AUA's motion before Woodward left.  Woodward and counsel for AUA appeared at the preliminary injunction motion hearing on April 19, 2010.

At the motion hearing, the Court began by discussing with AUA's counsel the merits of AUA's claims against Woodward, expressing some doubt as to the likelihood of AUA's success at least with respect to its claims under the Lanham Act, ACPA, and Family Educations Rights and Privacy Act of 1974.  (Doc. 19 at 1-22.)  The Court then engaged in a discussion with AUA's counsel and Woodward concerning the alleged defamatory statements on Woodward's website.  Discerning that it would be impossible in the time allowed to analyze the truth or falsehood of the various statements on the site, the Court suggested to Woodward the possibility of taking down his website until he returned to the country and could litigate this case.

Eventually, an agreement on the record was reached where Woodward agreed to modify his website to reflect on the main page that it is "under maintenance" or "under construction" and to rename the index file to prevent anyone from automatically going into the directory and bringing up its contents.  (*Id*. at 51-56, 59.)  Woodward also agreed to mark videos he posted on YouTube as "private" so they would not be accessible to anyone but himself.  (*Id*. at 59.)  Based on Woodward's representations of what he would do, the Court found it unnecessary to enter a preliminary injunction.  (*Id*. at 60.)

According to AUA, in mid-July 2010, after returning to the country, Woodward

republished the contents of his website without first seeking and obtaining leave of the Court. AUA therefore filed the renewed motion for preliminary injunction that currently is pending. Contending that it is likely to succeed on the merits of its defamation claim, AUA asks the Court to enjoin Woodward from the following: (1) "[f]rom all further publication under the internet domain name 'www.aua-med.com'"; (2) "[f]rom the unlicensed publication, in any manner, of AUA student academic records (other than his own)"; and (3) "[f]rom publication of all other contents presently disseminated through his websites www.aua-med.com and www.aua-vet.com including associated YouTube videos by any other means or medium." (Doc. 45 at 3.)

In his motion for sanctions and dismissal, Woodward claims that AUA has removed content from its website and appears to be arguing that this inhibits his ability to defend against AUA's claims. Specifically, Woodward asserts that AUA removed information that he would have shown to be false. Woodward asks the Court to impose sanctions against AUA for this conduct, including dismissing its action against him.

### Discussion

A court must balance four factors to determine whether to issue a preliminary injunction: (1) whether the movant has a substantial likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without an injunction; (3) whether issuance of an injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Hamilton Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (citation omitted). As suggested

4

previously, AUA relies on the success of its defamation claim to support its present request for a preliminary injunction. Even assuming that AUA could demonstrate a likelihood of success with respect to this claim and that other factors favor AUA, the issuance of an injunction– at least prior to a full adjudication of the merits– is a wholly inappropriate form of relief.

A fundamental principle emerging from the Supreme Court's decisions interpreting the First Amendment is that governmental units and courts may not impose a prior restraint on speech. *See Near v. Minnesota ex rel Olson*, 283 U.S. 697, 713-14, 51 S. Ct. 625 (1931) (". . . prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."); *see also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 560, 96 S. Ct. 2791, 2803 (1976); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418-19, 91 S. Ct. 1575, 1577-78 (1971) ("[C]ourts do not concern themselves with the truth or validity of the publication. Under *Near* . . . the injunction, so far as it imposes prior restraint on speech and publication constitutes an impermissible restraint on First Amendment rights.") "Temporary restraining orders and permanent injunctions– *i.e.*, court orders that actually forbid speech activities– are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993) (citation omitted). In *Near*, the Court invalidated a court order that perpetually enjoined the named party, who had published a newspaper containing articles found to violate a state nuisance statute, from producing any future "malicious, scandalous or defamatory" publication. 283 U.S. at 706, 51 S. Ct. at 627.

5

In addition to the First Amendment's "heavy presumption" against prior restraints, *see New York Times Co. v. Sullivan*, 403 U.S. 713, 714, 91 S. Ct. 2140, 2141 (1971), "courts have long held that equity will not enjoin a libel." *Metro. Opera Ass'n v. Local 100, Hotel Employees and Rest. Emp. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) (citing cases); *see also Kramer v. Thompson*, 947 F.2d 666, 677-78 (3d Cir. 1991) (following "nearly two centuries of widespread acceptance at common law" to conclude that equity will not enjoin a defamation). "'The usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.'" *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1206 (6th Cir. 1990) (Guy, J., majority opinion, controlling except as to injunctive relief for defamatory speech) (quoting *Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir.1987)).

The Court acknowledges that some courts have permitted an exception to this long-standing, traditional rule. In fact, a majority of the court in *Lothschuetz* granted "a narrow and limited injunction" as an exception to this rule, prohibiting the defendant "from continuing and reiterating the same libelous and defamatory charges" found to be false and libelous. 898 F.2d at 1208-09 (Wellford, J., for the court, concurring in part, dissenting in part.) The court made it clear, however, that such an injunction only should be permitted for statements found by the trier of fact to be false and libelous. *Id*. at 1209. Where this "modern rule" has been followed, there has been a full adjudication of the merits before an injunction has issued and the judge or jury has made a final determination that the statements to be enjoined are false and libelous. *See, e.g., Lassiter*

6

*v. Lassiter*, 456 F. Supp. 2d 876, 884 (E.D. Ky. 2006); *Kramer*, 947 F.2d at 676-77 (summarizing cases applying the modern rule but concluding that the Pennsylvania Supreme Court would adhere to the traditional rule).

At this stage of the proceedings, there has been no final determination that any statements on Woodward's website are false and defamatory. Precedent therefore instructs that it would be inappropriate to grant AUA's request for an injunction restraining Woodward's speech and website publications. Moreover, the Court notes that even if an injunction ultimately is entered in this case, it must "be clearly and narrowly drawn so as not to prohibit protected expression."[1] *See Lassiter*, 456 F. Supp. 2d at 884. The injunctive relief AUA requests in its motion reaches far beyond the statements on Woodward's website alleged to be false and defamatory and seeks to suppress *in toto* Woodward's lawful exercise of his First Amendment rights via the internet.

With respect to Woodward's motion for sanctions and motion to dismiss, the same constitutional concerns that foreclose the Court's restraint on Woodward's speech on his website apply to Woodward's request for sanctions based on AUA's modification of the contents of its website. Moreover, Woodward fails to identify a basis for finding AUA's conduct sanctionable. Furthermore, it is unclear what relevance the alleged false

---

[1]This is not to suggest that this Court would follow the modern rule and grant AUA an injunction following a final adjudication of its defamation claim. Notably, the Sixth Circuit was applying District of Columbia and not Michigan law in *Lothscheutz* in granting injunctive relief. Furthermore, the Court finds a number of strong arguments for *not* following the modern rule. *See, e.g.,* Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 Syracuse L. Rev. 157 (2007).

7

statements *on AUA's website* have to the issues in this case.  Finally, to the extent they are relevant, Woodward is aware of what those statements were, appears to possess evidence showing what statements AUA previously made, and therefore can inform the Court and/or trier of fact of the same.

Accordingly,

**IT IS ORDERED**, that Plaintiff's Renewed Motion for a Preliminary Injunction (Doc. 45) is **DENIED**;

**IT IS FURTHER ORDERED**, that Defendant's Motion for Sanctions and to Dismiss (Doc. 51) is **DENIED**.

<u>s/PATRICK J. DUGGAN</u>
UNITED STATES DISTRICT JUDGE

Copies to:
Eric A. Buikema, Esq.

Steven Woodward
7211 Brittwood Lane
Flint, MI   48507

8

# EXHIBIT-24

| _**Taubman Company v. Webfeats**_, 319 F.3d 770 (6th Cir. 2003) | AUA Vs. Steven Woodward (Exhibit-23) | LEVINSON AXELROD Vs. Edward HEYBURN | Ross Vs. Behzad Amini |
|---|---|---|---|
| **6th Cir. 2003** | **Federal Judge Patrick Duggan** | **Federal Judge Ann Thompson** | **Federal Judge Ann Thompson** |
| **§ 1114(1) § 1125(a)(c)(d)** | **§ 1114(1) § 1125(a)(c)(d)** | **§ 1114(1) § 1125(a)(c)(d)** | **§ 1114(1) § 1125(a)(c)(d)** |
| Multiple Domains | Multiple Domains | Multiple Domains | Multiple Domains |
| Disgruntled Customer | Disgruntled Medical Student | Competitor: Both lawyers | Disgruntled Medical Student |
| professional critiques | professional critiques | Mix of professional critiques and personal insults | professional critiques |
| Non-commercial | Non-commercial | Commercial | Non-commercial |
| Overturned | Denied | Granted | Pending |